## CARROLLTON–FARMERS BRANCH INDEPENDENT SCHOOL DISTRICT, et al., Appellants,

v.

## EDGEWOOD INDEPENDENT SCHOOL DISTRICT and Alvarado Independent School District, et al., Appellees.

### No. D–1469, et al.[1]

Supreme Court of Texas.

Jan. 30, 1992.

---

**1.** This proceeding consists of five direct appeals from judgments in three district courts. We noted probable jurisdiction over these appeals and, because all of them involve similar contentions, consolidated them for argument and decision. 35 Tex.Sup.Ct.J. 10 (October 9, 1991). Three of the five consolidated cases are appeals from the judgment rendered August 27, 1991, and made final after severance in *Edgewood Indep. Sch. Dist., et al. v. Meno,* No. 362,516–A in the 250th District Court in Travis County,

Texas: Cause No. D–1469, *Carrollton–Farmers Branch Indep. Sch. Dist., et al. v. Edgewood Indep. Sch. Dist., et al.,* Cause No. D–1477, *Andrews Indep. Sch. Dist., et al. v. Edgewood Indep. Sch. Dist., et al.,* and Cause No. D–1560, *Highland Park Indep. Sch. Dist., et al. v. Edgewood Indep. Sch. Dist., et al.;* Cause No. D–1493, *McCarty, et al. v. County Education Dist. No. 21, et al.,* is an appeal from the judgment rendered September 4, 1991, in Cause No. 2962 in the

18th District Court in Somervell County, Texas. Cause No. D–1544, *Eliodoro Reyes, et al. v. Mitchell County Education Dist., et al.,* is an appeal from the judgment rendered September 5, 1991, in Cause No. 12,195 in the 32nd District Court in Mitchell County, Texas.

Michael L. Atchley, Earl Luna, Robert E. Luna, Dallas, for appellants in No. C–1469.

Richard E. Gray, III, David R. Richards, Crillion Payne, Austin, Albert H. Kauffman, San Antonio, Toni Hunter, Kevin T. O'Hanlon, Austin, for appellees in No. C–1469.

R. James George, Jr., Austin, Schuyler B. Marshall, Dallas, Thomas I. Davies, Richard L. Arnett, Austin, Roger Rice, Sommerville, Mass., Truman Dean, Jr., Houston, Martha P. Owen, Austin, E. Ray Hutchinson, Dallas, Mark S. Partin, Toni Hunter, Austin, Albert H. Kauffman, San Antonio, Lonnie Hollingsworth, Jr., Kevin T. O'Hanlon, Austin, for appellants in No. C–1477.

David R. Richards, Crillion Payne, Austin, Jane Politz Brandt, Dallas, Hugh Lowe, Peter D. Kennedy, Austin, John H. Martin,

Deborah G. Hankinson, Dallas, for appellees in No. C–1477.

Schuyler B. Marshall, Deborah G. Hankinson, John H. Martin, G. Luke Ashley, Dallas, for appellants in No. C–1560.

Jerry R. Hoodenpyle, Arlington, E. Ray Hutchinson, Dallas, Richard E. Gray, III, Crillion Payne, David R. Richards, Richard L. Arnett, Martha P. Owen, Austin, Albert H. Kauffman, San Antonio, Lonnie Hollingsworth, Jr., Kevin T. O'Hanlon, Toni Hunter, Austin, for appellees in No. C–1560.

Hugh Lowe, Peter D. Kennedy, R. James George, Jr., Thomas I. Davies, Austin, for appellants in No. C–1493 and No. C–1544.

David B. Owen, A. Bruce Wilson, Fort Worth, for appellees in No. C–1493.

Stephen H. Suttle, David L. Buhrmann, Abilene, for appellees in No. C–1544.

## OPINION ON DIRECT APPEAL

GONZALEZ, Justice.

We are again called upon to determine whether the state public school finance system violates the Texas Constitution. Article VII, section 1 of the Texas Constitution gives the Legislature the duty "to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." We have twice recently held that the state public school system, because of the way in which it is financed, is not "efficient" as required by this provision of the Constitution. *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 398 (Tex.1989) [*"Edgewood I"*], 804 S.W.2d 491, 498 (Tex.1991) [*"Edgewood II"*]. To try to cure the system's constitutional infirmity, the Seventy–Second Legislature enacted Senate Bill 351, as amended by House Bill 2885 ("Senate Bill 351"),[2] making various changes in the school finance scheme. At issue before us now is whether the method prescribed by this statute violates other provisions of the Texas Constitution.

---

**2.** Act of April 11, 1991, 72nd Leg., R.S., ch. 20, 1991 Tex.Gen.Laws 381, *amended by* Act of May 27, 1991, 72nd Leg., R.S., ch. 391, 1991 Tex.Gen. Laws 1475.

Appellants, composed of numerous school districts and individual citizens, challenge the constitutionality of the school finance system devised by Senate Bill 351 on three grounds: (1) that it levies a state ad valorem tax in violation of article VIII, section 1–e; (2) that it levies an ad valorem tax without approval of the voters in violation of article VII, section 3; and (3) that it creates county education districts ("CEDs") in violation of article VII, section 3 and article III, sections 56 and 64(a). Appellees include the State of Texas, certain CEDs created by Senate Bill 351, and other interested school districts and individual citizens.[3] In this proceeding, all appellees are aligned with the State in defending Senate Bill 351 against the challenges by appellants.

We are fully aware of the gravity of the issues raised by the present appeals and the singular importance of this litigation to the people of Texas. In *Edgewood I*, we stated:

> [W]e have not been unmindful of the magnitude of the principles involved, and the respect due to the popular branch of the government.... Fortunately, however, for the people, the function of the judiciary in deciding constitutional questions is not one which it is at liberty to decline.... [We] cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution; [we] cannot pass it by because it is doubtful; with whatever doubt, with whatever difficulties a case may be attended, [we] must decide it, when it arises in judgment.

777 S.W.2d at 394, *citing Morton v. Gordon*, Dallam 396, 397–398 (Tex.1841). In *Edgewood II*, we stated:

> We do not undertake lightly to strike down an act of the Legislature. We are mindful of the very serious practical and

historical difficulties which attend the Legislature in devising an efficient system [of public schools], and we recognize the efforts of the legislative and executive departments to achieve this goal. 804 S.W.2d at 498.

The appellants must bear the burden of demonstrating that Senate Bill 351 is unconstitutional, because we presume state statutes to be constitutional. *E.g., Vinson v. Burgess*, 773 S.W.2d 263, 266 (Tex.1989); *Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 558 (Tex.1985), *appeal dism'd*, 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986). After careful consideration of the constitutional principles in issue, we sustain two of the appellants' challenges to Senate Bill 351. First, we hold that Senate Bill 351 levies a state ad valorem tax in violation of article VIII, section 1–e; and second, we hold that the Bill levies an ad valorem tax without an election in violation of article VII, section 3 of the Texas Constitution.

Appellees argue that in *Edgewood II* we in effect pre-approved the constitutionality of the finance structures later adopted in Senate Bill 351 and now under attack. Their argument, as we shall show, is disproved both by the text of *Edgewood II* and by the doubts raised before the Legislature concerning the validity of Senate Bill 351. We do not suggest that the Legislature has failed to act in good faith; we hold only that it has failed to enact a constitutional school finance system.

Our holding in this case does not conflict with our previous decisions in *Edgewood I* and *Edgewood II*, and we in no way withdraw from those opinions. None of the parties to this proceeding has urged us to reconsider our decisions in *Edgewood I* and *Edgewood II*, and we have not done so. We reaffirm our earlier holdings that un-

---

**3.** Some of these school districts and individuals are the same parties who successfully contended in *Edgewood I* and *Edgewood II* that the school finance system violated article VII, section 1. In proceedings which remain pending in the district court, these parties persist in their claims that the school finance system fails to meet the constitutional standard of efficiency, even following the enactment of Senate Bill 351.

They also contend, in the district court, that Senate Bill 351 violates the Voting Rights Act of 1965, 42 U.S.C. §§ 1973–1973bb–1 (1981 & Supp.1991) and violates the mandate of article VIII, section 18(a) of the Constitution that taxation be equal and uniform. None of these issues are before us in the present appeals, and we intimate no view on any of them.

constitutional inefficiency in the public school system must be eliminated without delay. Yet we cannot brush aside the serious constitutional infirmities that affect Senate Bill 351 in the interest of expediting necessary changes in public school finance. It is not clear that upholding Senate Bill 351 would advance this goal. The appellee school districts and private citizens do not concede that Senate Bill 351 satisfies the constitutional standard of efficiency set out in our earlier opinions; but that issue is not now before us. This case broaches other constitutional standards which must be applied as scrupulously as we previously applied the standard of efficiency to the provision of public education.

We recognize "the vital role of education in a free society." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 30, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1972). We acknowledge "that 'education is perhaps the most important function of state and local governments.'" *Id.* at 29, 93 S.Ct. at 1295; *Brown v. Board of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Article VII, section 1 of the Texas Constitution enunciates these same principles:

> A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.

The dissent implies that the Court's commitment to more equal educational opportunity has waned. The Court's commitment is to the Constitution, to each and every one of its provisions, and in that commitment we remain steadfast.

## I

Although we have reviewed the nature and history of our school finance system in *Edgewood I* and *Edgewood II*, an understanding of these matters is so important to the proper assessment of the legal issues before us that we revisit the subject here. The history of Texas school finance has been one of a " 'rough accommodation' of interests in an effort to arrive at practical and workable solutions." *Rodriguez*, 411 U.S. at 55, 93 S.Ct. at 1308 (citations omitted). Texas has steadily progressed from a time when local ad valorem taxes for public education were seen as a supplement to state funding, to the point that local ad valorem taxes now are expected to provide most of the basic needs of education.[4] From 1906 to 1989, the portion of total state school funding contributed by local tax revenue increased from 24 percent to 53 percent. Billy D. Walker, *The District Court and Edgewood III: Promethean Interpretation or Procrustean Bed?* 21–22 (Oct. 23, 1991) (unpublished monograph, on file with record). Differences in the wealth in local tax bases created great disparities in the amount of revenue which varying locales could generate with the same tax effort, despite regular legislative adjustments to the system. In *Edgewood I* and *Edgewood II* we determined that these disparities are indicative of an inefficient system. It is within this historical context that the Legislature passed Senate Bill 351.

When our present Constitution was adopted in 1876, it provided for the meting out of state education funds on a per-student basis.[5] TEX. CONST. art. VII, § 5. In 1883, the Constitution was amended so that local taxes could augment the required funding for education. The amendment allowed the Legislature to create local school districts and to authorize them to levy a tax within certain limits. TEX. CONST. art. VII, § 3 (1876, as amended 1883).

School districts, and the tax revenue each could contribute to education, did not devel-

---

**4.** Some funds for education are provided by the federal government, but they are a relatively small portion of the total funds spent. We do not include federal funds in our discussion.

**5.** Funds were administered through the Available School Fund. TEX. CONST. art. VII, § 5. The per capita distribution continues to this day, although it is absorbed into the Foundation Fund Program, and contributes a relatively small portion of school funds, about $300 per student annually. *Edgewood II*, 804 S.W.2d at 495 n. 10.

op at the same rate. By 1915, disparities in local tax resources had grown to the point that the Legislature made a special appropriation of equalization aid for rural school districts that were already taxing at the maximum legal rate. Act of May 26, 1915, 34th Leg., 1st C.S., ch. 10, 1915 Tex.Gen. Laws 22; *see generally* William P. Hobby & Billy D. Walker, *Legislative Reform of the Texas Public School Finance System, 1973–1991*, 28 HARV.J.LEG. 379, 380 (1991). This Court upheld rural equalization aid as being an appropriate means for the Legislature to discharge its duty to make "suitable provision for the support and maintenance of an efficient system of public free schools." *Mumme v. Marrs*, 120 Tex. 383, 40 S.W.2d 31, 36 (1931), *quoting* TEX. CONST. art. VII, § 1. The Court identified the very problem that persists to this day:

> The inequality of educational opportunities in the main arises from natural conditions.... The type of school which any community can have must depend upon the population of the community, the productivity of its soil, and generally its taxable wealth.

*Mumme*, 40 S.W.2d at 36.

The disparity of the wealth among local tax bases only increased as Texas moved towards an increasingly industrialized economy.

> Sizable differences in the value of assessable property between local school districts became increasingly evident as the State became more industrialized and as rural-to-urban population shifts became more pronounced. The location of commercial and industrial property began to play a significant role in determining the amount of tax resources available to each school district. These growing disparities in population and taxable property between districts were responsible in part for increasingly notable differences in levels of local expenditure for education.

*Rodriguez*, 411 U.S. at 8, 93 S.Ct. at 1283. As we observed in *Edgewood I:*

If our state's population had grown at the same rate in each district and if the taxable wealth in each district had also grown at the same rate, efficiency could probably have been maintained within the structure of the present system. That did not happen. Wealth, in its many forms, has not appeared with geographic symmetry. The economic development of the state has not been uniform. Some cities have grown dramatically, while their sister communities have remained static or have shrunk. Formulas that once fit have been knocked askew.

777 S.W.2d at 396. Limited resources were further strained by the creation of a large number of small, uneconomic school districts. In 1936, for example, 5938 of the 6953 school districts contained an average of 65 students each. Hobby & Walker, *supra*, 28 HARV.J.LEG. at 381, *citing* STATE BOARD OF EDUCATION, REPORT OF THE RESULTS OF THE TEXAS STATEWIDE SCHOOL ADEQUACY SURVEY 11 (1938). Although the total number of school districts has now declined to between 1000 and 1100, the crazy-quilt pattern of small school districts remains a significant feature of the Texas public education system. *Edgewood II*, 804 S.W.2d at 497.

Public school finance was comprehensively overhauled in 1949 by the enactment of the Gilmer–Aikin Bills.[6] These statutes created the Minimum Foundation Program as the basic vehicle for allocating school funds and envisioned a guaranteed minimum amount of resources per student, with roughly 80 percent of the funds for the program to come from the State and only 20 percent to come from local tax bases. The exact amount of funds each district would receive from the State was dependent on a formula designed to measure each county's ability to contribute towards the share of the program for the school districts within its boundaries, or its "local fund assignment." The local fund assignment was deducted from the guaran-

---

6. Act of June 1, 1949, 51st Leg., R.S., ch. 334, 1949 Tex.Gen.Laws 625; Act of April 28, 1949, 51st Leg., R.S., ch. 335, 1949 Tex.Gen.Laws 647.

teed allotment, and the State made up the difference. No district was required to raise any revenue; each district would receive its share of state funds as determined by the formula, regardless of whether the district actually raised its portion of the local fund assignment. Once a district met its local fund assignment obligation, it was free to add additional funds to enrich its educational programs. Hobby & Walker, *supra*, 28 HARV.J.LEG. at 382. Support of schools by local taxes was thus encouraged but not mandated.

By the 1960's, the Legislature had amended the Gilmer–Aikin Bills to include a number of adjustments to their economic index formulae. The amendments encouraged the development of improved and special educational programs through matching funds. The property-rich school districts were more capable of implementing these special programs, and thus they generally took advantage of the newly earmarked state funds. This aspect of the Foundation School Program unfortunately undermined the Program's original aim of equalizing educational opportunities. Patricia A. Fry, Comment, *Texas School Finance: The Incompatibility of Property Taxation & Quality Education*, 56 TEX. L.REV. 253, 256 (1978), *citing* REPORT OF THE JOINT SENATE INTERIM COMM. TO STUDY PUBLIC SCHOOL FINANCE at II–8 to II–9 (1973). This led a federal district court to observe in 1971 that the system of state "equalizing" actually benefited wealthier school districts more than the poorer districts, because only the wealthier districts could afford the programs which would generate state matching funds. *Rodriguez v. San Antonio Indep. Sch. Dist.*, 337 F.Supp. 280, 282, 285 (W.D.Tex.1971), *rev'd*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Because of these disparities, that court held that the Texas system of public school funding violated equal protection guarantees of the United States Constitution. 337 F.Supp. at 285.

The United States Supreme Court reversed, holding that the statutory plan bore at least a rational relationship to furthering state goals of guaranteeing a minimum level of educational opportunity and at the same time encouraging local control. *Rodriguez*, 411 U.S. at 55, 93 S.Ct. at 1308. In reaching its decision, the Court did not pronounce the patient well:

> We hardly need add that this Court's action today is not to be viewed as placing its judicial imprimatur on the status quo. The need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax.... But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them.

*Id.* at 58–59, 93 S.Ct. at 1309–10.

In the wake of *Rodriguez*, the Legislature renamed the Minimum Foundation Program the Foundation School Program, reformed the economic index formulae, and based the local fund assignment directly on the wealth within a school district rather than the county. Act of June 1, 1975, 64th Leg., R.S., ch. 334, 1975 Tex.Gen.Laws 877–899; HOUSE RESEARCH ORGANIZATION, SPECIAL LEGISLATIVE REPORT, NO. 157, AN INTRODUCTION TO SCHOOL FINANCE at 4 (Feb. 23, 1990) [hereinafter SPECIAL LEGISLATIVE REPORT]. The 1975 legislation created a second tier of financing, called State Equalization Aid, the purpose of which was to direct more state money to the poorer systems through the foundation program. 1975 Tex.Gen.Laws, *supra*, at 894. The stated policy was:

> that each student enrolled in the public school system shall have access to programs and services that are appropriate to his educational needs and that are substantially equal to those available to any similar student, notwithstanding varying local economic factors.

*Id.* at 877–78. The State, however, did not fully supply its own share of the funding necessary to meet this goal. Fry, *supra*, 56 TEX.L.REV. at 257 & n. 27.

In 1977, the Education Code was amended again. Act of July 15, 1977, 65th Leg., 1st C.S., ch. 1, 1977 Tex.Gen.Laws 11. This time the Legislature lowered the local fund assignment which school districts were encouraged to contribute and adjusted the

second tier of state funding directed to poorer districts. SPECIAL LEGISLATIVE REPORT, *supra*, at 4. The statute expressly provided that a qualified school district need not contribute its total local share of revenue to participate in the Foundation School Program and receive state funds. 1977 Tex.Gen.Laws, *supra*, at 26.

In 1979, the Legislature established county appraisal districts to afford more uniform local appraisal methods and increased state funds for education. Act of May 26, 1979, 66th Leg., R.S., ch. 841, 1979 Tex.Gen.Laws 2221, 2224; Act of May 28, 1979, 66th Leg., R.S., ch. 602, 1979 Tex. Gen.Laws 1300, 1318; SPECIAL LEGISLATIVE REPORT, *supra*, at 4. Legislation in 1984, House Bill 72, made further adjustments in the formula, including refinements to the basic allotment, equalization aid, and the local fund assignment. Act of June 30, 1984, 68th Leg., 2nd C.S., ch. 28, 1984 Tex. Gen.Laws 117. In 1989, the Legislature changed significantly the qualifications for participation in the state system of school finance. For the first time the Legislature required that a local district raise the full amount of its local share before it could qualify for state aid from the program fund. Act of May 29, 1989, 71st Leg., R.S., ch. 816, 1989 Tex.Gen.Laws 3732, 3742.

Despite the periodic adjustments to the system, when *Edgewood I* was brought forward on appeal, the ratio of taxable property in the wealthiest district to that in the poorest school district was 700 to 1, which resulted in a range in per-student spending of $2,112 to $19,333. In *Edgewood I*, we held that the existing system of public school finance, which relied so heavily upon an ad valorem tax in local districts, failed to provide for an "efficient" system for the "essential" purpose of a "general diffusion of knowledge" in violation of article VII, section 1 of the Texas Constitution. *Edgewood I*, 777 S.W.2d at 398. The inefficiency was this gross disparity both in tax burden and in tax spending. To put it graphically, in some areas of the state, education resembled a motorcycle with a 1000-gallon fuel tank, and in other areas it

resembled a tractor-trailer rig fueled out of a gallon bucket. Some vehicles were flooded, some purred along nicely, and some were always out of gas. A fleet of such vehicles is not efficient, even though a few of them may reach their destination. We did not hold that efficiency requires absolute equality in spending; rather, we said that citizens who were willing to shoulder similar tax burdens, should have similar access to revenues for education. Specifically, we said:

> There must be a direct and close correlation between a district's tax effort and the educational resources available to it; in other words, districts must have substantially equal access to similar revenues per pupil at similar levels of tax effort. Children who live in poor districts and children who live in rich districts must be afforded a substantially equal opportunity to have access to educational funds.

*Id.* at 397.

Following *Edgewood I*, the Legislature enacted Senate Bill 1 as a remedy to the constitutional defects.[7] It codified a goal that equivalent tax effort should produce roughly the same yield regardless of the local property wealth for at least 95 percent of the school districts. It retained, however, the basic system of administration of funds for public education through the Foundation School Program. The Foundation School Program maintained the two levels of financing. The first tier provided the basic allotment per student as adjusted by a number of factors. 1990 Tex.Gen.Laws, 6th C.S., at 2. The second tier guaranteed a yield based on local tax effort. *Id.* at 5. In addition, local districts were entitled to supplement the first and second tiers of financing. *Id.* Senate Bill 1 provided for ongoing study so that state contributions to revenue could be adjusted biennially. *Id.* at 7.

Senate Bill 1 was challenged in *Edgewood II*. We held that it, too, failed to meet the requirements of article VII, section 1. "The fundamental flaw of Senate Bill 1," we said, "lies not in any particular

---

7. Act of June 6, 1990, 71st Leg., 6th C.S., ch. 1, 1990 Tex.Gen.Laws 1.

provisions but in its overall failure to restructure the system." 804 S.W.2d at 496. Specifically, the heavy reliance upon disparate local ad valorem taxes had not changed at all. Senate Bill 1 did not change the boundaries of any of the 1052 school districts then in existence, or the basic funding allocation with more than half of all state education funds coming from local property taxes rather than state revenue. The great disparities in property wealth and spending among the school districts, though somewhat ameliorated, remained, and so did the resulting constitutional infirmities. Reiterating what we had said in *Edgewood I*, we concluded:

> To be efficient, a funding system that is so dependent on local ad valorem property taxes must draw revenue from all property at a substantially similar rate.

*Id.* We ordered the trial court to enforce our mandate in *Edgewood I*, which was stayed until April 1, 1991, to provide the Legislature time to enact new legislation. *Id.* at 499.

The Legislature responded with Senate Bill 351. Senate Bill 351 retains the same historical reliance upon local ad valorem taxes to fund most of the state cost of education. To ameliorate disparities among school districts due to local property wealth, Senate Bill 351 creates 188 county education districts. Most of these CEDs consist of school districts in a single county, although some of them include school districts in more than one county. Tex. Educ.Code § 20.941. CEDs have only tax functions; they perform no educational duties. They employ no teachers, provide no classrooms, and educate no children. CEDs do not even determine their own tax rate. That rate is effectively prescribed by statute. *Id.* at § 16.252(a). The CEDs' sole function is to levy, collect, and distribute property taxes as directed by the Legislature. *Id.* at § 20.942.

The complex provisions of Senate Bill 351 may be summarized as follows. Senate Bill 351 still provides a two-tiered program. The first tier "guarantees sufficient financing for all school districts to provide a basic program of education that meets accreditation and other legal standards." Tex.Educ. Code § 16.002(b). To this end, the statute entitles each district to a basic allotment for each student, which increases from $2200 for the 1991–1992 school year to $2800 for the 1994–1995 school year. *Id.* at § 16.101. This basic allotment, in addition, is subject to adjustment, *e.g.*, for the district's local "cost of education," and supplementation by "special allotments" for matters ranging from special education to "technology funds." *Id.* at §§ 16.102–.104 (cost of education, small districts, and sparsity); §§ 16.151–.160 (special, compensatory, vocational, and bilingual education students; gifted and talented students; transportation costs; career ladder supplements; technology funds).[8] Each district is guaranteed these basic and special allotments.

Senate Bill 351, however, mandates that each CED shall raise for this first tier an assigned "local share," defined as the product of a specified tax rate and the taxable value of property within the CED.[9] The tax rate per hundred dollars of valuation is set for each school year: $0.72 for 1991–92, $0.82 for 1992–1993, $0.92 for 1993–1994, and $1.00 thereafter. Tex.Educ.Code § 16.-252; *see also Id.* at § 11.86 ("Determination of School District Property Values"). Senate Bill 351 also commands that each CED "shall levy" an ad valorem tax at a rate sufficient to collect its assigned local share.[10] *Id.* at § 20.945. The commissioner of education notifies each CED of the amount due each component school district under the statute and sets the schedule for distributions. *Id.* at § 16.501–.502.

---

8. Many of these adjustments were added by House Bill 72, Act of June 30, 1984, 68th Leg., 2nd C.S., ch. 28, 1984 Tex.Gen.Laws 117.

9. The formula is given in the statute as "LFA = TR × DPV". Tex.Educ.Code § 16.252.

10. Before it was amended by House Bill 2885, § 9, *Senate Bill 351*, § 2, actually set the very rate at which CEDs must levy. *See* Act of April 11, 1991, 72nd Leg., R.S., ch. 20, 1991 Tex.Gen. Laws 381, 407, *amended by* Act of May 27, 1991, 72nd Leg., R.S., ch. 391, 1991 Tex.Gen.Laws 1475, 1478 (amending Tex.Educ.Code § 20.945). The change from prescribing the rate itself to prescribing a rate for estimated collections gives CEDs no more leeway in making this determination.

Tier two aspires "to provide all school districts with substantially equal access to funds to provide an enriched program and additional funds for facilities" with the "opportunity" to supplement as they should choose. TEX.EDUC.CODE §§ 16.002, 16.301. In simplified form, the tier two formula guarantees each school district a specified amount per student, ranging from $21.50 for the 1991–1992 school year to $28 for the 1993–1994 school year, for each cent of tax effort over that already assigned to the CED.[11] The State's guarantee, however, extends only to $0.45 of tax effort, and the statute caps a district's "enrichment and facilities tax rate," or "DTR," at $0.45. *Id.* at § 16.303. If a district's local revenue for the 1991–1992 school year, for example, should exceed $21.50 per student for each cent of the district's DTR, the district would get nothing more from the State. What it takes in excess of that amount, however, might be called "local enrichment."

There is a second, independent limit on each school district's tax rate provided in TEX.EDUC.CODE § 20.09. Except to the extent that they are authorized to collect taxes pledged for previously authorized debt, school districts may not tax at a rate exceeding $0.78 for 1991, $0.68 for 1992, $0.58 for 1993, and $0.50 for each subsequent year. *Id.* at § 20.09(a). These annual limits, if combined with the annually increasing CED tax rate, result in a maximum rate of $1.50 per $100 valuation in each tax year. *Id.; see also* § 16.252. The gap between the annually decreasing caps on school district tax rates, set by section 20.09, and the constant cap on each district's "DTR" in tier two, set by section 16.302, steadily decreases from $0.33 to $0.05. The effect of this is to reduce a district's ability to raise unequalized revenue—the so-called "third tier" of school finance.

There is an overall "revenue limit" for local school districts, defined as an amount equal to 110 percent of the state and local funds guaranteed under the Foundation School Program per student to *each* school district taxing at a rate of $0.25 per $100 of taxable value as calculated for the 1994–1995 school year. TEX.EDUC.CODE § 16.009(a). This limit does not appear to be uniform, comprehensive or absolute. That is, it is not a single amount which applies equally to all school districts, nor does it encompass all local revenues, nor does it absolutely bar transgression. Each district evidently has its own revenue limit, annually estimated by and certified to that district by the commissioner of education. *Id.* at § 16.009(b).[12]

Finally, the commissioner of education determines the State's share of the costs of the Foundation School Program—both tiers one and two—by subtracting what the district is due from the CED funds and what the district has collected from state available school funds. He then grants and

---

**11.** The guaranteed yield allotment, or "GYA", is calculated by the following formula:
$$GYA = (GL \times WADA \times DTR \times 100) - LR$$
TEX.EDUC.CODE § 16.302. "GL" is the dollar amount of state and local funds guaranteed for each weighted student for each cent of tax effort, "WADA" is the number of weighted students in average daily attendance, and "DTR" is the district enrichment and facilities tax rate of the school district, determined by dividing the total amount of taxes collected by the school district for the applicable school year by the quotient of the district's taxable value of property as determined under TEX.EDUC.CODE § 11.86, divided by 100. "LR" is the local revenue, determined by multiplying "DTR" by the quotient of the district's taxable value of property divided by 100.

**12.** Before determining whether the total state and local funds per student available to a district exceed this limit, the commissioner subtracts therefrom the total funds per student required for the district's debt service. Revenue collected in excess of the limit evidently triggers no consequences unless the commissioner, in his annual reviews, determines that the aggregate student population in districts exceeding their limits equals or exceeds two percent of the total student population. Then, for the next school year, no school districts—except for those already exceeding their revenue limits—may "levy a tax at a rate that would result in an amount of state and local funds, excluding funds required for debt service," that "exceeds the revenue limit". Districts already exceeding the revenue limit, however, evidently may continue to do so, insofar as they may "maintain" the same amount of revenue. Section 16.009 at (c), (d), and (e).

approves a warrant for the difference. If state appropriations prove insufficient, however, the commissioner will reduce each district's allocation. TEX.EDUC.CODE § 16.254.

Thus, since *Edgewood I,* some aspects of the public school system have been changed, but others have not. The reliance on local ad valorem taxes for more than half of the revenue for education has not changed. However, the manner in which local funds are contributed to the system has changed dramatically. The State has moved from encouraging school districts to contribute local tax revenue, to conditioning state funds on such contribution, to mandating a specified contribution. This has reduced the geographical disparities in the availability of revenue for education. It has accomplished this, however, by requiring the taxpayers in one school district, without a vote of approval, to fund the schools in other districts over which they have no control. These changes present the constitutional issues now raised before us.

## II

■ Article VIII, section 1–e of the Texas Constitution states: "No State ad valorem taxes shall be levied upon any property within this State." Appellants contend that the taxes which the CEDs are required by Senate Bill 351 to levy are state ad valorem taxes prohibited by this provision. We agree.

Senate Bill 351 mandates the tax CEDs levy. No CED may decline to levy the tax. The tax rate for all CEDs is predetermined by Senate Bill 351. No CED can tax at a higher rate or a lower rate under any circumstances. Indeed, the very purpose of the CEDs is to levy a uniform tax statewide. The distribution of the proceeds is set by Senate Bill 351. No CED has any discretion to distribute tax proceeds in any manner except as required by statute. Every function of the CEDs is purely ministerial. *See* Letter from John Hannah, Jr., Texas Secretary of State, to Assistant Attorney General, United States Department of Justice, Voting Section (May 3, 1991). If the State mandates that a tax be levied, sets the rate, and prescribes the distribution of the proceeds, the tax is a state tax, regardless of the instrumentality which the State may choose to use.[13]

Appellees advance several reasons why the tax should not be characterized as a

---

**13.** The dissent asserts that Florida caselaw construing a provision of the Florida Constitution similar to article VIII, section 1–e, supports the contention that the CED tax here is not a state ad valorem tax. That provision, article 7, section 1(a) of the Florida Constitution, states:

No tax shall be levied except in pursuance of law. No state ad valorem taxes shall be levied upon real estate or tangible personal property. All other forms of taxation shall be preempted to the state except as provided by general law.

The Florida cases cited by the dissent do not support its assertion. Unlike Senate Bill 351, none of the Florida cases cited by the dissent involved a statute which mandated the levy of ad valorem taxes, or prescribed the rate of such taxes, or required that they be used for specified purposes. *St. Johns River Water Management District v. Deseret Ranches of Florida, Inc.,* 421 So.2d 1067 (Fla.1982), holds that water districts, expressly authorized by one provision of the Florida Constitution to levy ad valorem taxes, could do so without violating the prohibition against state ad valorem taxes in another provision. In *Sandegren v. Florida ex rel. Sarasota County Pub. Hosp. Bd.,* 397 So.2d 657 (Fla.1981), the court upheld a statute which required local governments to share in the cost of state-mandated mental health services furnished in the local area. In *Board of Pub. Instruction v. State Treasurer of Florida,* 231 So.2d 1 (Fla.1970) (per curiam), the issue was whether county districts, constitutionally authorized to control their own public schools and levy a local ad valorem tax to fund them, could be required by statute to support local junior colleges not under district control. The statute provided that if a county district which had promoted the establishment of a junior college later withdrew its support, the state would withdraw from that district a part of its financial support for the public schools in the district. *Id.* at 3. The Florida Supreme Court upheld the statute, rejecting the argument that the operation of a junior college was purely a state function, and therefore that requiring a county district to use local ad valorem tax revenue to support a junior college amounted to a levy of a state ad valorem tax. *Id.* The court held junior colleges served both local and state purposes.

The Florida statutes at issue in these three cases are clearly distinguishable from Senate Bill 351. The Florida statutes only authorized local water districts to levy taxes as allowed by the state constitution (*St. Johns*), or conditioned state support of local schools upon local support of junior colleges (*Board*), or required local

State ad valorem tax. First, the State points out that while the Legislature has mandated the yield, it is the CED that sets the rate to achieve that yield. A witness in the district court testified that Senate Bill 351 does not mandate a tax rate because a CED is allowed to take into account projected tax delinquencies in arriving at the rate necessary to obtain the CED's share. One district court concluded that because collection rates will vary, the State does not set the rate, and therefore it is not a state tax. As one commentator observes:

> The court's logic is precarious because: (1) the state sets the amount of the local share at a fixed dollar figure, and (2) the CED taxable base is also fixed by the certified tax roll it receives from one or more appraisal districts. The rate, then, is self-calculating (levy divided by tax base). In effect, the state sets a *de facto* rate when it mandates a specific tax levy. The fact that each CED's *collection* rate will vary is a thin distinction to draw between a state-established tax rate and a locally-established tax rate.

Walker, *supra*, at 19 (footnotes omitted). The collection rate is based on objective facts, another fixed number in the formula mandated by the State.

■ Despite this contention that it does not set the CED tax rate, the State concedes, as it surely must, that if the proceeds of the tax levied by the CEDs under Senate Bill 351 were deposited into the state treasury, the tax would be a state tax prohibited by article VIII, section 1–e. But the State argues that because the proceeds are not deposited into the state treasury, the tax is not a state ad valorem tax. The distinction the State attempts to draw is not viable. If the State could avoid the prohibition of article VIII, section 1–e simply by requiring that tax proceeds be deposited in some lesser instrumentality's account, that provision would be essentially meaningless. The State could create County Highway Districts, or County Prison Districts, or all-purpose County Funding Districts to levy taxes at set rates for funding of state mental health programs without prescribing the source of funds (*Sande-*

prescribed purposes, and by such means accomplish what it could not do itself. CEDs are mere puppets; the State is pulling all the strings. Though the hands collecting the tax be Esau's, the voice of authority is unmistakably Jacob's. The depository for CED taxes does not govern whether they are state or local.

■ By the same analysis, the dedication of the proceeds of each CED's tax to activities conducted wholly within its boundaries does not make the tax a local one outside the prohibition of article VIII, section 1–e. Again, were it otherwise, the State could simply divide itself into districts and prescribe the funding for activities conducted within each district. Although the activities funded by CED taxes are conducted within the district, their funding is part of the state public education scheme mandated by Senate Bill 351.

The State argues that the CED taxes required by Senate Bill 351 simply reflect the historical uses of both local and state funds for public education, authorized by article VII, section 3 of the Constitution. However, neither the plain language of article VIII, section 1–e nor its history reveals any exception that permits state ad valorem taxes for education. Prior to January 1, 1951, the State could levy ad valorem taxes for general purposes. Effective that date, article VIII, section 1–a proscribed state ad valorem taxes for general revenue purposes, still allowing such taxes for specific purposes, including education. Article VIII, section 1–a did not eliminate the state ad valorem tax for public schools authorized by article VII, section 3. However, when article VIII, section 1–e was adopted in 1968, this special state ad valorem school tax was repealed:

> 1. From and after December 31, 1978, no State ad valorem taxes shall be levied upon any property within this State for State purposes except the tax levied by Article VII, Section 17, for certain institutions of higher learning.

*gren* ).

2. The State ad valorem tax authorized by Article VII, Section 3, of this Constitution shall be imposed at the following rates on each One Hundred Dollars ($100.00) valuation for the years 1968 through 1974: [setting forth a rate that declines in each of these years] and *thereafter no such tax for school purposes shall be levied and collected.*

TEX. CONST. art. VIII, § 1–e (1968, *amended* 1982); *see also,* Tex.S.J.Res. 32, 60th Leg., R.S., 1967 Tex.Gen.Laws 2972 (emphasis added). In 1982, article VIII, section 1–e was amended to remove any remaining authority to impose state ad valorem taxes, resulting in the blanket prohibition now in effect. The history of article VIII, section 1–e thus establishes that its framers and ratifiers specifically intended to eliminate the state ad valorem tax as a source of funds for public education.

In the past, the State has taken a carrot-and-stick approach in encouraging local funding for public education. For several years prior to 1989, a qualified school district was not required to contribute its total local share to obtain state funding from the Foundation School Program. *See, e.g.,* Act of June 30, 1984, 68th Leg., 2nd C.S., ch. 28, 1984 Tex.Gen.Laws 143. School districts were encouraged to raise in excess of their local share; however, this was only so that they could be rewarded with increased aid under the guaranteed yield program. After changes in the law in 1989, a school district could not qualify for state aid from the program fund unless it raised its local share. Act of May 29, 1989, 71st Leg., R.S., ch. 816, 1989 Tex.Gen.Laws 3742. Although districts thus had some incentive to raise their local share for education, none was mandated to do so. Senate Bill 351 takes a final step away from local discretion, and for the first time, state law mandates local ad valorem taxes at a set rate for specified purposes. Senate Bill 351 is thus all stick with no carrot attached.[14]

The State argues that CED taxes uniform statewide are necessary to meet the requirement of article VII, section 1 that the public school system be efficient. Assuming that this argument is correct, it does not follow, nor does the State argue, that this system is the only one which would comply with article VII, section 1. While the Legislature has some latitude in the manner it chooses to discharge its duty to establish and maintain an efficient public school system, it cannot go so far as to violate another constitutional provision in attempting to comply with article VII, section 1.

■ An ad valorem tax is a state tax when it is imposed directly by the State or when the State so completely controls the levy, assessment and disbursement of revenue, either directly or indirectly, that the authority employed is without meaningful discretion. How far the State can go toward encouraging a local taxing authority

---

14. The dissent contends that the public school finance system created by Senate Bill 351 is no different from other programs in which the State requires local participation. Invalidating Senate Bill 351, the dissent warns, "imperils the delicate balance of rights and responsibilities" between state and local government. Opinion at 554. The dissent exaggerates our ruling. We do not hold that any fiscal burden placed on local government by the State is unconstitutional. For example, the Indigent Health Care and Treatment Act, cited by the dissent, requires counties to provide a certain amount of health care for qualified indigent patients. TEX.HEALTH & SAFETY CODE §§ 61.001–.081 (1991). Under the Act, a county is the payor of last resort for health care to persons who do not reside in the service area of a public hospital or hospital district. *Id.* at § 61.022(b). The county is liable for the care of each eligible patient up to $30,000 or 30 days of hospitalization or treatment, whichever comes first. *Id.* at § 61.035. When a county's expenditures for indigent care reach 10 percent of the county's general revenue levy for that year, the county is eligible for State assistance to the extent appropriated funds are available. *Id.* at § 61.036. Once those State funds are exhausted, the county that has expended 10 percent of its general revenue levy has no further liability. *Id.* at § 61.038. Unlike Senate Bill 351, the Health Code does not impose any tax. Counties may discharge their obligations using general revenue, including any sales and use taxes, raising property taxes, reducing expenses, or some combination of these. *Id.* at § 61.002(6). The statutory requirement that counties share in funding indigent health care does not approach the mandate of Senate Bill 351 that CEDs levy ad valorem taxes at a prescribed level from which the CEDs cannot deviate.

to levy an ad valorem tax before the tax becomes a state tax is difficult to delineate. Clearly, if the State merely authorized a tax but left the decision whether to levy it entirely up to local authorities, to be approved by the voters if necessary, then the tax would not be a state tax. The local authority could freely choose whether to levy the tax or not. To the other extreme, if the State mandates the levy of a tax at a set rate and prescribes the distribution of the proceeds, the tax is a state tax, irrespective of whether the State acts in its own behalf or through an intermediary. Between these two extremes lies a spectrum of other possibilities. If the State required local authorities to levy an ad valorem tax but allowed them discretion on setting the rate and disbursing the proceeds, the State's conduct might not violate article VIII, section 1–e. It is difficult, perhaps impossible, to define for every conceivable hypothetical precisely where along this continuum such taxes become state taxes. Therefore, if the Legislature, in an effort to remedy Senate Bill 351 with as few changes as possible, chose to inject some additional element of leeway in the assessment of the CED tax, it is impossible to say in advance whether that element would remove the tax from the prohibition of article VIII, section 1–e. Each case must necessarily turn on its own particulars. Although parsing the differences may be likened to dancing on the head of a pin, it is the Legislature which has created the pin, summoned the dancers, and called the tune. The Legislature can avoid these constitutional conundra by choosing another path altogether.

■ Two things are clear, however, among many which are not. One is that local revenue may play a role in achieving an efficient system of free public schools. The other is that article VIII, section 1–e prohibits the State from doing indirectly through CEDs what it cannot do directly, that is, levy an ad valorem tax. We have not attempted to dictate to the Legislature what part local revenue should play in funding public education, viewing that decision as properly the Legislature's prerogative in the first instance. Although the

Constitution requires the Legislature to "establish and make suitable provision for" free public schools, it contains no specific requirement that public education be funded completely with state revenue. The Constitution prohibits, however, heavy reliance on grossly disparate local revenue to provide the funding essential for public schools. *Edgewood II*, 804 S.W.2d at 496–97, 500. Were local revenue but an insubstantial part of the total funding, the disparities in school district property wealth might be inconsequential to the system as a whole. But when local revenue pays a very significant part of the cost of a fundamental education—now more than half—those disparities dominate the entire system.

In sum, we conclude that the tax mandated by Senate Bill 351 is a state ad valorem tax prohibited by article VIII, section 1–e of the Constitution.

### III

Independently of their argument based upon article VIII, section 1–e, appellants argue that Senate Bill 351 violates article VII, section 3, because the CEDs levy a tax without first gaining the approval of the affected voters. Appellees counter that local taxes may be levied under article VII, section 3 without voter approval, or alternatively, that article VII, section 3–b excuses the voting requirement because Senate Bill 351 has "consolidated" school districts. We consider first the article VII, section 3 argument, and then the article VII, section 3–b argument.

### A

Article VII, section 3 is a constitutional wilderness. "[A] rather patched up and overly cobbled enactment," *Shepherd v. San Jacinto Junior College Dist.*, 363 S.W.2d 742, 744 (Tex.1962), it has been cited as an example of how not to write a constitution, GEORGE BRADEN, 2 THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 519 (1976). In its present form, it is a single sentence

of 393 words.[15] It retains obsolete provisions such as the poll tax and state ad valorem tax, and covers subjects as disparate as the provision of free text books and the procedure for forming school districts. Our focus is on the following four consecutive clauses:

> [1] the Legislature may also provide for the formation of school district[16] ... [2] and the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts and for the management and control of the public school or schools of such districts ... [3] and the Legislature may authorize an additional ad valorem tax to be levied and collected within all school districts ... [4] provided that a majority of the qualified property tax paying voters of the district voting at an election to be held for that purpose, shall vote such tax....

TEX. CONST. art. VII, § 3.

■ Senate Bill 351 "nominally" creates CEDs as "independent school districts," although as we have noted, they do not perform any of a school district's traditional functions. TEX.EDUC.CODE § 20.942. The Constitution does not prescribe the functions for a school district, and we have long regarded the Legislature to have plenary power to constitute and regulate school districts. *Love v. City of Dallas,* 120 Tex. 351, 40 S.W.2d 20, 26 (1931); *State v. Brownson,* 94 Tex. 436, 61 S.W. 114, 115 (1901). We therefore consider it to be within the Legislature's power to create entities like the CEDs before us as school districts.

Appellees acknowledge that the tax authorized by the third of the clauses quoted above must, according to the fourth clause, be approved by the voters. The issue is whether the second clause imparts upon the Legislature a power to tax that is independent of the third clause and free of the proviso in the fourth.

The history of article VII, section 3 helps resolve this issue. The original section 3 simply limited the amount of the State's general revenue to be spent on schools and established a poll tax.[17] Other sections of the article provided additional funding mechanisms for public schools. However, no provision of the original article VII expressly authorized local school districts to

---

**15.** "One-fourth of the revenue derived from the State occupation taxes and poll tax of one dollar on every inhabitant of the State, between the ages of twenty-one and sixty years, shall be set apart annually for the benefit of the public free schools; and in addition thereto, there shall be levied and collected an annual ad valorem State tax of such an amount not to exceed thirty-five cents on the one hundred ($100.00) dollars valuation, as with the available school fund arising from all other sources, will be sufficient to maintain and support the public schools of this State for a period of not less than six months in each year, and it shall be the duty of the State Board of Education to set aside a sufficient amount out of the said tax to provide free text books for the use of children attending the public free schools of this State; provided, however, that should the limit of taxation herein named be insufficient the deficit may be met by appropriation from the general funds of the State and the Legislature may also provide for the formation of school district by general laws; and all such school districts may embrace parts of two or more counties, and the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts and for the management and control of the public school or schools of such districts, whether such districts are composed of territory wholly within a county or in parts of two or more counties,

and the Legislature may authorize an additional ad valorem tax to be levied and collected within all school districts heretofore formed or hereafter formed, for the further maintenance of public free schools, and for the erection and equipment of school buildings therein; provided that a majority of the qualified property taxpaying voters of the district voting at an election to be held for that purpose, shall vote such tax not to exceed in any one year one ($1.00) dollar on the one hundred dollars valuation of the property subject to taxation in such district, but the limitation upon the amount of school district tax herein authorized shall not apply to incorporated cities or towns constituting separate and independent school districts, nor to independent or common school districts created by general or special law."

**16.** Although this word, "district," is singular in the text, the context and history of the provision suggest that it should be plural.

**17.** "There shall be set apart annually not more than one-fourth of the general revenue of the State, and a poll tax of one dollar on all male inhabitants in this State between the ages of twenty-one and sixty years, for the benefit of the public free schools." TEX. CONST. art. VII, § 3 (1876).

levy taxes. In *City of Fort Worth v. Davis*, 57 Tex. 225 (1882), this Court rejected the argument that the Legislature had the inherent power to authorize school districts to levy taxes under former article VII, section 3. The Court reasoned that the Constitution manifested an intention to limit the power of the government to tax; because the Constitution spoke on the matter of school funding in article VII, there was no room for implied authority. *Id.* at 231–32. The Court stated that:

> Taxation by school districts was familiar to the framers of the present constitution. It was the system generally prevailing in other states, by which the deficiencies of a general or state school fund were supplemented. The omission of a provision authorizing that system was plainly intentional, for, in addition to what has been said, the journals of the convention show that all propositions embracing that system were voted down.

*Id.* at 232.

In response to *Davis*, article VII, section 3 was amended and greatly expanded in 1883. The amendment authorized a state ad valorem tax to fund the public schools and then added what eventually became the first, third and fourth clauses which we quoted above. This amendment empowered the Legislature to authorize school districts to levy local ad valorem taxes as long as the taxes were approved by local voters.

In 1908, this Court held in *Parks v. West*, 102 Tex. 11, 111 S.W. 726 (1908), that article VII, section 3, as amended, did not allow the creation of school districts that crossed county lines. The Court also suggested that even if section 3 authorized such districts, they nevertheless might lack the power to tax:

> it is not true that the Constitution gave or has ever given the Legislature unlimited power to levy or to authorize the levy of taxes to provide the school fund. On the contrary, the Constitution has, itself, said what the fund should consist of and how it may be raised. . . .

*Id.* 111 S.W. at 727. *Parks* prompted another amendment in 1909 to article VII, section 3. This amendment principally allowed the creation of school districts that crossed county lines and removed any doubt that such districts had the power to tax. Of note, the 1909 amendment added the substance of the second clause on which we focused above:

> [1] the Legislature may also provide for the formation of school districts . . ., and all such school districts . . . may embrace parts of two or more counties. [2] And the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts and for the management and control of the public school or schools of such districts, whether such districts are composed of territory wholly within a county or in parts of two or more counties. [3] And the Legislature may authorize an additional ad valorem tax to be levied and collected within all school districts . . ., [4] provided that a majority of the qualified property taxpaying voters of the district, voting at an election to be held for that purpose, shall vote such tax. . . .

Tex.H.R.J.Res. 6, 31st Leg., R.S., 1909 Tex. Gen.Laws 251.[18]

Amendments to article VII, section 3 were proposed in 1915 and 1916 to allow for increased county school taxes, but they were both defeated. *See generally* 2 BRADEN, *supra*, at 512–13. The section was

---

**18.** In its present form, the condition of an election in what we have called clause four follows a semicolon. Preceding clauses two and three, separated by a comma, also follow a semicolon. One might argue that this grammatical construction favors applying the condition in clause four to both antecedent clauses two and three. The 1909 version of the provision, however, was quite different grammatically. There, clauses three and four were in the same sentence, but clause two in a separate, preceding sentence. The more plausible construction of that version is that clause four applied only to clause three. Nothing in the history of either version suggests that either the punctuation or the change in grammatical form of the provision was intended to affect its meaning. Under the circumstances, we decline to rest our construction of the provision on its grammar. *See Sears v. Bayoud,* 786 S.W.2d 248, 251 fn. 5 (Tex.1990).

again amended in 1918,[19] in part to raise the state ad valorem tax, and in 1920,[20] to remove the limit on local taxation. The final amendment, adopted in 1926, removed the authority of the State to create school districts by special law, and edited the language to the form now in effect.[21]

■ The history of article VII, section 3 thus indicates that what we have called clause two was added in response to *Parks* to ensure that school districts which crossed county lines could tax. There is no suggestion of support for appellees' conclusion that clause two authorizes imposition of a local ad valorem tax without an election. Their argument rests upon two questionable premises. First, appellees assert that the word "assessment" in clause two means levy; thus clauses two and three would have an identical effect. While we have some doubt that the two words are synonymous, at least in this context, we assume that they are and confront the second premise necessary to appellees' argument, which is that the condition of an election in clause four does not apply to clause two.

Appellees' reading of article VII, section 3 would allow a local ad valorem tax to be imposed either with or without an election. If a district can impose a tax without the burden of an election under clause two, there is no reason why it should choose instead to impose the tax only after calling an election under clauses three and four. Thus, the effect of appellees' reading of clause two, independent of clause four, is to nullify clauses three and four altogether. One fundamental provision of constitutional construction is that effect must be given to all its provisions if possible. *Hanson v.*

*Jordan,* 198 S.W.2d 262, 263 (Tex.1946). Applying that principle here, we construe article VII, section 3 to condition the imposition of a local ad valorem tax upon the approval of the electorate.

■ We are supported in this construction by the additional fact that in the eight decades since ratification of the 1909 amendment, the Legislature has never acted as if this amendment authorized local ad valorem taxes without voter approval. To the contrary, every time the Legislature has sought to alter the power of districts to levy an ad valorem tax, it went to the trouble of seeking constitutional amendments. If appellees' reading of article VII, section 3 were correct, the Legislature could simply have passed a statute.[22] Not until Senate Bill 351 has the Legislature asserted such power. "[A]lthough non-use[ ] will not defeat the power to exercise rights expressly delegated in a written Constitution, an established practical construction 'should not be disregarded unless the terms of the provision furnish clear and definite support for a contrary construction.'" *Walker v. Baker,* 145 Tex. 121, 196 S.W.2d 324, 327 (1946).[23] Not only is there no clear and definite support for a construction of article VII, section 3 contrary to the view of the provision that the Legislature apparently held for over eighty years, we think the more plausible reading of the provision is consistent with that view. Accordingly, we conclude that a CED may not be authorized to levy an ad valorem tax under article VII, section 3, without the approval of the voters in the CED.

**19.** Tex.H.R.J.Res. 27, 35th Leg., R.S., 1917 Tex. Gen.Laws 503.

**20.** Tex.S.J.Res. 17, 36th Leg., R.S., 1919 Tex.Gen. Laws 356.

**21.** Tex.H.R.J.Res. *9, 39th* Leg., R.S., 1925 Tex. Gen.Laws 682.

**22.** Tex.H.R.J.Res. 9, 34th Leg., R.S., 1915 Tex. Gen.Laws 286; Tex.H.R.J.Res. 30, 34th Leg., R.S., 1915 Tex.Gen.Laws 287; Tex.S.J.Res. 17, 36th Leg., R.S., *1919 Tex.Gen.Laws 356;* Tex. S.J.Res. No. 6, 57th Leg., R.S., 1961 Tex.Gen. Laws 1301; Tex.H.R.J.Res. 65, 59th Leg., R.S.,

1965 Tex.Gen.Laws 2230; *see generally* 2 BRADEN, *supra,* at 512–13.

**23.** In *Walker,* the issue was whether the Senate had the power to convene on its own motion. *In holding that the Senate lacked such power,* the Court noted that "it is significant that forty-eight legislatures passed before it occurred to the Senate that the power to confirm or reject the Governor's appointments implies a duty to convene at will for that purpose...." *Id.* 196 S.W.2d at 327.

The dissent cynically refers to this right to vote as a "veto," transposing the vowels. But the right to vote cannot be brushed aside with word tricks; the people have insisted upon this right as a prerequisite to ad valorem taxation by school districts by establishing it in article VII, section 3. The right is no less deserving of protection simply because there may be votes cast against a public school finance plan that the Legislature has passed and of which the dissent strongly approves, or because some who vote against this plan may be wealthier, or in the dissent's words, more "privileged," than some who vote for it. The record shows that although a school district may be property rich, it does not necessarily mean that its citizens are "privileged."[24] It is of course axiomatic that the votes cast by all persons, regardless of their circumstances, count equally. The vote which the Constitution vouchsafes under article VII, section 3, is a veto of the CED tax mandated by Senate Bill 351 only if there are more voters against the tax than for it; and if there are, they are no less entitled to vote simply because they do not favor a tax that the dissent favors. The dissent seems to assume that the CED tax mandated by Senate Bill 351 would not be approved by the voters. This assumption leads the dissent to first disparage and then deny the constitutional right to vote to save the statute from the people's will. The people may surrender their right to vote under article VII, section 3, by amending that provision; but they ought not to have the right taken from them by judicial fiat, or ignored by the Legislature.

### B

Appellees further contend that article VII, section 3–b excuses an election by the CEDs created under Senate Bill 351. The legislature adopted this provision,[25] which

24. The dissent's insinuations that only the wealthy and "privileged" oppose Senate Bill 351 are refuted by the record. During the floor debates in the Legislature, Representative Uher from Bay City described the adverse effect Senate Bill 351 would have on the Palacios School District in Matagorda County:

> In my district I have a school system that, fifteen years ago, was an extremely poor school system. It is a school system that is about 65% minority; and it is a school system that has had some good fortune in that a nuclear plant was built within its boundaries. The result of that has been, over the last fifteen years, they have gone from a property poor school system to a property rich system; and they now have a current tax rate of about $0.42. Now under the substitute under 351 we would go just like every other school system to the level of $0.80, and then the other factors that kick in. The problem that we have with this generic approach to how we deal with each school system is that while we are having to raise and double our tax rate to get to the $0.80 rate—we are now $0.42—what it means is we are going to have to bring down expenditures that we are now spending on our young people. And it is not the idea of this bill, I don't believe, and I know it is not the idea of our Governor, when we approach this very difficult subject matter, to reduce the learning qualities that are there—as the Governor said, "the dumb down syndrome." We don't want that.
>
> . . . . .
>
> But the problem of it is, that we will reduce expenditures in a system that is heavily mi-

nority and that is going forward at a very good scholastic pace. For instance, we have just competed in the academic decathlon; for the first time a small school in South Texas competed very well and won many first and second places, not only at the regional level but at the state level. So it is very important that we are able to continue a quality program that is heavily invested in the well-being of the young people who live in the Palacios school district.

> . . . . .
>
> Here is a school district that is 65% minority. It is a fishing village primarily, that is the way most people make their livings. Young men and women will leave school at the third and fourth grade level to go and work on shrimp boats and other fishing vessels as young people, and they drop out of the school system. But what we have done by the good fortune that we have had, we have been able to keep those youngsters in school. And today we have got Yale University, we've got Stanford University. . . . Debate on Tex.S.B. 351 on the Floor of the House, 72nd Leg., R.S., 14–16 (Feb. 28, 1991).

25. "No tax for the maintenance of public free schools voted in any independent school district and no tax for the maintenance of a junior college voted by a junior college district, nor any bonds voted in any such district, but unissued, shall be abrogated, cancelled or invalidated by change of any kind in the boundaries thereof. After any change in boundaries, the governing body of any such district, without the necessity of an additional election, shall have

is nearly as cumbersome as section 3 of the same article, in 1962 but limited its application to "any independent school district, the major portion of which is located in Dallas County." Tex.S.J.Res. 6, 57th Leg., R.S., 1961 Tex.Gen.Laws 1301. It appears to have been prompted by the necessity of having a tax authorization election every time the boundaries of a school district changed. *See Crabb v. Celeste Indep. Sch. Dist.,* 105 Tex. 194, 146 S.W. 528 (1912); *Parks,* 111 S.W. 726; *Davis,* 57 Tex. 225; *Burns v. Dilley County Line Indep. Sch. Dist.,* 295 S.W. 1091 (Tex.Comm'n App. 1927, judgm't adopted); *Millhollon v. Stanton Indep. Sch. Dist.,* 231 S.W. 332 (Tex.Comm'n App.1921, holding approved). It is not clear why the provision was originally restricted to Dallas County. 2 BRADEN, *supra,* at 521. In 1966, it was amended to apply to all school districts. Tex. H.J.Res. 65, 59th Leg., R.S., 1965 Tex.Gen. Laws 2230.

The first sentence of section 3–b has no application in this case. Appellees base their argument upon the following portions of the second and third sentences of the provision:

> After any change in boundaries, the governing body of any such district, without the necessity of an additional election, shall have the power to assess, levy and collect ad valorem taxes on all taxable property within the boundaries of the district as changed, for the purposes of the maintenance of public free schools … in the amount, at the rate, or not to exceed the rate, and in the manner authorized in the district prior to the change in its boundaries.… In those instances where the boundaries of any such independent school district are changed by the annexation of, or consolidation with, one or more whole school districts, the taxes to be levied for the purposes hereinabove authorized may be in the amount or at not to exceed the rate theretofore voted in the district having at the time of such change the greatest scholastic population according to the latest scholastic census.…

TEX. CONST. art. VII, § 3–b. These provisions do not fit the creation of CEDs. No physical boundaries of school districts are changed by Senate Bill 351, only the imaginary boundaries of their taxing power. It is stretching somewhat to regard a school district's ceding of taxing power as a change in its "boundaries." Even so, the first sentence quoted above does not apply to CEDs, because the change in imaginary boundaries occurs only in existing school districts, not in the newly created CEDs. The first sentence would allow existing school districts to go on exercising their taxing power irrespective of the creation of CEDs. But it is the taxing power of the CEDs, not of existing school districts, that is in question. There has been no change in the boundaries of CEDs, imaginary or otherwise, because they are newly created by Senate Bill 351. The first sentence relied upon by appellees does not confer taxing authority on CEDs. Nor does the sec-

---

the power to assess, levy and collect ad valorem taxes on all taxable property within the boundaries of the district as changed, for the purposes of the maintenance of public free schools or the maintenance of a junior college, as the case may be, and the payment of principal of and interest on all bonded indebtedness outstanding against, or attributable, adjusted or allocated to, such district or any territory therein, in the amount, at the rate, or not to exceed the rate, and in the manner authorized in the district prior to the change in its boundaries, and further in accordance with the laws under which all such bonds, respectively, were voted; and such governing body also shall have the power, without the necessity of an additional election, to sell and deliver any unissued bonds voted in the district prior to any such change in boundaries, and to assess, levy and collect ad valorem taxes on all

taxable property in the district as changed, for the payment of principal of and interest on such bonds in the manner permitted by the laws under which such bonds were voted. In those instances where the boundaries of any such independent school district are changed by the annexation of, or consolidation with, one or more whole school districts, the taxes to be levied for the purposes hereinabove authorized may be in the amount or at not to exceed the rate theretofore voted in the district having at the time of such change the greatest scholastic population according to the latest scholastic census and only the unissued bonds of such district voted prior to such change, may be subsequently sold and delivered and any voted, but unissued, bonds of other school districts involved in such annexation or consolidation shall not thereafter be issued."

ond sentence. It applies to boundaries changed by "the annexation of, or consolidation with, one or more *whole* school districts." TEX. CONST. art. VII, § 3–b. Senate Bill 351, as appellees admit, does not consolidate *whole* school districts, but only a portion of their taxing power.[26]

■ The purpose of article VII, section 3–b is to obviate the necessity of a tax authorization election every time a school district's boundaries are changed. If boundaries are changed, the prior electoral authorization is unaffected. If whole districts are consolidated, the effective authorization is that approved by the voters in the prior district with the largest scholastic population. In either situation, the changed district exercises a power to tax authorized by the electorate to support schools in the district. When school districts are consolidated, the power of the new district may be somewhat more or less than that previously authorized in one or more of the consolidated districts; the use of the power, however, remains to support the schools in the district. Neither the purpose nor the language of article VII, section 3–b authorizes a newly created CED to siphon off the taxing power of its constituent school districts and exercise it to take revenue from one school district and spend it in another.

We have construed article VII, section 3–b only once, in *Freer Municipal Indep. Sch. Dist. v. Manges*, 677 S.W.2d 488 (Tex. 1984) (per curiam), *rev'g* 653 S.W.2d 553 (Tex.App.—San Antonio 1983), *after remand*, 728 S.W.2d 842 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.), *and* 775 S.W.2d 774 (Tex.App.—San Antonio 1989, no writ). In that case, the inhabitants of the City of Freer voted to withdraw from the Benavides Independent School District, of which Freer was a part, and form a separate independent school district. *Freer*, 677 S.W.2d at 489. This Freer did, and later annexed additional area which had also been part of the Benavides district. Property owners in this annexed area refused to pay taxes assessed by the

newly formed Freer district because the voters in the district had never authorized it to levy taxes. *Id.* This Court held that despite the Freer district's failure to have a tax authorization election, under article VII, section 3–b it derived the same power to levy taxes that the voters, including the property owners in the annexed area, had approved for the Benavides district when Freer was a part of it. *Id.* at 490. The Court concluded:

> Article VII, section 3–b authorizes independent school districts to tax for school purposes in those instances in which the subject district was formed wholly by disannexation from an existing independent school district that possessed the power to tax.

*Id.* As we have seen, no part of article VII, section 3–b addresses specifically the creation of new districts. However, in *Freer*, the new school district was created by a change in the boundaries of an existing school district, a situation contemplated by article VII, section 3–b. But by no stretch of the language or history of article VII, section 3–b can that section be read as permitting half or more of the districts' allotted tax authorization to be stripped away and redeposited in a new state-controlled entity without voter participation.

This case is quite different from *Freer*. In *Freer*, the voters in the Benavides district, including Freer, voted to authorize the district to levy an ad valorem tax for support of the schools within the district. 677 S.W.2d at 489. The creation of the Freer district out of the Benavides district, with the same power to tax, did not fundamentally alter what the voters had authorized. The residents of both districts continued to be subject to an ad valorem tax for local schools. In the present circumstances, however, transferring a portion of the taxing power of a school district to a CED fundamentally changes the tax burden approved by the voters of the school district. Now they are subject to being taxed not only to pay for the schools in

---

**26.** No school district is divided between more than one CED, as the quote from appellees' brief cited by the dissent suggests. Nevertheless, only part of each district—its taxing power—is consolidated.

their own school district, but they must share the cost of schools in all the other school districts in the CED. They are entitled to no voice in the affairs of these other districts, yet they are obliged to pay their expenses. The residents of a CED may choose to vote to do this, that is, they may vote to authorize the CED to levy taxes that will be disbursed among the school districts in the CED to be expended at the discretion of the school boards of those districts. Here, however, the residents of the CEDs have never voted to take this course. Rather, Senate Bill 351 thrusts it upon them.

The dissent attempts to justify the consolidation of taxing power in CEDs as "less intrusive" than school district consolidation, which the Legislature might have undertaken in order to remove the enormous disparities in property wealth on which school finance so heavily relies. It is difficult to measure which course is more "intrusive" or "disruptive." Certainly, general consolidation of whole school districts would dilute a community's control over its own schools and alter the entire structure of the education system, but consolidation of taxing power in CEDs without a vote forces taxpayers to pay for schools over which they have nothing to say. The effects of the former alternative are hardly minimal, but neither are the effects of the latter.

In sum, article VII, section 3–b does not allow CEDs created by Senate Bill 351 to levy the ad valorem tax mandated by the statute on all the property in the CED, based solely upon the prior approval of the voters in each constituent school district to allow their district to levy a tax. Article VII, section 3, requires that before CEDs may levy the statutory tax, it must be approved by the voters in the CED.

### IV

Some appellants contend that the creation of CEDs as school districts violates article III, sections 56 and 64(a) and article VII, section 3. We examine each of the provisions in turn.

Article III, section 56 provides in pertinent part that "[t]he Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law ... [r]egulating the affairs of ... school districts...." Appellants argue that Senate Bill 351 is such a special law. However, a special or local law is one that applies to a limited class of persons as distinguished by geography or some other special characteristic. *Clark v. Finley*, 93 Tex. 171, 54 S.W. 343, 345 (1899). By this definition, Senate Bill 351 is clearly not a special or local law: it applies generally to the entire State. The fact that sections of the statute assign particular school districts to CEDs does not make the law a special one inasmuch as it affects school districts throughout the state. *Lower Colorado River Authority v. McCraw*, 125 Tex. 268, 83 S.W.2d 629, 636 (1935). Thus, Senate Bill 351 does not violate article III, section 56.

Alternatively, appellants argue that if Senate Bill 351 is not a special law then it violates article III, section 64(a), which states:

The Legislature may by special statute provide for consolidation of governmental offices and functions of government of any one or more political subdivisions comprising or located within any county. Any such statute shall require an election to be held within the political subdivisions affected thereby with approval by a majority of the voters in each of these subdivisions, under such terms and conditions as the Legislature may require.

Appellants contend that this provision requires that consolidation of school districts be by special statute. When article III, section 64(a) was first adopted in 1968, it applied only to El Paso and Tarrant Counties. As such, it was obviously not intended to restrict the Legislature's authority to create or consolidate school districts under article VII, section 3. Nor is there evidence of any such intention when it was amended to apply generally in 1970.

Article VII, section 3 provides in part that "the Legislature may also provide for the formation of school district[s] by gener-

al laws." TEX. CONST. art. VII, § 3. This Court has interpreted that provision as granting the Legislature a "free hand in establishing independent school districts" including the abolition and consolidation of districts. *State v. Brownson*, 94 Tex. 436, 61 S.W. 114, 115 (1901); *see also Prosper Indep. Sch. Dist. v. County Sch. Trustees*, 58 S.W.2d 5, 6 (Tex.Comm'n App.1933, judgm't adopted); *Neill v. Cook*, 365 S.W.2d 824, 829 (Tex.Civ.App.—Eastland 1963, writ ref'd n.r.e.), *appeal dism'd and cert. denied*, 376 U.S. 202, 84 S.Ct. 698, 11 L.Ed.2d 650 (1964) (the Legislature has the power to change the boundaries of or abolish school districts, to consolidate them and to annex school districts to other school districts). Article VII, section 3 applies to school districts specifically. Inasmuch as article III, section 64(a) deals with the consolidation of governmental functions generally, it must give way to the specific provisions of article VII, section 3. "In construing apparently conflicting constitutional provisions, a general provision must yield to a special provision." *San Antonio & A.P. Ry. Co. v. State*, 128 Tex. 33, 95 S.W.2d 680, 686 (1936); *see also County of Harris v. Shepperd*, 156 Tex. 18, 291 S.W.2d 721, 726 (1956); *City of San Antonio v. Toepperwein*, 104 Tex. 43, 133 S.W. 416, 417 (1911).

We have held above that even though CEDs are merely tax redistribution mechanisms with no educational functions, in constituting them as school districts, the Legislature has not exceeded its long recognized, broad authority to create and empower school districts. Our decision in *City of Weatherford v. Parker County*, 794 S.W.2d 33 (Tex.1990), does not limit the Legislature's power to consolidate school districts under article VII, section 3. There we held a general statute providing for the consolidation of the tax assessing and collecting functions for all taxing units within an appraisal district unconstitutional because such consolidation could be authorized only by special law, as required by article III, section 64(a). That section dictated the result in *City of Weatherford* because no other constitutional provision specifically authorized the consolidation of

tax collecting and assessing functions. As we have noted, this is not the case with the consolidation of school districts. The tax base consolidation affected by Senate Bill 351 does not violate article III, section 64(a), or article VII, section 3.

### V

Appellees argue that our holding today invalidating Senate Bill 351 conflicts with what we said in *Edgewood II*. The dissent expands this argument going so far as to accuse the Court in *Edgewood II* of deliberately misleading the Legislature into thinking that Senate Bill 351 was valid. This accusation is wholly without merit. In *Edgewood I* and *Edgewood II*, this Court did not confront the specific constitutional issues presented in this case. Nor has this Court ever determined the constitutionality of a school finance system like that embodied in Senate Bill 351. In both *Edgewood I* and *Edgewood II*, we insisted that change in the public school system itself was essential to meet the constitutional standard of efficiency in article VII, section 1. *Edgewood I*, 777 S.W.2d at 397; *Edgewood II*, 804 S.W.2d at 496. However, we refrained from directing the Legislature to take a particular course in effectuating the required change. In *Edgewood I*, we said:

Although we have ruled the school financing system to be unconstitutional, we do not now instruct the legislature as to the specifics of the legislation it should enact; nor do we order it to raise taxes. The legislature has primary responsibility to decide how best to achieve an efficient system. We decide only the nature of the constitutional mandate and whether that mandate has been met.

777 S.W.2d at 399. In *Edgewood II*, after concluding that the Legislature's action following *Edgewood I* did not "restructure the system," 804 S.W.2d at 496, the Court mentioned two examples of the kind of systemic change necessary to correct the constitutional defect.

Consolidation of school districts is one available avenue toward greater efficiency in our school finance system.

Another approach to efficiency is tax base consolidation.

804 S.W.2d at 497. We did not suggest that there were no other alternatives, or that one of these two options was preferred. To the contrary, after discussing each option briefly, we reiterated: "We do not prescribe the means which the Legislature must employ in fulfilling its duty." *Id.* at 498.

Our discussion of the viability of tax base consolidation was restricted to questions that had been raised in the district court regarding the effect of our decision in *Love v. City of Dallas,* 40 S.W.2d 20 (Tex.1931). We said:

We disagree with the district court's observation that [tax base consolidation] "appears to run afoul of certain constitutional provisions related to taxation." The district court was apparently concerned that consolidation of tax bases violated this Court's opinion in *Love.*

804 S.W.2d at 497. After reviewing our holding in *Love,* we concluded:

Article VII of the Constitution accords the Legislature broad discretion to create school districts and define their taxing authority. The Constitution does not present a barrier to the general concept of tax base consolidation, and nothing in *Love* prevents creation of school districts along county or other lines for the purpose of collecting tax revenue and distributing it to other school districts within their boundaries. While consolidating tax bases may not alone assure substantially equal access to similar revenues, the district court erred in concluding that it is constitutionally prohibited.

*Id.* at 497–98 (footnote omitted). In saying that neither the Constitution nor *Love* prohibited "the *general concept* of tax base consolidation," we did not exempt such action, regardless of how it might be undertaken, from all other requirements of the Constitution. We did not say that tax base consolidation *could not be* unconstitutional; all we said was that it *could be* constitutional. Our discussion of *Love* simply was not concerned with any of the constitutional issues of this case.

We observed that tax base consolidation might be implemented under existing statutes with voter approval.

Since this constitutional grant of power [to create school districts and define their taxing authority under article VII] does not specify the details of statutory implementation, a number of alternatives are available to the Legislature. One such method, already in place, allows *voters* to "create an additional countywide school district which may exercise in and for the entire territory of the county the taxing power conferred on school districts by Article VII, Section 3, of the Texas Constitution." TEX.EDUC.CODE § 18.01. The *voters* are permitted to implement such a taxing scheme "without affecting the operation of any existing school district within the county."

804 S.W.2d at 497 n. 14 (emphasis added). We recognized that this one method was not the Legislature's only alternative. Nevertheless, in the limited context of our discussion, we obviously contemplated that approval of the voters of the county would be required. Moreover, *Love* itself suggests that an election would be necessary:

Since the Constitution does not permit the taxation of the people of a school district for the support of that district, except upon *a vote of the people* of the school district, it is not debatable that the Legislature cannot compel one district to use its funds and properties for the education of scholastics from another district, without just compensation.

*Love,* 40 S.W.2d at 29–30 (emphasis added).

On rehearing, we were asked to overrule *Love* "or interpret that case 'in a manner that would permit the [state-wide] recapture of local ad valorem revenues for purposes of equalization.'" 804 S.W.2d at 499. A majority of the court refused to do so, stating: "We believe *Love* is sound and decline to overrule *or modify* it." *Id.* (emphasis added).[27] Rejecting the argument

---

27. The court was not unanimous on the question of whether an opinion should issue on rehearing. I, along with Justices Mauzy, Doggett and Gammage were of the opinion that the

"that all school districts are mere creatures of the state, and 'in reality, all taxes raised at the local level are indeed State taxes subject to state-wide recapture for purposes of equalization'," a majority of the court stated:

> Our Constitution clearly recognizes the distinction between state and local taxes, and the latter are not mere creatures of the former. The provision that "[n]o State ad valorem taxes shall be levied upon any property in this State," TEX. CONST. art. VIII, § 1–e, prohibits the Legislature from merely recharacterizing a local property tax as a "state tax." Article VII, section 3, however, states that "the Legislature may authorize an *additional* ad valorem tax to be levied and collected within all school districts heretofore formed or hereafter formed, for the *further* maintenance of public free schools, and for the erection and equipment of school buildings *therein.*" TEX. CONST. art. VII, § 3 (emphasis added). These constitutional provisions mandate that local tax revenue is not subject to state-wide recapture.

*Id.* By holding that the State could not reclassify a local tax to be a state tax, the court did not authorize the State to call a state tax a local tax. In disapproving statewide recapture of local taxes, we did not approve the state-mandated local taxes levied by CEDs under Senate Bill 351. The latter mechanism was not considered in *Edgewood II.*

In *Edgewood II,* we simply did not address the issues now raised in this proceeding, which have resulted from the manner of tax base consolidation fashioned by the Legislature in Senate Bill 351. The legislative history of Senate Bill 351 reveals that the members of the Legislature were confronted within sharply conflicting testimony concerning the many difficult constitutional issues presented by this case. Contrary to what the dissent argues, they were not fooled into thinking that this Court had preapproved the system enacted by Senate Bill 351. In clarifying the views of one of the witnesses, the chairman of the conference committee stated that an attorney would in all probability "come back and file suit and say, well, that's, that's a legal fiction, that's just really a state tax and you created a district to collect the state tax, that's all that is." *Hearings of Conference Committee on Senate Bill 351,* Tex.S.B. 351, 72nd Leg., R.S., (Mar. 7, 1991) (Tr. 330). One witness who testified concerning the conflict between Senate Bill 351 and article VIII, section 1–e, was asked by the chairman, "Do you see any legal problem with the Legislature assigning a minimum tax or a tax rate?" The witness answered, "Yes, I do." *Id.* at 17.

Concerning the right of the people to vote on the imposition of local taxes for schools, an assistant attorney general testified before the conference committee: "you can steal the authorization [from existing school districts for CEDs] if you will under article VII, section 3–b, ... can we guarantee that this is going to meet a constitutional challenge, the answer is, is no." *Id.* at 3–4.[28] Another witness testi-

---

motion for rehearing should be overruled without opinion. *See Edgewood II,* 804 S.W.2d at 500, (Gonzalez, J., concurring); *Id.* at 501 (Gammage, J., concurring); *Id.* (Doggett, J., concurring).

**28.** The dissent asserts that this quotation has been taken *out of context* and that Mr. O'Hanlon clearly indicated that Senate Bill 351 was constitutional. In fact Mr. O'Hanlon's testimony is indicative of the intense debate and uncertain conclusions surrounding Senate Bill 351. We cite it at length:

> [T]he problem here is that, that we appear to be in a situation either repeated references to tax base consolidations and things of that nature of being led down the road by the Texas Supreme Court, *that which, that no one*

*has yet fought. The notion of tax base consolidation is not something that you've done before, that's why we can't tell you, we cannot predict the outcome of the, a challenge to the mechanics of how we set, set about doing it.* We have never done a limited purpose consolidation which is what the Supreme Court has said over and over and over again is the way to fix the problem. *They're directing us into the, into an area where, where there are no answers. But they have,* on each occasion in which they have chosen to write on this, endorsed the concept of tax base consolidation, *they have word, they've called it another base-tax sharing, and appear to be leading us down this road. I will reiterate that every time that they mention Love and they, and Love still exists out there, that they talk about it in terms*

fied: "article VII, section 3 says before that new [CED] school district can levy that tax it's got to be a vote as by a majority of the voters authorizing that tax." *Id.* at 18. The chairman observed: "Wouldn't be anybody against it, but the people." *Id.* at 20. One committee member summarized: "Without passing a constitutional amendment there, we almost have a hundred percent assurance that we're going to have future litigation from one side or another on this." *Id.* at 11.

The chairman stated in an earlier proceeding: "I think almost everybody is now of a mind that it will require constitutional revision to allow recapture, redistribution, and kind of state-wide equalization plan where you take money from one district and use it in another." *Hearings of Senate Education Committee on Senate Bill 351,* Tex.S.B. 351, 72nd Leg., R.S., 9 (Feb. 13, 1991). The conference committee chairman also stated: "[D]o you truly believe the Supreme Court of the State of Texas has the guts to shut the school system down? ... Well, I want to state here publicly and send them a message across there, I don't believe they have the guts to do it.... The question is whether we have the guts to challenge the Supreme Court to shut the schools down." *Hearings of Conference Committee on Senate Bill 351,* Tex.S.B. 351, 72nd Leg., R.S., 16–26 (Mar. 7, 1991) (Tr. 345–355).

While we do not fault the Legislature for reaching the wrong answers to the difficult constitutional questions of school finance, we cannot ignore the unconstitutionality of Senate Bill 351. We cite its proceedings to demonstrate that it was not misled by our prior opinion to think that Senate Bill 351 was free from the challenges now raised against it.

## VI

Having concluded that provisions of Senate Bill 351 violate the Constitution, we now turn to the effect of our ruling.

## A

In addressing the issues raised today our focus has been on the provisions of Senate Bill 351 which create CEDs and require them to levy taxes. These provisions, though relatively few among the many matters covered by Senate Bill 351, are an integral part of the statutory school finance system. Indeed, the CED tax levied by Senate Bill 351 is the very cornerstone of the entire school finance structure.

Like many statutes, Senate Bill 351 contains a savings clause, the purpose of which is to isolate any infirmity that may be found to individual provisions and preserve uninfected the remainder of the statute. That savings clause, section 29 of the statute, states:

If any provision of this Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act that can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable.

*of statewide recapture. Love prohibits statewide recapture of funds.* And they go on to say in Edgewood III [*Edgewood II* motion for rehearing] that we can still do tax base consolidations through the creation (implementing) school districts. That's what we're doing. *The question then becomes is, is this recaptured district amount to it, some kind of a sham because it's not a school district. I refer you to Chapter 18. Chapter 18 is not a school district as we know it either. Chapter 18 is an entity that exists solely for the purposes of collecting, levying taxes when they refer to the levy in that footnote 14 that I talked to you a little while ago. [Mr. O'Hanlon explained footnote 14 of Edgewood II to the committee twice].* They said that was one method that the legislature provided that it's constitutionally appropriate. They didn't say that was the exclusive method. And I take again that their choice of language in that regard to be significant. If they'd a said that was the only method that you had to provide for only collection of taxes by the local levy of this now larger unit, they could have told us that and they chose not to. So in sum, this is a bit of a chancy prospect. There's no question about. But there is no guidance. Anybody that gets up there and, and tells you that there is a clear path and that we can only do it one way or another has got to be talking about their own opinion because there's (two) other than Love.....

*Id.* at 4 (emphasis added).

Act of April 11, 1991, 72nd Leg., R.S., ch. 20, § 29, 1991 Tex.Gen.Laws 381, 415. Applying this provision, we do not hold Senate Bill 351 unconstitutional and therefore invalid in its entirety; rather, we limit our holding to the finance system it creates. We cannot, however, restrict our holding to only those portions of the statute which create CEDs and require them to tax. Were we to do so, the finance system that remained—if a system could be discerned in the remnants at all—would bear no resemblance to that which the Legislature intended, and would do nothing to remedy the disparities in school funding condemned in *Edgewood I* and *Edgewood II*. The finance scheme envisioned by Senate Bill 351 cannot be given effect without the CED tax.

We therefore conclude, as we have in both those prior school funding decisions, that the constitutional defects we have found pertain not to individual statutory provisions but to the scheme as a whole. It is the system that is invalid, and not merely a few of its components.

**B**

 When we held that the school funding system violated the Constitution in *Edgewood I* and *Edgewood II*, we stayed the effect of our ruling in order to allow the Legislature to respond. We must consider whether it is appropriate to follow the same course here because in one respect, at least, this case is different. In our prior decisions, we dealt more with the operation of the system as a whole rather than with any specific element of it. Our ruling that the system was invalid could not be given retroactive effect because the past could not be corrected. We did, however, delay its prospective effect for a period of time, allowing the system to continue in operation until it could be changed. In this proceeding, by contrast, our ruling invalidating the CED tax could be given retroactive effect by requiring that the tax be refunded to the taxpayers.

Generally, judicial decisions apply retroactively. *Sanchez v. Schindler*, 651 S.W.2d 249, 254 (Tex.1983). This rule is not without exceptions, however, and we have occasionally departed from it to apply a decision prospectively.[29] In this we are not alone. The United States Supreme Court also has recognized that certain cases require prospective application.[30]

**29.** *E.g., Reagan v. Vaughn,* 804 S.W.2d 463, 468 (Tex.1990) (adopting cause of action for loss of parental consortium); *Moser v. United States Steel Corp.,* 676 S.W.2d 99, 103 (Tex.1984) (construing "other minerals" in mineral conveyances); *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 434 (Tex.1984) (adopting comparative causation); *Friendswood Dev. Co. v. Smith–Southwest Indus. Inc.,* 576 S.W.2d 21, 30–31 (Tex. 1978) (rule imposing liability for negligent use of groundwater applied prospectively); *Whittlesey v. Miller,* 572 S.W.2d 665, 669 (Tex.1978) (adopting cause of action for loss of consortium); *Felderhoff v. Felderhoff,* 473 S.W.2d 928, 933 (Tex.1971) (limiting parental immunity).

**30.** *American Trucking Ass'ns, Inc. v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 2332, 110 L.Ed.2d 148 (1990) (held state highway use tax unconstitutional, but refused to require refunds for pre–1987 tax years); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982) (prospectively invalidated statute granting Article III judicial powers to non-Article III bankruptcy judges, and stayed judgment to allow Congress to act); *Buckley v. Valeo,* 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976) (stayed for 30 days that part of judgment affecting authority of Federal Election Commission); *Lemon v.*

*Kurtzman,* 411 U.S. 192, 199, 93 S.Ct. 1463, 1468–69, 36 L.Ed.2d 151 (1973) (permitted state to reimburse nonpublic sectarian schools under invalidated state aid statute); *Chevron Oil Co. v. Huson,* 404 U.S. 97, 107–09, 92 S.Ct. 349, 355–57, 30 L.Ed.2d 296 (1971) (prospectively applied state limitations period to action under Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*); *Cipriano v. City of Houma,* 395 U.S. 701, 706, 89 S.Ct. 1897, 1900–01, 23 L.Ed.2d 647 (1969) (prospectively invalidated state statute permitting only property owners to vote on municipal bonds); *Linkletter v. Walker,* 381 U.S. 618, 628, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965) (prospectively applied exclusionary rule announced in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)); *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964) ("where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid"); *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 422, 84 S.Ct. 461, 468, 11 L.Ed.2d 440 (1964) (declined to apply new interpretation of *Government & Civic Employees*

Numerous other state supreme courts have invalidated state taxes and applied their decisions prospectively, refusing to grant refunds.[31] And as we have done in *Edgewood I* and *Edgewood II*, numerous other state supreme courts which have invalidated their school finance systems on state constitutional grounds have nevertheless allowed the systems to continue to operate while legislatures constructed new finance plans.[32]

The United States Supreme Court has recognized that whether a state court's rulings of state law are to be given prospective or retroactive application is a matter for the state court to decide. *Great Northern Ry. Co. v. Sunburst Oil & Ref. Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). In *Sunburst*, the United States Supreme Court reviewed a decision of the Supreme Court of Montana. In an earlier case the Montana Supreme Court had held that persons who paid intrastate shipment rates later determined to be excessive were entitled to refunds. When Sunburst sued Great Northern and obtained a refund against it, Great Northern appealed. The Montana Supreme Court reversed its earlier decision and held that in the future persons who paid excessive rates could not obtain refunds. However, the court refused to apply its decision to Sunburst or any other person who had paid excessive rates prior to its decision. Great Northern appealed, contending that the decision violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. Rejecting this contention, the United States Supreme Court in a unanimous opinion stated:

> This is a case where a court has refused to make its ruling retroactive, and the novel stand is taken that the Constitution of the United States is infringed by the refusal.
>
> We think the Federal Constitution has no voice upon the subject. A state in

Organizing Comm., CIO v. Windsor, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957)); *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 374, 60 S.Ct. 317, 318–19, 84 L.Ed. 329 (1940) (rejected any "principle of absolute retroactive invalidity").

**31.** *E.g., Gulesian v. Dade County Sch. Bd.*, 281 So.2d 325, 326 (Fla.1973) (refused to order refund of ad valorem taxes collected under unconstitutional school funding bill because it would cause fiscal chaos, and school boards had relied in good faith on presumptively valid statute); *Southern Pac. Co. v. Cochise County*, 92 Ariz. 395, 403, 377 P.2d 770, 778 (1963) (prospectively invalidated tax assessment procedure to avoid "great economic hardship"); *Strickland v. Newton County*, 244 Ga. 54, 258 S.E.2d 132, 133–34 (1979) (prospectively applied invalidation of sales tax to avoid "unjust results"); *Jacobs v. Lexington–Fayette Urban County Gov't*, 560 S.W.2d 10, 14 (Ky.1977) (refused to retroactively apply holding invalidating unconstitutional personal property tax, to avoid a "chaotic disruption of services" and "a hardship upon all the citizens of that local government"); *Salorio v. Glaser*, 93 N.J. 447, 461 A.2d 1100, 1111 *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983) (prospectively applied invalidation of tax as of six months after decision); *Foss v. City of Rochester*, 65 N.Y.2d 247, 491 N.Y.S.2d 128, 136, 480 N.E.2d 717, 724–25 (1985) (refused to retroactively invalidate tax because city "would suffer an undue burden if it had to refund the taxes collected"); *Hurd v. City of Buffalo*, 41 A.D.2d 402, 343 N.Y.S.2d 950, 953–54 (App.Div.

1973) (refused to require refund of unconstitutional tax collected before date of decision), *aff'd*, 34 N.Y.2d 628, 355 N.Y.S.2d 369, 311 N.E.2d 504 (1974); *Metropolitan Life Ins. Co. v. Commissioner of Dep't of Ins.*, 373 N.W.2d 399, 412 (N.D.1985) (refused refund of unconstitutional state tax, to avoid "significant hardship upon the state's existing financial requirements"); *Soo Line R.R. v. State*, 286 N.W.2d 459, 465 (N.D.1979) (prospectively invalidated property tax method prospectively to avoid "chaos"); *Rio Algom Corp. v. San Juan County*, 681 P.2d 184, 196 (Utah 1984) (invalidated ad valorem taxes prospectively, except as to plaintiffs); *Bond v. Burrows*, 103 Wash.2d 153, 690 P.2d 1168, 1174 (1984) (denied refund of unconstitutional sales tax to avoid "great financial and administrative hardship"); *Gottlieb v. City of Milwaukee*, 33 Wis.2d 408, 147 N.W.2d 633, 646 (1967) (prospectively applied holding on unconstitutional property tax law to avoid creating fiscal problems).

**32.** *E.g., Serrano v. Priest*, 5 Cal.3d 584, 96 Cal. Rptr. 601, 626, 487 P.2d 1241, 1266 (1971), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977); *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 216 (Ky.1989); *Helena Elementary Sch. Dist. No. 1 v. State*, 236 Mont. 44, 769 P.2d 684, 693 (1989); *Seattle Sch. Dist. No. 1 v. State*, 90 Wash.2d 476, 585 P.2d 71, 104–05 (1978) (en banc); *Washakie County Sch. Dist. v. Herschler*, 606 P.2d 310, 337, 340 (Wyo.), *cert. denied sub nom., Hot Springs County Sch. Dist. No. 1 v. Washakie County Sch. Dist. No. 1*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980).

defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions. Indeed there are cases intimating, too broadly ... that it *must* give them that effect; but never has doubt been expressed that it *may* so treat them if it pleases, whenever injustice or hardship will thereby be averted.... On the other hand, it may hold to the ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration as law from the beginning.... The alternative is the same whether the subject of the new decision is common law ... or statute.... The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature. We review not the wisdom of their philosophies, but the legality of their acts. The State of Montana has told us by the voice of her highest court that with these alternative methods open to her, her preference is for the first. In making this choice, she is declaring common law for those within her borders. The common law as administered by her judges ascribes to the decisions of her highest court a power to bind and loose that is unextinguished, for intermediate transactions, by a decision overruling them. As applied to such transactions we may say of the earlier decision that it has not been overruled at all. It has been translated into a judgment of affirmance and recognized as law anew. Accompanying the recognition is a prophecy, which may or may not be realized in conduct, that transactions arising in the future will be governed by a different rule. If this is the common law doctrine of adherence to precedent as understood and enforced by the courts of Montana, we are not at liberty, for anything contained in the constitution of the United States, to thrust upon those courts a different conception either of the binding force of precedent or of the meaning of the judicial process.

*Id.* at 364–66, 53 S.Ct. at 148–49 (citations omitted).

The Supreme Court has recently reaffirmed *Sunburst* in *American Trucking Associations, Inc. v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990). There the Court stated:

When questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions.

*Id.* 110 S.Ct. at 2330 (citing *Sunburst*). Likewise, the Court stated, it has the sole authority to determine the retroactivity of its own decisions. The Court had previously held that certain unapportioned highway use taxes violated the Commerce Clause of the U.S. Constitution. In *American Trucking* the Court held that its prior decision should not be applied retroactively to require the State of Arkansas to refund the revenue collected under such a tax before the Supreme Court's initial decision.

The same day *American Trucking* was decided, the Court held in another case that the State of Florida was required to refund preferential liquor excise taxes levied in violation of the Commerce Clause of the U.S. Constitution. *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco,* 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). The difference between the two cases, the Court explained in *American Trucking,* was that the Florida tax in *McKesson* had been levied after such taxes had been held to be unconstitutional, and Florida was thus on notice of the Court's holding before the tax was authorized. Thus, the issue was not retroactivity but the failure of Florida to follow Court precedent in fashioning its tax laws. As the Court stated: "Of course, we had no occasion to consider the equities of *retroactive* application of new law in *McKesson* because that case involved only the application of settled Commerce Clause precedent." 110 S.Ct. at 2332.

*American Trucking* recognizes that some judicial decisions, including decisions invalidating taxes, should be applied only prospectively.[33] Its reaffirmance of *Sunburst* establishes that when the issue is whether the decision of a state court should be retroactive, that issue is to be decided by the state court. Our Court has also recognized that whether to apply a state law decision retroactively or prospectively is well within our discretion. *Huston v. FDIC*, 800 S.W.2d 845, 849 (Tex. 1990); *see also Sanchez*, 651 S.W.2d at 254 (citing *Sunburst*). Other jurisdictions likewise have adopted this same position. *E.g., Board of Comm'rs of Wood Dale Pub. Library Dist. v. County of Du Page*, 103 Ill.2d 422, 83 Ill.Dec. 224, 226, 469 N.E.2d 1370, 1372 (1984); *Jacobs*, 560 S.W.2d at 14; *Metropolitan Life*, 373 N.W.2d at 408; *Soo Line*, 286 N.W.2d at 466; *Rio Algom*, 681 P.2d at 195.

Although we have the authority to determine the effect of our decisions and have frequently exercised it, we have not clearly articulated the factors which bear upon such decisions. Twenty years ago the United States Supreme Court first adopted a three-part analysis to help resolve questions of civil prospectivity:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed.
>
> Second, ... [the court] must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.
>
> Finally, [the court must] weig[h] the inequity imposed by retroactive application, for where a decision of [the court] could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the injustice or hardship by a holding of nonretroactivity.

*Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971).[34] A number of states have used the

---

**33.** In *American Trucking,* Justice Scalia concurred with four other members of the Court in holding that Arkansas was not required to refund the taxes in issue. However, Justice Scalia refused to join the analysis employed by the plurality, arguing instead that courts should never engage in prospective decision making. Because only four members joined in the plurality opinion refusing to give retroactive effect to a decision that taxes like Arkansas' are unconstitutional, the dissent suggests that a majority of the U.S. Supreme Court no longer favors applying some judicial decisions prospectively only, and that we therefore cannot consider doing so in this case. The dissent's argument is without merit for several reasons. First, precedent is more binding than prognosis. What the Supreme Court may do in future cases involving retroactivity issues is not as significant as what it has already done in decided cases. Second, the Supreme Court's recent retroactivity discussions have evoked substantial discussion, raising many considerations which have not yet received full attention. *See* Fallon & Meltzer, *New Law, Non–Retroactivity, and Constitutional Remedies,* 104 HARV.L.REV. 1733, 1832 (1991). Finally, the ongoing debate in the Supreme Court over what retroactive effect its decisions must be given does not dictate our own resolution of this issue. Throughout the debate, *Sunburst,* which allows each court to arrive at its own resolution of the issue, has not been questioned.

**34.** The dissent mistakenly interprets *James B. Beam Distilling Co. v. Georgia*, —— U.S. ——, 111 S.Ct. 2439, 2448, 115 L.Ed.2d 481 (1991), as casting doubt on the *Chevron* test. In fact, Justice Souter, who announced the Court's decision in that case, joined by Justice Stevens, took care to state that his opinion did not limit *Chevron:* "The grounds for our decision today are narrow. They are confined entirely to an issue of choice of law: when the Court has applied a rule of law to the litigants in one case it must do so with respect to all others not barred by procedural requirements or res judicata. *We do not speculate as to the bounds or propriety of pure prospectivity.*" (Emphasis added). Justice White, concurring in the judgment, stated: "[t]he propriety of prospective application in this Court, in both Constitutional and statutory cases, is settled by our prior decisions." *Id.* 111 S.Ct. at 2449. Justices O'Connor, Kennedy, and the Chief Justice affirmed the vitality of prospectivity, noting that "it is precisely in determining general retroactivity that the *Chevron Oil* test is most needed.... The inquiry the Court summarized in *Chevron Oil* represents longstanding doctrine on the application of nonretroactivity to civil cases." *Id.* 111 S.Ct. at 2452. Furthermore Justice Stevens, the author of the

*Chevron* test in resolving their own prospectivity questions.[35] We have applied the test in matters involving federal constitutional law. *Wessely Energy Corp. v. Jennings,* 736 S.W.2d 624, 628 (Tex.1987), and

dissent in *American Trucking,* refused to join Justices Blackmun, Scalia, and Marshall's dissents or to question *Chevron's* vitality.

**35.** *E.g., Ex parte Coker,* 575 So.2d 43, 52 (Ala. 1990) (noted usefulness of the *Chevron* test and applied it to state law question); *Alaskan Village, Inc. v. Smalley,* 720 P.2d 945, 949 (Alaska 1986) (new rule could be applied prospectively if "(1) the rule is one of first impression ... (2) defendant justifiably relied on prior interpretations, (3) undue hardship would result, and (4) the purpose and effect of the holding is best served by a purely prospective application"); *Chevron Chem. Co. v. Superior Court,* 131 Ariz. 431, 641 P.2d 1275, 1280 (1982) (en banc) (noted its approval of the *Chevron* test and applied it in the case); *Woods v. Young,* 53 Cal.3d 315, 279 Cal.Rptr. 613, 807 P.2d 455, 463 (1991) ("Particular considerations relevant to the retroactivity determination include the reasonableness of the parties' reliance on the former rule, the nature of the change as substantive or procedural, retroactivity's effect on the administration of justice, and the purposes to be served by the new rule"); *Wood Dale,* 83 Ill.Dec. at 226–28, 469 N.E.2d at 1372–74 (applied *Chevron* to determine whether decision invalidating county practice of retaining interest on investment of tax receipts should be applied retroactively); *Schrottman v. Barnicle,* 386 Mass. 627, 437 N.E.2d 205, 209 (1982) (applied test almost identical to the *Chevron* test in determining whether to apply libel rule prospectively); *Moorhouse v. Ambassador Ins. Co., Inc.,* 147 Mich.App. 412, 383 N.W.2d 219, 223 (1985) (examined "(1) the purpose of the new rule, (2) the general reliance upon the old rule, and (3) the effect of full retroactive application of the new rule on the administration of justice."); *Sumners v. Sumners,* 701 S.W.2d 720, 724 (Mo.1985) (en banc) (adopted a test closely resembling *Chevron*); *Orleans v. Commercial Union Ins. Co.,* 133 N.H. 493, 578 A.2d 360, 362 (1990) (declined to adopt *Chevron* test outright but noted its usefulness and applied it); *Rutherford Educ. Ass'n v. Board of Educ.,* 99 N.J. 8, 489 A.2d 1148, 1155–56 (1985) (test contained "virtually the same factors" as the *Chevron* test); *Gurnee v. Aetna Life & Casualty Co.,* 55 N.Y.2d 184, 448 N.Y.S.2d 145, 433 N.E.2d 128, 130–31 (1982) (court used *Chevron* test to determine if state insurance law decision should be given retroactive effect); *Fountain v. Fountain,* 214 Va. 347, 200 S.E.2d 513, 514–15 (1973) (explained that "consideration should be given to the purpose of the new rule, the extent of the reliance on the old rule, and the effect on the administration of justice of a retroactive application of the new rule").

we consider it to be equally useful in matters of state law. Accordingly, we consider whether our decision today should be applied retroactively in light of *Chevron's* three factors.[36]

In the most recent application of the *Chevron* test by a state court, the North Carolina Supreme Court noted that "we might conclude from *American Trucking* that a majority of the Supreme Court is moving away from the non-retroactive application of constitutional decisions. We do not believe we should so conclude. In *Beam* the Court had an opportunity to say that the rule of *Chevron* should no longer be applied in civil cases and declined to do so." *Swanson v. State,* 329 N.C. 576, 407 S.E.2d 791, 795 (1991); *see Stroh Brewery Co. v. Department of Alcoholic Beverage Control,* 112 N.M. 468, 816 P.2d 1090, 1093–94 (1991).

**36.** Conflict exists among the various courts that use the *Chevron* test concerning the weight each *Chevron* factor should be given in applying the test. *See* Cameron S. Delong, Note, *Confusion in Federal Courts: Application of the Chevron Test in Retroactive–Prospective Decisions,* 1985 U.ILL.L.REV. 117, 128 (1985). Some federal courts require the proponent of prospective application to demonstrate that each of the *Chevron* factors favors a prospective decision. *See, e.g., Lowary v. Lexington Local Bd. of Educ.,* 903 F.2d 422, 427 (6th Cir.1990); *Schaefer v. First Nat'l Bank,* 509 F.2d 1287, 1294 (7th Cir.1975). We decline to follow these cases and instead adopt the approach followed by the majority of federal courts which allows a broader balancing among the three *Chevron* factors. *Silverman v. Barry,* 845 F.2d 1072, 1085–86 (D.C.Cir.1988) (court applied decision prospectively despite fact that second prong did not favor prospectivity); *Jones v. Consolidated Freightways Corp.,* 776 F.2d 1458, 1460 (10th Cir.1985) ("A proper assessment under *Chevron Oil* focuses upon the relative significance of the individual *Chevron* factors. It is not necessary that each factor compel prospective application"); *Barina v. Gulf Trading & Transp. Co.,* 726 F.2d 560, 564 (9th Cir.1984) (prospective application allowed because "the strength of the considerations relating to the first and third factors outweigh[ed] that relating to the second factor ..."); *Stretton v. Penrod Drilling Co.,* 701 F.2d 441, 445–46 (5th Cir.1983) (court allowed prospective holding despite concluding that the second prong favored a retroactive holding); *Simpson v. Director, Office of Workers' Compensation,* 681 F.2d 81, 85 (1st Cir.1982); *Cash v. Califano,* 621 F.2d 626, 629 (4th Cir.1980) ("The application of [the *Chevron*] factors is not accomplished through a discrete reference to each separate factor, but by an analysis of how they interact with one another"). We share the view of the First Circuit, that "[t]he [*Chevron*] factors are not discrete, disembodied tests, but rather offer three

First, today's decision involves issues of first impression whose determination was not clearly foreshadowed. There is, as we have noted, a dearth of caselaw interpreting the constitutional provisions in issue, and none of those cases involve circumstances like those presented in this case. No Texas court has previously addressed a challenge brought under article VIII, section 1-e. In only one previous instance has this Court spoken on article VII, section 3-b, and that case did not address the issues presented by the case at bar nor did it foreshadow our decision today. Witnesses who testified before the Legislature concerning the same issues were in vigorous disagreement. The first *Chevron* factor favors a prospective application of our decision.[37]

The second factor of the *Chevron* test is the "prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." The "rule in question" in this case is not a simple one because more than one constitutional provision is involved. Part of the purpose of article VII, section 3

is to provide for the creation and funding of school districts. The CED tax levied by Senate Bill 351 will provide an essential part of public school funding for the school year now half past. If we should apply our decision retroactively and require a refund of those taxes, the effect upon the school system would be devastating. Many schools, we are assured by the parties, would not be able to operate through the end of the year. Another part of the purpose of article VII, section 3, however, is to condition school districts' power to levy on the approval of the electorate. By applying our decision prospectively, we allow the collection of a tax without voter approval, in derogation of this constitutional provision. We also allow levy of a state ad valorem tax in violation of article VIII, section 1-e. There is no need to attempt a detailed analysis of all the purposes served by the constitutional provisions at issue here, and how those various purposes would be affected by a retroactive or prospective decision in this case. Suffice it to say that the effect of a retroactive application of our decision would be so damaging

---

perspectives on the central question of retroactivity: was reliance on a contrary rule so justified and the frustration of expectation so detrimental as to require deviation from the traditional presumption of retroactivity." *Simpson,* 681 F.2d at 85.

**37.** The dissent is logically inconsistent in its analysis of this *Chevron* factor. On the one hand, the dissent argues that the Court plainly told the Legislature in *Edgewood II* that the plan embodied in Senate Bill 351 was constitutional. On the other hand, the dissent argues that today's decision exactly to the contrary is nothing new. In fact, the dissent is wrong on both counts: we did not pre-approve Senate Bill 351 in *Edgewood II* or otherwise so foreshadow today's decision that it must be applied retroactively.

The flaw in the dissent is the "fallacy of the excluded middle": the dissent argues that the Court must take one of two extreme positions because there is no ground between them. Thus, according to the dissent, the Court must hold that *Edgewood II* clearly foreshadowed that a school finance system like that adopted in Senate Bill 351 either would be constitutional, so that the Court has now misled the Legislature, or would be unconstitutional, so that today's decisions cannot be made to apply prospectively only. The truth, however, is that

*Edgewood II* did neither; it simply did not address the issues here because they were not raised in that proceeding. The issue is *Edgewood II* was whether the Legislature had adopted an efficient school finance system. Tax base consolidation and its possible problems were discussed simply as one alternative the Legislature might consider. We said only that it is possible to consolidate school district tax bases without violating the Constitution. In that very limited context, we obviously contemplated tax authorization elections and said so. But we were not asked by any party to decide, and we did not hold that voter approval either would or would not be required; the issue was not properly before us.

The dissent also contends that prospective application of our decision in this case is inconsistent with our recent opinion in *Caller-Times Publishing Co. v. Triad Communications, Inc.,* 826 S.W.2d 576 (Tex.1991). There we determined for the first time the elements required to prove predatory pricing, but refused to remand the case for retrial. Although the issue was one of first impression for us, it has been addressed by dozens of courts and commentators throughout the country for years. We were not writing on a clean slate; rather, our state antitrust statute requires us to construe it in harmony with federal antitrust law. See TEX. BUS & COM.CODE § 15.04. By contrast, the constitutional issues raised in the present case, and

to the school system it could not further any purpose of the Constitution.

The third element of the *Chevron* test calls us to examine the equitable considerations involved in applying a decision prospectively or retroactively. In particular, the court should consider the injustice or hardships that would result from a retroactive application. Again, a retroactive holding would severely disrupt school finances during the current school year. It would cause wasteful school closings, delays in payments to teachers and administrators, and inestimable damage to the children whose education could be interrupted for an indeterminable amount of time. The Legislature should not be permitted to impose an illegal tax on the citizens of this State. As onerous as this burden is, however—and it is very onerous, indeed—we believe that equitable considerations favor avoiding a very serious disruption in the education of Texas' children. Although the considerations on both sides of this factor are significant, we believe that the balance clearly favors a prospective application of our decision.

Based upon all three of the *Chevron* factors, we conclude that our decision in this case should be applied prospectively. The dissent argues that a decision applied prospectively is advisory. Opinion at 524 (citing *Wessely,* 736 S.W.2d at 628 ("[t]o

declare [a statute] unconstitutional and then not apply the holding [in the same case] would transform our pronouncement into mere advice")). In some respects, of course, every prospective decision is advisory. Nevertheless, this Court, and every other jurisdiction of which we are aware, has recognized the necessity of prospective decisions in some circumstances. By applying our decision in this case prospectively, we do not leave the parties before us unaffected. We only limit that relief because it is impossible to give full retroactive effect to our decision without destroying the constitutionally guaranteed interests that it serves.[38]

### C

In *Edgewood I,* we announced our decision on October 2, 1989, but stayed its effect for about seven months, until May 1, 1990, to give the Legislature an opportunity to respond. 777 S.W.2d at 399. There was no regular session of the Legislature during this time period, but the subject of school finance was considered in four called sessions. *Edgewood II,* 804 S.W.2d at 493 n. 3.[39] The Legislature enacted Senate Bill 1 on June 6, 1990, a little more than a month after the deadline we set. Act of June 6, 1990, 71st Leg., 6th C.S., ch. 1, 1990 Tex.Gen.Laws 1. In *Edgewood II,* we announced our decision on January 22, 1991, and stayed its effect until April 1, 1991, or just over two months, for enactment of

---

their peculiar application to public school funding in Texas, are unique.

**38.** The dissent criticizes the Court for affording only prospective relief when, of course, it would afford no relief at all, prospective or otherwise. Its professions of sympathy for taxpayers are thus most disingenuous. The dissent's position, in brief, is that Senate Bill 351 is constitutional, and that it should not be possible for the Court to reach a contrary conclusion without being compelled to destroy the public school system of Texas.

The dissent contends that the Court's decision forces taxpayers to pay an illegal tax in violation of their due process rights under the federal constitution. Our decision has no such effect because it is prospective only. We delay the effect of our holding until after collection of the 1991 and 1992 CED tax, as we are permitted to do under *Sunburst.* Enforcement of the CED

tax until our decision becomes effective is no more a denial of due process than denying Great Northern recovery of the rates it refunded to Sunburst in that case.

**39.** "We noted when we issued our opinion in *Edgewood I* that the Governor had called the Legislature into special session beginning November 14, 1989. 777 S.W.2d at 399 n. 8. The school funding system was not included in the call, however, until the third special session of the Legislature, which began February 27, 1990. That session adjourned without adopting corrective legislation, as did the fourth special session, which immediately followed and adjourned on May 1, 1990. At the fifth special session, which began May 2, 1990, a school finance bill was passed by both houses of the Legislature but was vetoed by the Governor on May 22, 1990. Tex.S.B. 1, S.J. OF TEX., 71st Leg., 5th C.S. 145

legislation to be effective by September 1, 1991. *Edgewood II*, 804 S.W.2d at 498–499 nn. 16–17. Although this time period was appreciably shorter than the deadline we had earlier prescribed, the Legislature was then in regular session. Senate Bill 351 was enacted April 11, 1991, and amended May 27, 1991. *ante*, at 492 n. 2. Other courts which have required revisions in their state's school finance laws have allowed time for their legislatures to respond ranging from an indefinite period to six months.[40]

In both of our prior cases, an important consideration in setting a reasonable deadline was the annual cycle of public school operations. Appraisal rolls must be certified by July 25, TEX.TAX CODE § 26.01, and submitted to taxing units by August 1, *Id.* at 26.04. School budgets must be prepared. TEX.EDUC.CODE § 23.42, and tax rates must be adopted by September 1, TEX.TAX CODE § 26.05. All of these deadlines could, of course, be adjusted by the Legislature. However, in order to cause as little disruption as possible to contracts, ordinary operations, and the public's expectations, we set a deadline that would give the Legislature as much time as possible to act before the beginning of the next school year.

Although we have repeatedly urged that school finance reform not be delayed, *Edgewood I*, 777 S.W.2d at 399, *Edgewood II*, 804 S.W.2d at 498–499, we recognize that the task is not an easy one. While the Governor could call the Legislature into special session at any time, the Legislature will not meet in regular session until January 1993. We wish to provide the Legislature sufficient opportunity to consider comprehensive reform to the public education system. However, as in the past, the Legislature must take corrective action as soon as it is possible to do so without unduly disrupting the orderly functioning of the schools.[41]

Accordingly, we hold Senate Bill 351 invalid, but defer the effect of this ruling so as not to interfere with the collection of all 1991 and 1992 CED taxes. Our ruling is not to be used as a defense to the payment of any such taxes. We extend the Legisla-

---

(1990). Senate Bill 1 was enacted during the sixth special session."

**40.** *The United States District Court which invalidated Texas' school finance system in 1971 allowed the Legislature two years to take corrective action. Rodriguez v. San Antonio Indep. Sch. Dist.,* 337 F.Supp. 280, 286 (W.D.Tex.1971). Those states that have held their systems to be unconstitutional have granted prospective relief of varying duration based upon the realization that the enormity of the task of restructuring the system would take some time. *E.g., Serrano v. Priest,* 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929, 940, 958 (1976) (trial court judgment setting a period of six years from the date of entry of judgment as a reasonable time for bringing the system into constitutional compliance affirmed); *Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359, 376 (1977) (stayed judicial intervention to afford the General Assembly an opportunity to take appropriate legislative action); *Rose v. Council for Better Educ., Inc.,* 790 S.W.2d 186, 216 (Ky.1989) (withheld finality of the judgment issued June 8, 1989 until 90 days after the adjournment of the General Assembly at its regular session in 1990); *Helena Elem. Sch. Dist. No. 1 v. State,* 236 Mont. 44, 784 P.2d 412, 413 (1990) (delayed effective date of February 1, 1989, judgment until July 1, 1991); *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273, 298

(1973) (issued no deadline: "some period of time will be needed to establish another statutory system, obligations hereafter incurred pursuant to existing statutes will be valid in accordance with the terms of the statutes"); *Robinson v. Cahill,* 63 N.J. 196, 306 A.2d 65, 66 (per curiam) (court would not disturb the statutory scheme unless the Legislature failed to enact by December 31, 1974, legislation compatible with decision and effective no later than July 1, 1975), *cert. denied sub nom., Dickey v. Robinson,* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973); *Seattle Sch. Dist. No. 1 v. State,* 90 Wash.2d 476, 585 P.2d 71, 105 (1978) (en banc) (opinion issued September 28, 1978, deemed all acts taken under existing statutes valid until July 1, 1981); *Washakie County Sch. Dist. No. 1 v. Herschler,* 606 P.2d 310, 337 (Wyo.) (court ordered that the conversion be in effect and underway not later than July 1, 1982), *cert. denied sub nom., Hot Springs County Sch. Dist. No. 1 v. Washakie County Sch. Dist. No. 1,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980).

**41.** We categorically deny the dissent's allegation that the court has deliberately delayed its decision. To the contrary, we have expedited consideration of this case and announced a decision as soon as we could complete our deliberations. The dissent's insinuation that the is-

ture a longer period in which to act that it may have sufficient time to consider all options fully. We do not, however, encourage it to exhaust the time we have allotted. The Governor may well consider that the best interests of the people require that the Legislature be called immediately into session to adopt a constitutional school finance plan for the coming school year. Legislators, too, may believe that the best interests of their constituents mandate immediate action. We simply urge the other two branches of government not to delay. We require only that corrective measures be adopted before the 1993–1994 school year, specifically by June 1, 1993. To assure enforcement of this deadline, we modify the injunction previously issued by the 250th District Court as set out in the footnote.[42]

## VII

### A

■ As before, we do not prescribe the structure for "an efficient system of public free schools." The duty to establish and provide for such a system is committed by the Constitution to the Legislature. TEX. CONST. art. VII, § 1. Our role is only to determine whether the Legislature has complied with the Constitution. We have not, and we do not now, suggest that one way of school funding is better than another, or that any way is past challenge, or that any member of this Court prefers a particular course of action (other than what those Justices writing separately today have expressed for themselves), or that one measure or another is clearly constitutional. Unlike the dissent, we do not contemplate that our review of the school finance system in this litigation will continue indefinitely. Rather, we hope and expect that the Legislature will immediately make sound changes in the system that will withstand constitutional challenge.

We offer only two additional observations. The first is that the consensus for at least two decades has been that systemic change is essential to correct the deficien-

suance of this opinion is related in any way to any other event is totally unfounded.

**42.** The 18th District Court and the 32nd District Court denied injunctive relief in the proceedings before them, respectively. The 250th District Court previously issued the following injunction:

### INJUNCTION

It is hereby ORDERED that William N. Kirby, Commissioner of Education, and Robert Bullock, Comptroller of the State of Texas and their successors, and each of them, be and are hereby enjoined from giving any force and effect to the sections of the Texas Education Code relating to the financing of education, including the Foundation School Program Act (Chapter 16 of the Texas Education Code); specifically said Defendants are hereby enjoined from distributing any money under the current Texas School Financing System (Texas Education Code § 16.01, *et seq.*, implemented in conjunction with local school district boundaries that contain unequal taxable property wealth for the financing of public education).

It is further ORDERED, that this injunction shall in no way be construed as enjoining Defendants, their agents, successors, employees, attorneys, and persons acting in concert with them or under their direction, from enforcing or otherwise implementing any other provisions of the Texas Education Code.

In order to allow Defendants to pursue their appeal, and should this decree be upheld on appeal, to allow sufficient time to enact a constitutionally sufficient plan for funding public education, this injunction is stayed until September 1, 1989. It is further ORDERED that in the event the legislature enacts a constitutionally sufficient plan by September 1, 1989, this injunction is further stayed until September 1, 1990, in recognition that any modified funding system may require a period of time for implementation. This requirement that the modified system be in place by September 1, 1990, is not intended to require that said modified system be fully implemented by September 1, 1990.

In *Edgewood II,* we modified this injunction to extend the date September 1, 1989, to April 1, 1991, and the date September 1, 1990, to September 1, 1991. 804 S.W.2d at 499 n. 17. We now modify this injunction to extend the original date September 1, 1989, to June 1, 1993, and the original date September 1, 1990, to September 1, 1993. We also modify the injunction to include the CEDs and to change the names of the parties. We do not direct the 18th and 32nd District Courts to issue identical injunctions; the modified injunction of the 250th District Court is sufficient to effectuate relief.

The modified injunction will not bar suits for collection of delinquent taxes, penalties and interest.

cies in the school finance system. In *Rodriguez*, the U.S. Supreme Court observed:

> The need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax. And certainly innovative thinking as to public education, its methods, and its funding is necessary to assure both a higher level of quality and greater uniformity of opportunity. These matters merit the continued attention of the scholars who already have contributed much by their challenges. But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them.

411 U.S. at 58–59, 93 S.Ct. at 1309–1310. In *Edgewood I*, we stressed, "the system itself must be changed." 777 S.W.2d at 397. As long as our public school system consists of variations on the same theme, the problems inherent in the system cannot be expected to suddenly vanish.[43]

The second observation we would offer is that, although the issues brought before us in *Edgewood I*, *Edgewood II*, and now *Edgewood III*, have all been limited to the financing of the public schools, as opposed to other aspects of their operation, money is not the only issue, nor is more money the only solution. Contrary to the dissent's suggestion, an income tax is not the only remedy. In *Edgewood I* we stated: "More money allocated under the present system would reduce some of the existing disparities between districts but would at best only postpone the reform that is necessary to make the system efficient." 777 S.W.2d at 397. We are constrained by the arguments raised by the parties to address only issues of school finance. We have not been called upon to consider, for example, the improvements in education which could be realized by eliminating gross wastes in the bureaucratic administration of the system. The Legislature is not so restricted.

**B**

In summary, we hold that the public school finance system enacted under Senate Bill 351 levies a state ad valorem tax in violation of article VIII, section 1–e, and levies an ad valorem tax without an election in violation of article VII, section 3 of the Texas Constitution. However, we defer the effect of our ruling as stated in part VI C of this opinion, and direct the Judge presiding in Cause No. 362,516–A, docketed in the 250th District Court, Travis County, Texas, to re-issue the injunction previously issued, (see footnote 42 of this opinion and *Edgewood II*, 804 S.W.2d at 498, n. 16,) as modified in this opinion. The causes are remanded to the respective courts for further proceedings consistent with this opinion.

There remains for the Legislature and the Governor the responsibility for reforming the public school system to comply with the sovereign will of the people expressed in our Constitution. We trust that they will make the necessary structural changes without unnecessary delay.

Concurring and dissenting opinions by CORNYN and GAMMAGE, JJ.

Dissenting opinion by DOGGETT, J., joined by MAUZY, J.

CORNYN, Justice, concurring and dissenting.

Each time this court has held Texas' system of public school finance unconstitutional we have prospectively enjoined the payment of state funds used to finance the system. The reason we have eschewed an immediate effect of our ruling, in favor of prospective relief, has been a desire to ameliorate any unduly disruptive impact of our ruling on our school children. Today, the court holds that the CED tax enacted by Senate Bill 351 is unconstitutional, a decision which I join. Furthermore, in an effort to alleviate the harm to school children

---

**43.** It should go without saying that the Court does *not endorse* in any way the dissent's suggestion that voters could be forced to choose between approval of CED taxes and school district consolidations. Without relaxing the mandatory nature of the tax imposed by Senate Bill 351, voter approval alone would not avoid the obstacle of article VIII, section 1–e.

whose schools would be closed were it not for the revenue produced by that tax, we hold that 1991–92 taxes are nevertheless still due. I agree that a proper balancing of the equities compels this result too.

But the court veers from the straight and narrow path of judicial propriety and into a constitutional ditch by, in effect, telling taxpayers that an unconstitutional CED tax must be endured for an additional tax cycle because this is an election year. The court apparently believes that citizen opposition to the available legislative alternatives to Senate Bill 351 will be too irresistible to permit the type of fundamental reforms which this court has repeatedly held are indispensable to an efficient system of public education. However, this simply is not an equitable or legal basis for the court to refuse to perform its clear duty. Political pressures, the reason for delaying the effect of today's judgment for two tax cycles, do not rise to the same level in equity as the potential disruption of the school system which is the reason for the correct holding that the 1991–92 taxes are still due.

Moreover, the purported justification the court offers for delaying the effect of today's ruling an additional year simply cannot withstand scrutiny. Even if one assumes that the purported justification is valid, the court can offer taxpayers no reassurance that similar political pressures will not likewise be present in the next general session of the legislature. There is something fundamentally wrong with the court's logic when it can so dramatically and decisively strike down one constitutional violation, as we have done in *Edgewood I* (*Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391 (Tex.1989)) and *Edgewood II* (804 S.W.2d 491 (Tex.1991)), only to abide another constitutional violation for two years because of political expediency. Furthermore, the court itself unnecessarily contributes to the delay, and resulting confusion, in establishing a constitutional school system by its two-year postponement of the effect of its judgment. Does the court really expect the legislature to react in advance of any deadline we might set? Experience should tell us that any

such expectation is unwarranted. The wound that the court self-inflicts today will be slow to heal. The court's disparate treatment of two different violations of the same constitution is a starkly unacceptable abdication of its constitutional responsibility. We either have a constitution which is the fundamental law of our state or we do not. Out of due regard for the rule of law, the constitution must be enforced or it must be amended—the law simply cannot be ignored or its enforcement delayed for reasons of expediency. For these reasons, although I join in the court's judgment and opinion in all other respects, I dissent from section VI, C of the court's opinion and decline to join in that portion of the judgment that delays the effect of today's decision until 1993.

I.

Moreover, I believe that the exigencies of this case, particularly the likelihood that the constitutionality of our public school finance system will remain in doubt and unsettled for at least two more years, warrants a description of some of the key attributes of the kind of school finance system that would pass constitutional muster. In failing to describe those attributes, the court practically insures that public school finance litigation will remain unresolved anytime in the foreseeable future. Since this state-court litigation began in 1984, equitable funding for our public schools has dominated our three opinions and the ensuing legislative debate. Only in passing has the *quality* of the public education system in Texas been addressed. Yet our system of public education languishes in mediocrity with no improvement in sight. If educational achievement, by constitutional means, is not the *solitary goal* of our system of public education, there is a different battle being waged in the name of public education from that which has been generally argued and popularly assumed. *See n. 8, infra.* Equitable funding can only be one means to that end. An "efficient" education requires more than elimination of gross disparities in funding; it requires the inculcation of an

essential level of learning by which each child in Texas is enabled to live a full and productive life in an increasingly complex world. There comes a time when patience to permit the legislative process to run its course ceases to be a virtue. I am convinced that the extraordinary nature of these proceedings demands that the court discard its collective mask of inscrutability and describe the basic elements of an efficient system of public education in Texas. I am convinced that we do not serve the school children of our state well by merely reversing this case and, in effect telling the legislature to "try, try again," without guidance. Otherwise, given the history of school funding in Texas, recounted in all-too-painful detail in JUSTICE GONZALEZ'S opinion, the constitutional requirements of the public school system in Texas are certain to be litigated for years to come.[1] Surely, no one can contend that interminable litigation serves the best interests of our school children. Nor does it solve the fundamental defects in our schools. Many, far too many, of our children are educationally crippled by illiteracy due to the lack of a basic education when they exit the public school system. I am concerned that we will ultimately conclude, like New Jersey's Supreme Court did after 17 years of litigation, that we have not laid these issues to rest. *See Robinson v. Cahill*, 62 N.J. 473, 514, 303 A.2d 273 (1973), *cert. denied sub nom., Dickey v. Robinson*, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973); *Abbott v. Burke*, 119 N.J. 287,

575 A.2d 359, 404 (1990). Or, finally, in the words of one of the judges below, we may begin

> to wonder if [w]e ha[ve] been assigned to some judicial purgatory where [w]e must hear the same case over and over.

*Edgewood III*, slip op. at 36.

The fact that this court has never given more than a hint of the substantive level of education our constitution requires[2] has not been met with universal aplomb.[3] As a consequence,

> [g]iven the passions, entrenched bureaucracies, scarcity of resources, and conflicting interests, informed political horse-trading and not rational models have and will continue to carry the day in education finance.

Yudof, *School Finance Reform* at 597.

In the rough and tumble of another attempt to resolve this crisis, it is fundamentally important that the legislature be mindful of all of the elements of the efficiency standard we announced in *Edgewood I*. That standard deals with more than money, it mandates educational results. Otherwise, we may end up like Connecticut, for example, where after years of "legally successful" school finance litigation which increased the state's financial support to public schools by 35%, student performance has not significantly improved. Liebman, *Implementing Brown in the Nineties: Political Reconstruction, Liberal Recollection, and Litigatively En-*

---

1. This case will, if it has not already, become like the notorious, albeit fictional, case of Jarndyce and Jarndyce:

 Jarndyce and Jarndyce drones on. This scarecrow of a suit has, in course of time, gotten so complicated that no man alive knows what it means. The parties to it understand it least; but it has been observed that no two Chancery lawyers can talk about it for five minutes without coming to a total disagreement as to all the premises.

 Charles Dickens, BLEAK HOUSE 52 (Penguin classics ed. 1971)

2. Rather we have said, first in *Edgewood I*:

 [W]e do not now instruct the legislature as to the specifics of the legislation it should enact....

 777 S.W.2d at 399. Similarly, in *Edgewood II* we reiterated:

We do not prescribe the means which the Legislature must employ in fulfilling its duty. 804 S.W.2d at 498.

3. We are informed that "the question asked by most legislators [is] ...: How can the basic structure of the educational system be maintained, with minimal changes, while still satisfying the state constitution?" Yudof, *School Finance Reform: Don't Worry, Be Happy*, 10 REV. OF LITIG. 585, 587 (1991) (hereinafter Yudof, *School Finance Reform*); *see also* Parker & Weiss, *Litigating Edgewood: Constitutional Standards and Application to Educational Choice*, 10 REV. OF LITIG. 599, 600 (1991) ("[T]he court has demanded a legislative solution that passes constitutional muster but has never clearly enunciated the elements of a constitutional system").

*forced Legislative Reform,* 76 VA.L.REV. 349, 392–93, n. 144 (1990). Or, we may ultimately conclude, like New Jersey, which spends more per student than any other state except Alaska, that: "[B]eyond doubt ... money alone has not worked." [4] *Abbott v. Burke,* 119 N.J. 287, 575 A.2d 359, 404 (1990). Accordingly, in addition to its anticipated efforts to address financial aspects of educational efficiency the Legislature should forthrightly embrace the equally difficult issue of how the educational dollar in Texas is spent. A focus on results is required by this court's opinions in *Edgewood I* and *Edgewood II* and requires the legislature to articulate the requirements of an efficient school system in terms of educational results, not just in terms of funding. Although the legislature currently requires testing of student competence in reading, writing, social studies, science and mathematics, overall performance of Texas' school children on these tests has been despairingly poor.

Texas does not start with a blank slate. Other states have struggled, successfully, with similar constitutional mandates for "efficient" schools. The example of other states points to the need for the legislature to clearly define, and then fund, a minimally adequate education for all Texas school children. This means that for those districts which cannot do so based on local tax effort, the state must provide sufficient means. For those students and schools who are not getting a minimally adequate education because they speak English as a second language, because of learning disabilities—for whatever reason—the state must fund remedial instruction and programs, triggered by substandard performance, to bring them up to the legislatively articulated standard. Only then will the Texas public school system be constitutionally efficient.

**4.** New Jersey's Supreme Court ultimately concluded that although the standard set by the legislature for a thorough and efficient system was adequate (the court noted the funding mechanism equalized spending per child in 64% of the districts but nevertheless that gross disparities were eliminated), the monitoring system designed to measure educational results had not realized its lofty objectives. *Id.* at 370.

II.

In *Edgewood II,* in an opinion denying plaintiff-intervenors' motion for rehearing, we wrote:

> [Plaintiff-intervenors] position raises the question of whether the Legislature may constitutionally authorize school districts to generate and spend local taxes to enrich or supplement an efficient system (footnote omitted). [T]he Constitution does permit such enrichment, without equalization....

*Edgewood II,* 804 S.W.2d at 499. In other words, we implied—but did not expressly state—that the Constitution does not require equalization of funds between students across the state. This means that the educational system in Texas is not constitutionally required to have equal funding per student. Further, implicit in the concept of an efficient school system is the idea that the output of the system should meet certain minimum standards—it should provide a minimally "adequate" education. Billy D. Walker, *Intent of the Framers in the Education Provisions of the Texas Constitution of 1876,* 10 REV. OF LITIG. 625, 661, n. 289–290 (1991) (hereinafter, *Intent of the Framers*). This was directly addressed in *Edgewood I,* when a unanimous court held:

> [e]fficient conveys the meaning of effective or productive of results and connotes the use of resources so as to produce results with little waste.[5]

777 S.W.2d at 395.

This is precisely the approach taken by the Supreme Court of Kentucky, for example, in requiring that "[e]ach child, *every* child, in this Commonwealth must be provided with equal opportunity to have an adequate education." *Rose v. Council for Better Educ.,* 790 S.W.2d 186, 211 (Ky.

**5.** Concern for efficiency in the education article in the Texas Constitution arose from a basic Texan sense of frugality, distrust of opulence, and a fear of government overreaching and excessive spending. Billy D. Walker, *Intent of the Framers* at 665.

1989). But the state's obligation to provide an adequate education does not seek equalization of school funds as its primary goal. Once a uniform, basic education is provided by the school system, equalization of funding is not necessary. As the Kentucky court noted:

> In no way does this constitutional requirement act as a limitation on the General Assembly's power to create local school entities and to grant to those entities the authority to supplement the state system.... [I]t may empower them to enact local revenue initiatives to supplement the uniform, equal educational effort that the General Assembly must provide. * * * Such [a] system will guarantee to all children the opportunity for an adequate education, through a *state* system. To allow local citizens and taxpayers to make supplementary effort in no way reduces or negates the minimum quality of education required in the statewide system.

*Id.* at 211–12.[6] Implicit in the Kentucky Supreme Court's rationale is the preservation of "local control." Indeed, "local control" by parents translates, at least in part, to "the freedom to devote more money to the education of [their] children." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 49, 93 S.Ct. 1278, 1305, 36 L.Ed.2d 16 (1972). It is not difficult to discern how "equality of funding" took center stage in this drama. In the trial of *Edgewood I,* Judge Harley Clark held H.B. 72, the public school finance system then in place, unconstitutional as violative of Texas Constitution, art. I, section 3 (equal rights

guarantee); art. I, section 19 (due course of law), and the "efficiency" mandate of art. VII, section 1. On appeal, because this court agreed that the system was unconstitutional under art. VII, section 1's "efficiency clause," it did not reach the other constitutional arguments.[7] 777 S.W.2d at 398.

In the trial of one of the consolidated causes, *Edgewood III,* Judge McCown nevertheless appears to have engrafted an equal rights (art. I, section 3) requirement on our *Edgewood* decisions. For example, Judge McCown wrote that "the constitutional rights of children to 'a substantially equal opportunity to have access to educational funds' are so strong that they cannot be thwarted by a local election." Slip op. at 8–9. I agree with one commentator who has written that "[t]his particular statement hints strongly at equal educational opportunity as a 'fundamental right,' an issue studiously avoided by the Texas Supreme Court in *Edgewood I* and not even mentioned in *Edgewood II* and *Edgewood IIa* (majority opinion on Motion for Rehearing)." Billy D. Walker, *The District Court and Edgewood III: Promethean Interpretation or Procrustean Bed?* at 12 (Oct. 1991) (unpublished monograph, on file with record).

In the trial court's defense, however, this court in *Edgewood I* concentrated on the disparity of educational funding in the state rather than educational results. Though that decision was based on the efficiency provision of our constitution, the

---

**6.** The Kentucky high court wrote, however:
> Such local efforts may not be used by the General Assembly as a substitute for providing an adequate, equal and substantially uniform educational system throughout this state.

*Id.* at 212.

**7.** Six states: Kentucky, Montana, New Jersey, Texas, Washington and West Virginia, have invalidated their public school financing systems based on their state constitution's education article, while rejecting or declining to reach equal protection claims. *Abbott v. Burke,* 119 N.J. 287, 575 A.2d 359, 373 (1990).

The state constitutions of Arkansas, Texas, Kentucky, Delaware, Virginia (until 1971) and Illinois (since 1970) require "efficient" public educational systems. States whose constitutions mandate "thorough and efficient" education systems include Ohio, Minnesota, Maryland, Pennsylvania, New Jersey, Illinois (from 1870–1970) and West Virginia. *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859, 865 (1979). "It appears to make no difference in the outcome [of school finance legal challenges] whether the clause says thorough, efficient, or thorough and efficient." Thro, *The Third Wave: The Impact of the Montana, Kentucky, and Texas Decisions on the Future of Public School Finance Reform Litigation,* 19 J.L. & EDUC. 219, 244 n. 134 (1990).

court did on occasion use equal rights terminology. For example, the court stated: [i]t is apparent from the historical record that those who drafted and ratified article VII, section 1 never contemplated the possibility that such gross *inequalities* could exist within an 'efficient' system. *Id.* (emphasis added). This word choice was unfortunate because the court expressly did not reach the equal rights issue; the court was addressing the 700–1 disparity in revenue available for education when the richest and poorest school districts were compared, ranging in expenditures per student from $2,112 to $19,333. In fact, the trial court, by subtly changing the court's "efficiency" rationale in *Edgewood I,* has contributed to the legislative dilemma. By mandating strict equality in funding as the solitary goal of efficiency rather than requiring a system that is productive of results, the trial court has in my opinion skewed our holdings in *Edgewood I* and *II.*[8]

Fiscal input alone offers no guarantee of a quality education. This is because pure "equality of input" requirements do not require a positive correlation between dollars spent (input) and quality of education realized (output). A school system where so few children demonstrate mastery of basic educational skills cannot be constitu-

tionally efficient, no matter what level of funding is provided. Elimination of gross funding disparities alone will not result in an efficient school system.

The unwelcome constitutional responsibility of attempting once again to enact a constitutional school finance system following rendition of the present judgment presents the legislature with the formidable duty to enact and to fund a school system that meets minimum standards of academic achievement.[9]

## III.

An efficient school system cannot be achieved through simple control of the inputs to the system (and certainly not through control of funding alone); the outputs of the system must be monitored and measured against a standard and the inputs must then be adjusted to correct any deficiencies.

## A.

In *Edgewood I* the court assumed as true a conclusion that is, in fact, widely disputed by experts when it wrote:

The amount of money spent on a student's education has a real and meaning-

---

**8.** It has been argued that fundamental rights analysis could be applied to compel increased state government funding of higher education, indigent health care, housing, and abortions. *See generally* Albert H. Kauffman & Carmen Maria Rumbaut, *Applying* Edgewood v. Kirby *to Analysis of Fundamental Rights Under the Texas Constitution,* 22 ST. MARY'S L.J. 69 (1990).

**9.** Texas, like Arkansas, New Jersey and New York, for example, already uses minimum competency tests to identify students lacking basic skills and schools in need of improvement (including 'failing' schools), to determine students' needs and eligibility for remedial services and certain dedicated funds. *See* Title 2, Ch. 21, Subchapter O, TEX.EDUC.CODE; *See also* Liebman, *Implementing Brown in the Nineties: Political Reconstruction, Liberal Recollection, and Litigatively Enforced Legislative Reform,* 76 VA. L.REV. 349, 376 n. 102 (1990). However, there is no state definition of what constitutes a basic or adequate education in Texas; and, because that right has not been clearly articulated as a constitutional right, there is no current legal requirement that such an education be ade-

quately funded. Although the purpose of the Foundation School Program, first enacted in 1949, is to provide "adequate resources to provide each eligible student a basic instructional program and facilities suitable to the student's educational needs," under S.B. 351 the Foundation program provides for a basic allotment per school district of only $2,200 for the school year 1991–92. *See* § 16.002, TEX.EDUC.CODE; *Edgewood III,* slip op. at 4. "[T]he Foundation School Program does not cover even the cost of meeting the state-mandated minimum [financial] requirements." *Edgewood I,* 777 S.W.2d at 392.

Furthermore, in order to receive Foundation School funds, a school district need only comply with state-mandated standards regarding number of school days, accreditation by the Central Education Agency, student/teacher ratios, composition of professional and paraprofessional personnel and teacher Career Ladder Salary Supplementation. Ch. 16, Subchapter B, TEX. EDUC.CODE. None of the requirements of the current system even purport to address educational outputs on the level of an individual school or student.

ful impact on the educational opportunity offered to that student.

777 S.W.2d at 393. Significantly, the court offered no citation of authority for this conclusion. On the other hand, most educational experts agree that there is no direct correlation between money and educational achievement. Seventeen years before *Edgewood I*, the United States Supreme Court referred to an assumed correlation between money and academic achievement as a matter of "considerable dispute among educators and commentators." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 24 n. 56, 43 n. 86, 46–47 n. 101, 93 S.Ct. 1278, 1291 n. 56, 1302 n. 86, 1303 n. 101 (1972) ("[T]he extent to which the quality of education varies with expenditure per pupil is debated inconclusively by the most thoughtful students of public education"). Significantly, the debate over the unproven assumption that equal money means equal education rages still today, notwithstanding this unfortunate statement in *Edgewood I*.

For example, one commentator who recently published a survey of 187 educational studies, performed between 1967–1988, in an attempt to correlate expenditures with student achievement flatly concludes: "There is no systematic relationship between school expenditures and student performance." Eric A. Hanushek, *When School Finance "Reform" May Not Be Good Policy*, Vol. 28, No. 2 HARV.J. ON LEGIS. 423, 425 (Summer 1991). Indeed, if equal money meant equal education, it would be impossible to explain why some schools, operating on a fraction of the money, consistently out perform other better-funded schools.[10] Even among those experts that harbor hopes that increased money will result in increased academic achievement there are those who concede it does not do so across' the board.

> [T]here seems little question that money *could* count, but within the current organization of schools, it does not do so systematically.

*Id.* at 439 (emphasis added). However, it seems highly unlikely that judges are more qualified to discover a positive correlation between public school spending and academic achievement than the experts in the field.[11] In fact, to the contrary, student

---

10. *See note 12, infra; see also e.g.*, Peter M. Flanigan, *A School System That Works*, The Wall Street Journal, February 12, 1991, at A–12. New York City's public schools, at $6,700 per student, cost approximately twice the amount of the city's Catholic schools. Although 95% of the students entering high schools run by the Roman Catholic Archdiocese of New York graduate on schedule, the public high schools can only make that claim for about 25% of its students. Moreover, four out of five of the Catholic schools' graduates go on to post-secondary education. In contrast, graduates of New York's public schools frequently read and write far below grade level. Although the Archdiocesan schools were created to integrate Irish, Italian and Polish immigrants, when these groups moved out of the inner city they were replaced primarily by relatively poor black and Hispanic students.

> There are many reasons for the cost difference, and one of them is, as defenders of the public school system point out, that Catholic school teachers get smaller salaries than their public counterparts. But another, less often mentioned, is that the public system supports more than 7,000 bureaucrats in its headquarters and Community School Districts; the Catholic system employs fewer than 35 people in its central office.

*Id.*

11. In fact, it is precisely because of the historical difficulty in correlating input to output that some courts have held their school finance systems unconstitutional on inequality of funding alone—in other words, on equal protection grounds, a holding this court did not reach in *Edgewood I. See e.g.* Yudof, *Equal Educational Opportunity*, 51 TEX.L.REV. 411, 418 (1973) (describing the problem of correlating educational inputs and outputs at that time as not one of "will not," but "cannot"); J. Coons, W. Clune & S. Sugarman, PRIVATE WEALTH AND PUBLIC EDUCATION (1972) ("[T]he basic lesson to be drawn from the experts at this point is the current inadequacy of social science to delineate with any clarity the relation between cost and quality. We are unwilling to postpone reform while we await the hoped-for refinements in methodology which will settle the issue.") (cited in Eric A. Hanushek, *When School Finance "Reform" May Not Be Good Policy*, Vol. 28, No. 2 HARV.J. ON LEGIS. 423, 425 n. 9 (Summer 1991). *But see* Ratner, *A New Legal Duty for Urban Public Schools: Effective Education in Basic Skills*, 63 TEX.L.REV. 777, 779 (1985). Ratner argues that more recent educational studies have identified the characteristics of effective schools and allow greater opportunity for controlling successful "inputs." "Giv-

performance as measured by the Scholastic Aptitude Test (SAT) has actually fallen during recent periods of increased school spending in the United States indicating an *inverse* relationship (illustrated by the attached Figure 1 extracted from Eric A. Hanushek, *When School Finance "Reform" May Not Be Good Policy*, 28 HARV.J. ON LEGIS. 423, 427 (1991)). Critically important too is the fact that by concentrating on money alone, the current school finance debate overshadows reforms designed to produce results. And if student performance is not our goal, we are engaged in a perverse exercise that will likely have ramifications uncontemplated and unintended by a majority of the court.

Thus, any correlation between funding and educational results is tenuous at best.[12] So it is with CEDs under S.B. 351 that dutifully turn over funds to independent school districts, governed by independent boards of trustees, who make whatever use of the funds—good or bad or indifferent— as they, in their virtually unlimited discretion, see fit. Unless some way is found to change the districts that would merely squander the additional funds into districts that would use the money effectively, added funds alone are not likely to improve student performance. Moreover, the failure to educate students effectively in basic skills is very costly to society.

If concern for "results" gives way to equality of funding as an end all, our schools will continue to languish in mediocrity, forever, with the consequent loss of human dignity and competitiveness and added burden to our state's already overloaded social service system.

Functionally illiterate adults make up a disproportionately large percentage of the unemployed, depriving the country of valuable contributions to the gross national product and corresponding tax revenue. Furthermore, functional illiterates who are employed can be dangerous to employers. Disproportionately high percentages of this group commit crimes. Society not only suffers the direct financial, physical, and emotional losses caused by crime, but also pays billions of dollars per year to imprison the criminals. In addition, disproportionately high percentages of illiterate adults need welfare and other forms of government assistance, for which society pays billions of dollars per year.

Ratner, *A New Legal Duty for Urban Public Schools: Effective Education in Basic Skills*, 63 TEX.L.REV. 777, 784 (1985).

## IV.

Setting measurable standards for student achievement is part of a nationwide educational reform effort in response to study after study that concludes that ours is a nation at risk due to the failure to teach at least minimal skills to our nation's school children. Chambers, *Adequate Education for All: A Right, and Achievable Goal*, 22 HARV.C.R.–C.L.L.REV. 55, 60 (1987) (hereinafter Chambers, *Adequate Education for All*). As part of this nationwide effort, several state courts have ventured to describe the contours of the basic minimum adequate education their state constitutions require. *See Rose v. Council for Better Educ.*, 790 S.W.2d 186,

---

en the demonstrated capacity of schools to succeed, public policy no longer provides any justification for excusing their failure." *Id.*

12. For example, for the 1988–89 school year, Petersburg Independent School District in Hale County (410 students) spent $5,085 per student while 100 per cent of its ninth graders passed all three TEAMS tests administered that year. The Fruitvale Independent School District in Van Zandt County (296 students) spent $8,686 per student but only 26 per cent of its ninth graders passed the TEAMS test. The San Elizario Independent School District in El Paso (1,417 students) which ranked last in the state with only 12 per cent of its ninth graders passing, spent $3,437 per student. But the amount spent in that district is $672 higher per student than that spent by Lindsay Independent School District in Cooke County (417 students) which ranked third in the state with a 97 per cent passage rate. *See* National Center for Policy Analysis, Report Card on Texas Schools (January 17, 1990); National Center for Policy Analysis, *Report Card on Texas Schools* (January 17, 1990); *accord* Texas Education Agency, Department of Research and Development, *Snapshot: 1988–89 School District Profiles* (March 1990) (*Edgewood v. Kirby (Edgewood II)*, Defendant's Exhibit H.2).

212 (Ky.1989); *Abbott v. Burke,* 119 N.J. 287, 575 A.2d 359, 374 (1990);[13] *Seattle School Dist. No. 1 v. State,* 585 P.2d 71, 94 (1978); *Pauley v. Kelly,* 255 S.E.2d 859, 877 (1979). For example, in *Rose v. Council for Better Educ.,* the Kentucky Supreme Court held that an "efficient" system of education must have as its goal to provide, *at minimum,* each and every child with at least the following seven capacities:

(i) Sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable students to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market.

790 S.W.2d 186, 212 (Ky.1989). But the Kentucky court reiterated that what was required was results not equal expenditure of money.

**13.** The New Jersey Supreme Court wrote: "Rather than equality ... our Constitution require[s] a certain level of education...." *Id.* 575 A.2d at 386. Significantly, New Jersey was second only to Alaska in per pupil expenditures for 1988–90 and consistently spends one of the highest amounts per pupil in the United States. *Id.* at 366.

**14.** One primary goal of public education was embraced by the founders of the Republic of Texas, in their Declaration of Independence from Mexico.

[I]t is an axiom of political science, that unless a people are educated and enlightened, it

The court definitions demand substantive rather than financial improvements, they ensure the education of disadvantaged youth by guaranteeing an education, rather than a sum of money, and they leave in the hands of educators and legislators the responsibility for designing a plan that will deliver the required education.

McUsic, 28 HARV.J. ON LEGIS. at 332.

### B.

Obviously, a strict results test for efficiency is not a panacea because the court and legislature can disagree on whether the standards are being met. But the proper goals of education, or the results sought to be achieved by a public school education are not new subjects.[14] For instance, the following components have been suggested as the basic requirements of "minimally adequate education" legislation: (1) requirements for minimum curriculum; (2) minimum competency tests; (3) testing requirements that trigger remedial assistance, and (4) programs designed to identify failing schools and to generate plans to improve them. Liebman at 433–34. Indeed, "[w]hile no single nation-wide definition of a legally sufficient education is discernable, the ingredients of such a definition are coalescing." Chambers, *Adequate Education for All* at 61. "Achievement levels required for entrance into the military, societally accepted reading and math norms as reflected by newspapers and modes of exchange, and basic competency standards might all be applied to the task of defining adequate education."[15] *Id.* at n. 27.

is idle to expect the continuance of civil liberty, or the capacity for self-government.

The Declaration of Independence of the Republic of Texas 519, 520 (Vernon).

**15.** This is not a new concept. For example, in 1859 John Stuart Mill wrote:

It is not a self-evident axiom, that the State should require and compel the education, up to a certain standard, of every human being who is born its citizen?

\*　\*　\*　\*　\*　\*

The instrument of enforcing the law could be no other than public examinations, extending to all children, and beginning at an early age.

Obviously, if standards are too vague they can and will be circumvented. On the other hand, specific standards have the benefit of certain application. Arkansas, for example, conclusively presumes that schools in which 15% of the students fall below standard on state-mandated tests are failing schools and must participate in a state-mandated school-improvement program. Liebman at 391 n. 140; *see also* Molly McUsic, *The Use of Education Clauses in School Finance Reform Litigation,* 28 HAR.J.ON LEGIS. 307, 333 (Summer 1991). Texas, which currently employs similar state-mandated competency testing, has already legislatively mandated minimum literacy standards and the means of assessing performance. However, what is missing is the remediation element of the formula, properly funded, adequate to accomplish that objective in all schools.

One commentator has proffered his answer to the purported justifications for failure to educate—they are false.

> Effective education ... *is* possible. Successful schools *do* have important characteristics in common. These characteristics *are* capable of being replicated. And success *is* affordable. The proof that public schools can educate the vast majority of their students in basic skills is that many have already done so. Enough public schools serving sizable populations of poor and minority students in enough different locations nationwide have successfully taught the vast majority of these students basic skills within existing budgets, and the evidence of common characteristics and replicability is so strong, that the purported justifications for failure are no longer defensible.

Ratner, *A New Legal Duty for Urban Public Schools: Effective Education in Basic Skills,* 63 TEX.L.REV. 777, 795–96 (1985). Ratner cites the characteristics of successful schools as follows: (1) the principal's leadership and attention to the quality of instruction; (2) a pervasive and broad-ly understood instructional focus; (3) an orderly, safe climate conducive to teaching and learning; (4) teacher behaviors that convey the expectation that all students are expect to obtain at least minimum mastery; and (5) the use of measures of pupil achievement as the basis for program evaluation. *Id.* at 801 (which he refers to as the "new catechism of urban school improvement," originated by the late Professor Ronald Edmonds of Michigan State University); *see also* Billy D. Walker, *Intent of the Framers* at 662–63 (listing generally accepted input-oriented measures of adequacy in education and citing E. CUBBERLEY, SCHOOL FUNDS AND THEIR APPORTIONMENT 17, 23 (1905)).

## V.

The advantages of an efficiency standard that requires results are self-evident:

> (1) The remedy puts the money where the problem is, where it is more likely to deal with the disadvantaged child; it does not pour money into a school district for no specific purpose other than to equalize spending. Such a policy will help ensure that spending that is not essential to the schools' proper mission—enhancing student academic achievement—is far less likely. For example, expenditures on superfluous administrators, or Astroturf, or the like will be minimized. More importantly, a refocusing of resources where the need is greatest will result in increased funding to substandard schools. *See e.g., Connecticut to Link Aid, Test Scores,* Education Week, May 25, 1988, at 10 (Connecticut plan to distribute aid to school districts based on number of students scoring below the remedial level and on test-score improvement rates). Furthermore, the remedy is not overbroad;

> (2) The remedy addresses the reality that education costs differ across districts, especially as the needs of rural and urban schools are considered in a state as im-

---

\* \* \* Once in every year the examination should be renewed, with a gradually extending range of subjects, so as to make the universal acquisition, and what is more, reten-tion, of a certain minimum of general knowledge virtually compulsory.

J.S. Mill, ON LIBERTY 317–18 (Encyclopedia Britannica ed. 1952).

mense and geographically diverse as Texas;

(3) The remedy can be implemented without harming healthy school districts because minimum standards call for a minimum education not interference with all school districts, healthy or not;

(4) The remedy will produce no disruption of "local control" and will allow maximum local creativity as long as results meet standards;

(5) The remedy promotes accountability;

(6) The remedy ties input to output; and

(7) Finally, the remedy leaves the means of accomplishing efficiency to representative departments of state government.

It is my profound hope that the public school finance debate not eclipse the urgent need for schools that actually work. Otherwise, yet another generation of school children will be denied the benefits of their constitutional rights. For the reasons stated, I join the majority opinion in holding Senate Bill 351 unconstitutional, but dissent to that portion of the court's judgment which stays the judgment beyond the 1991–92 tax year.

Figure 1
## Real School Expenditures and SAT Scores:
### 1966-1989

Note: Current expenditures in 1989
dollars per student in average daily attendance

GAMMAGE, Justice, concurring and dissenting.

It will be of little avail to the people that the laws are made by men of their own choice if the laws be so voluminous that they cannot be read, or so incoherent that they cannot be understood; if they be repealed or revised before they are promulgated, or undergo such incessant changes that no man, who knows what the law is today, can guess what it will be tomorrow. Law is defined to be a rule of action; but how can that be a rule, which is little known, and less fixed?

THE FEDERALIST No. 62 (James Madison).

Madison's admonition may be a fitting epitaph for this episode in the continuing saga of public school finance.

While I concur in the portion of the judgment holding that Senate Bill 351 is unconstitutional and agree that this judgment should be applied prospectively, I cannot join in the majority's overwritten opinion and do not agree that it is either necessary or desirable to inflict an unconstitutional tax on the citizens of this state for more than one taxing cycle.

I agree generally with the majority's historical account, in Part I of its opinion, of the development of Texas school finance and the recent challenges it has faced. I also agree generally with Parts III and VIa of the majority's opinion, but with the qualifications expressed below. The fatal defect in Senate Bill 351 is its failure to submit newly proposed taxing authorities to local voters, as required by Article VII, sections 3 and 3–b of our State's Constitution. The issues addressed in Parts II, IV, VIB, and VIIA of the majority's opinion are unnecessary to the decision in this case. I disagree with making the court's judgment prospective for two taxing cycles as provided for in Parts VIC and VIIB. Moreover, I disagree with Part V, wherein the court insists on once more wading into the advisory opinion swamp—a constitutionally proscribed journey, TEX. CONST. art. V, § 3; *Morrow v. Corbin*, 122 Tex. 553, 563, 62 S.W.2d 641, 646 (1933), criticized in my concurrence in overruling the motion for rehearing in *Edgewood II.* 804 S.W.2d at 501.

## I

The history of Article VII, section 3 reveals that the legislature and the courts have consistently given it a practical construction requiring a vote of local citizens to authorize the levy of an ad valorem tax for a school district's support when such a district is created by the legislature. *See generally* 2 G. BRADEN, THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 512–13 (1976). Article VII, section 3–b does not authorize creation of CEDs with taxing authority, absent voter approval, because a newly-created CED is not a change in "boundaries" of an existing school district. In *Freer Municipal Indep. School Dist. v. Manges*, 677 S.W.2d 488 (Tex.1984) (per curiam), this court held that when an existing school district splits into two completely separate school districts by disannexation of a portion of the original district, that is a "boundaries" change for *both* of the resulting districts, *id.* at 490, and Freer could continue to tax at the rate authorized by the Benavides district, of which it had been a part. *Freer* simply does not apply to this case. Further, the new CEDs are not boundary changes by "the annexation of, or consolidation with, one or more *whole* school districts." TEX. CONST. art. VII, § 3–b (emphasis added). Senate Bill 351 does not consolidate *whole* school districts, but rather creates a new taxing authority purporting to utilize a portion of the existing districts' taxing power.

## II

Our decision should be applied prospectively because school districts, their students and patrons have relied on the presumption of constitutionality of Senate Bill 351, and because the equitable considerations apparent in disruption of the Texas public school system favor only a prospective remedy. Senate Bill 351 violates a constitutional provision unique to the Texas

Constitution, and its invalidity is a question only of state law. No federal legal issues are involved. Whether to make this court's decision prospective or retrospective is a decision for this court. *American Trucking Associations, Inc. v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 2330, 110 L.Ed.2d 148 (1990); *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932). We need not and should not adopt any federal test for prospectivity, because federal law is not involved. Our decision in *Reagan v. Vaughn,* 804 S.W.2d 463, 467–68 (Tex.1990) ("considerations of fairness and policy preclude full retroactivity when the court's decision establishes a new principle of law that either overrules clear past precedent on which litigants may have relied or decides an issue of first impression whose resolution was not clearly foreshadowed"), controls. We should not engage in legal gymnastics to make our test fit the federal formula under *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), or try to rationalize factors as if we were applying federal law. Nor should we be distracted by election-year political considerations from our earlier recognition of the urgency of resolving the issues of public school finance. For these reasons I agree with the majority that the effect of the court's judgment should be prospective, but would withhold its effect only until June 1, 1992.

### III

I strongly object to Part V of the court's opinion. Whether the legislature speculated that the act might be unconstitutional is irrelevant. This court's role in this cause, where we have actual parties contesting the constitutionality of the statute, is to decide whether the act suffers from the constitutional infirmities alleged. The court goes further to defend its writing on rehearing in *Edgewood II,* by arguing it "did not say that tax base consolidation *could not be* unconstitutional; all we said was that it *could be* constitutional." *Ante,* at 512 (emphasis in original). The court imprudently tried to give advice, but once undertaking the task failed to give complete advice. Legislatures enact statutes; courts decide cases. Even when this court has before it an actual case involving a specific constitutional complaint, we have no business speculating for the legislature, the executive department, or anyone else, what may or may not be otherwise constitutionally done. Our duty is to address the questions presented to the extent necessary to dispose of the case—no more and no less.

### IV

Justice Doggett's dissent correctly characterizes the requirement of a local vote on the CED taxation issue as a "veto" in the following sense: unless the voters in *each* CED approve the tax, the whole state system fails to meet the *Edgewood I* mandate requiring substantially the same educational opportunity for the same tax effort. For the entire *system* to meet this efficiency requirement, all of its CED *components* must have substantially the same tax system. Consequently, any one of the 188 CEDs can, in effect, "veto" the statutory school tax scheme for the entire state.

But the issue *presented* for our decision is indeed whether to enforce this specific right to vote on taxation, a right the people of Texas expressly reserved to themselves in Article VII, sections 3 and 3–b of our Constitution. We may not ignore the express words of the Constitution, nor may we shirk our duty to construe section 3 and the exceptions of section 3–b consistent with precedent and sound legal analysis. We should not bend the words of the Constitution beyond their reasonable construction to suit our convenience, nor even to meet our own perceptions of what is "good" for educating Texas school children. Our oath is to uphold the Texas Constitution, including the people's right, expressly reserved therein, to vote on such tax matters.

DOGGETT, Justice, dissenting.

So many words—so little justice! What does it all mean to the ordinary Texan—the lofty prose, the footnotes and citations, the multiple opinions, the charges and coun-

tercharges? It means that the New Year brings an immense new wrong. For the school children, there is delay—perhaps infinite delay—in achieving equal educational opportunity; for the taxpayers, most probably an income tax. This is the unspoken but very real message announced here. A majority of this court has led the Legislature down the primrose path. Today's unconstitutional legislation is only yesterday's judicial vision; it is nothing more than the natural response to the majority's previous encouragement of tax base consolidation. The Legislature, the Governor, and three separate Texas trial judges all followed accurately the prior judicial instructions; now the majority unjustifiably changes the instructions. Its new opinion is a morass of contradictions and excuses. I dissent.

The wrong inflicted on Texans today is aggravated by the majority's deliberate delay. Public announcement of this improper decision could and should have been made long ago.[1] With each passing day, the majority denied the legislative and executive branches an opportunity to respond to the new judicial instructions for assembling a constitutional school finance system. Surely school boards, teachers, and administrators deserved a year without constant budgetary uncertainty; surely the school children deserved better. Instead, the majority creates another election year crisis [2] with an impact far beyond the educational

system alone. Taxpayers who awaited a clear indication of their obligations are astonishingly told that they have forfeited their illegally collected 1991 taxes and must continue to pay unconstitutional taxes into 1993.

Disregarding a constitutional provision permitting consolidation of school districts without a vote, the majority announces a new principle—the privileged must be accorded a veto of any sharing of the state's resources with the underprivileged. Indeed, whenever referencing a local *"vote,"* today's opinion really means *"veto"*. The further declaration that the County Education Districts' (CEDs') tax levy is an unconstitutional state ad valorem tax injects confusion in the overall relationship between state government and its subdivisions. Future litigation can be expected over any state mandate that can be satisfied only by the expenditure of revenues generated by local property taxes. After causing this havoc in both education and intergovernmental relations, the court then compounds its errors by compelling Texas taxpayers to pay an unconstitutional tax.

Given the verbosity with which the majority has cloaked its injustice, I have written at length to respond thoroughly to the misinterpretations and to clarify the true consequences of each. This dissent includes the following:

---

**1.** Not even a plea from the Governor concerning the adverse effect of the court's inaction on current property tax collections was sufficient to move the majority to a timely announcement. Letter Amicus Brief for Governor Ann Richards (Dec. 13, 1991). With this needless delay, several thousand taxpayers, including many of the state's major corporations, have delayed payment of school taxes and filed numerous lawsuits to preserve their right to a refund of taxes paid before the January 31 due date. *See, e.g., Bandera Land & Cattle Co. v. Travis Co. Educ. Dist.,* No. 92–00860 (Dist.Ct. of Travis County, 331st Judicial Dist. of Texas, filed Jan. 23, 1992); *Keahey v. Travis Co. Educ. Dist.,* No. 92–00936 (Dist.Ct. of Travis County, 200th Judicial Dist. of Texas, filed Jan. 23, 1992); *Halliburton Co. v. Central Educ. Agency,* No. 92–00996 (Dist.Ct. of Travis County, 331st Judicial District of Texas, filed Jan. 28, 1992); *NCB v. Morales,* No. 92–

01104 (Dist.Ct. of Travis County, 98th Judicial Dist. of Texas, filed Jan. 28, 1992); *American Gas Storage, L.P. v. Morales,* No. 92–01050 (Dist. Ct. of Travis County, 98th Judicial Dist. of Texas, filed Jan. 28, 1992); *Beta Mu Bldg. Co. v. Morales,* No. 92–01060 (Dist.Co. of Travis County, 250th Judicial Dist. of Texas, filed Jan. 28, 1992).

Nor is it merely coincidental that this preconceived plan has finally been announced after the Legislature has come and gone from its special session and after the filing deadline for three seats on this court has expired.

**2.** *See Terrazas v. Ramirez,* 829 S.W.2d 712, 739 (Tex.1991, orig. proceeding) (Mauzy, J., dissenting) (addressing the majority's rejection of long-followed legal principles to afford Republicans preferential treatment in the 1992 legislative elections).

| | | |
|---|---|---|
| I. | The Long Struggle for Justice | Page 539 |
| II. | Judicial Entrapment by Advisory Opinion | 540 |
| III. | Rewriting Article VII of the Texas Constitution | 547 |
| IV. | The "statewide property tax prohibition" | 551 |
| V. | "Prospective–Plus" Application of Today's Ruling | 557 |
| VI. | Response to Justice Cornyn's Opinion | 569 |
| VII. | Any Glimmer of Hope? | 574 |
| VIII. | Conclusion | 575 |

Confronted with one substantive point after another to which it cannot effectively respond, the majority undoubtedly finds this dissent highly distressing. Incredible inconsistencies, repeated rejection of precedent, and an ever-present elitist philosophy permeate the majority's writing.

It was not always this way. In two prior opinions on this same case, the court worked together to follow the rather clear command of the Constitution without regard to the political consequences of its decision. Through compromise and consensus-building, the court spoke with one firm voice in what many have recognized as the most important case it has ever considered. Tragically, this has all been lost.

In its last writing, the majority concluded that justice demanded too much. Reasoned constitutional determination gave way to political calculation; precedent gave way to partisanship as an interpretive guide. As the Supreme Court, our responsibility is to assure justice by upholding the supreme law of our state—our Constitution. We cannot pick and choose to apply only favored provisions; we cannot invoke its provisions only at times deemed convenient and comfortable for the members of this court; we must consistently and regularly enforce all of its terms. The damage the majority insists on today is not just to our children's education but to the very credibility of our system of justice.

## I. The Long Struggle for Justice

The history of this case is reflected in the efforts of Demetrio Rodriguez and the ex-periences of thousands of other concerned parents and students from all regions and ethnic groups in Texas. In 1968, Mr. Rodriguez sought relief from the inequities of the state school finance system in federal court. Three federal judges in Texas said that it was inequitable and unconstitutional. All nine members of the United States Supreme Court said this school finance system was inequitable, but only four of them were willing to declare it unconstitutional. *Rodriguez v. San Antonio Indep. Sch. Dist.*, 337 F.Supp. 280 (W.D.Tex.1971), *rev'd*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

In many ways today's ruling is quite similar to this 1973 writing upon which it relies. Pronouncements of compassionate generalities abound, but are unaccompanied by enforcement of constitutional rights. True, five judges of the United States Supreme Court "recognize[d] 'the vital role of education in a free society.'" Majority Op. at 494 (quoting *Rodriguez*, 411 U.S. at 29, 93 S.Ct. at 1294). They recognized it just before they refused thousands of school children any remedy for a denial of this same "vital" element. As Justice Thurgood Marshall eloquently responded:

> [T]he majority's holding can only be seen as a retreat from our historic commitment to equality of educational opportunity and as unsupportable acquiescence in a system which deprives children in their earliest years of the chance to reach their full potential as citizens.

*Rodriguez,* 411 U.S. at 70–71, 93 S.Ct. at 1316 (Marshall, J., dissenting).

After this federal failure and further unsuccessful attempts to obtain state legislative redress, Demetrio Rodriguez and others returned to state court.[3] In *Edgewood Independent School District v. Kirby,* 777 S.W.2d 391 (Tex.1989) (*Edgewood I*), they obtained it. After two decades of persistently opposing his claims, attorneys for the state and attorneys for its richest school districts have finally conceded the injustice of which Demetrio Rodriguez complained. In oral argument before this court, they have belatedly indicated agreement[4] with the principle unanimously announced in *Edgewood I* that:

> There must be a direct and close correlation between a district's tax effort and the educational resources available to it; in other words, districts must have substantially equal access to similar revenues per pupil at similar levels of tax effort. [All] [c]hildren ... must be afforded a substantially equal opportunity to have access to educational funds.

*Id.* That is the only good news from this case. But it is good news that comes too late for the children of Demetrio Rodriguez;[5] it is good news that comes too late for some of the grandchildren of Demetrio Rodriguez. The bad news of today is that with its disposition the majority ensures that the benefits of the reform of the Tex-

as school finance system may not be fully enjoyed even by Mr. Rodriguez's great-grandchildren. Nearly a quarter of a century after Demetrio Rodriguez began his journey for justice, the end is nowhere in sight.

## II. Judicial Entrapment by Advisory Opinion

To understand more completely the injustice which the majority has today accomplished, a review of recent developments in this litigation is necessary. The arguments made in the instant proceeding—that there are constitutional barriers to school districts sharing resources and that restructuring the property tax system would impose an unconstitutional statewide property tax—are not at all new; they were raised in opposition to the principles advanced in *Edgewood I.*[6] In its first opinion, this court declined to address these arguments or to mandate a method by which the Legislature could remedy the unconstitutional features of the school finance system.

Confronting a most recalcitrant Governor William Clements and multiple forces which refused to accept this court's unanimous writing in *Edgewood I,* the Legislature initially produced Senate Bill 1,[7] only after Judge Scott McCown appointed a master and indicated a willingness to proceed with a court-imposed plan. This inadequate legislation was challenged by prop-

---

3. At the same time that federal relief was narrowly rejected, Justice Marshall appropriately noted the availability of state constitutional remedies for inequitable school finance systems. *See Rodriguez,* 411 U.S. at 133, n. 100, 93 S.Ct. at 1348, n. 100 (Marshall, J., dissenting).

4. *See* Transcription of Oral Argument (November 19, 1991) (Responses by R. James George, Earl Luna, Toni Hunter, David Richards, and Deborah G. Hankensen to questions from Justice Doggett). Further, with the exception of Mr. Luna, all counsel now specifically concede that unlimited local supplementation or enrichment financed through reliance on widely disparate property tax bases would also result in an unconstitutionally inefficient system. It is for this reason that we said in *Edgewood I* that "any local enrichment must derive solely from

local tax effort." 777 S.W.2d at 398. *See also infra* discussion following note 85.

5. Mr. Rodriguez, who was introduced to the court at oral argument in this cause, when originally told of our previous decision in *Edgewood I,* stated:

> I cried this morning because this is something that has been in my heart.... My children will not benefit from it.... Twenty-one years is a long time to wait.

Jonathan Kozol, *Savage Inequalities* 226 (1991).

6. *See* Transcription of Oral Argument in *Edgewood I* (July 5, 1989) (Responses by Kevin T. O'Hanlon to questions from Justice Doggett).

7. Act of June 6, 1990, 71st Leg., 6th C.S., ch. 1, 1990 Tex.Gen.Laws 1.

erty-poor school districts who urged judicial substitution of the Uribe–Luna Plan, consolidating each county's tax base without an election.[8] They urged the trial judge to recognize that the Constitution "do[es] not require elections to create county taxing districts."[9] Judge McCown rejected this contention, concluding that three constitutional deficiencies precluded the proposed alternative:[10]

> Because of the resistance to district consolidation, some have advocated tax base consolidation or sharing or recapture. All of these terms mean essentially the same thing. Senate Bill 9 and House Bill 34, the Uribe–Luna Plan, was based on county-wide tax base consolidation and produced significant equity. The Texas Research League has developed a similar plan. Tax base consolidation, however, appears to run afoul of certain constitutional provisions related to taxation. *See* Tex. Const. art. VII, § 3, and art. VIII, § 1(e); *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20 (1931).

It is precisely these three obstacles referenced by the trial court in its opinion of September 1990 that govern the issues of the present appeal: (1) whether article VII, section 3 requires a vote, (2) whether a levy by the CEDs is an unconstitutional state tax under article VIII, section 1–e,[11] and (3) whether *Love* prohibits the creation of the CEDs and the sharing of resources.

On appeal those same challengers urged "that this Court [in rejecting Senate Bill 1] order the District Court to implement the Uribe/Luna plan as a practicable and just alternative and the only method to assure protection of plaintiffs rights in the 1991–92 school year."[12] They claimed that Judge McCown had erred in rejecting tax base consolidation and again maintained that the Constitution "do[es] not require elections to create county taxing districts."[13] In response, the State insisted during oral argument that to implement tax base consolidation, "you have to have the local option election. You have to let the citizens vote to impose this new taxing authority on themselves or not."[14]

Addressing these arguments and concerned that the trial judge had misinterpreted our prior silence on the subject, we unanimously wrote in *Edgewood Independent School District v. Kirby*, 804 S.W.2d 491, 497–98 (Tex.1991) (*Edgewood II*), to override all of the constitutional barriers ascertained by the trial court:

> Another approach to efficiency is tax base consolidation. Senate Bill 1 expressly provides that future legislatures may use other methods to achieve fiscal neutrality, including "redefining the tax base." Tex.Educ.Code § 16.001(d). We disagree with the district court's observation that this option "appears to run afoul of certain constitutional provisions related to taxation." ... While consolidating tax bases may not alone assure substantially equal access to similar revenues, the district court erred in concluding that it is constitutionally prohibited.

If this court had desired to remove some but not all of the three barriers raised by the trial court to tax base consolidation, it could easily have done so. Instead, this

---

**8.** This tax base consolidation plan was encompassed in Tex.S.B. 9, 71st Leg., 3d C.S. (1990), authored by Senator Hector Uribe, and Tex.H.B. 34, 71st Leg., 3d C.S. (1990), authored by Representative Greg Luna.

**9.** Transcript at 545, *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491 (Tex.1991) (*Edgewood II*).

**10.** *Id.* at 589.

**11.** The majority's contention that "[n]o Texas court has previously addressed a challenge brought under article VIII, section 1–e," Op. at 520, is contradicted by the citation of this provision by both Judge McCown and the majority on rehearing in *Edgewood I*, 804 S.W.2d at 499.

**12.** Brief of Appellants Edgewood I.S.D. at 33, *Edgewood II.*

**13.** *Id.* at 38.

**14.** *See* Transcription of Oral Argument in *Edgewood II* (November 28, 1990) (Response by Kevin T. O'Hanlon to questions from Justice Mauzy).

court unanimously concluded that Judge McCown had misinterpreted our prior silence with reference to all three constitutional provisions, not just one.

Unfortunately the majority's commitment to our Constitution yielded as the pressure of external forces intensified. *See* Opinion on Motion for Rehearing (*Edgewood Two Minus* or *Edgewood II–*),[15] 804 S.W.2d at 502 (Doggett, J., concurring) and 804 S.W.2d at 507 (Appendix A). Engaging in a "conscious manipulation," the majority improperly utilized an unrelated motion for rehearing to issue an advisory opinion. *Id.* at 506. "[R]acing to publish this opinion before the other branches provide[d] their own solution," the majority sought to guide the legislative process,[16] "to legislate rather than adjudicate." *Id.*

The opinion on rehearing addressed whether statewide recapture of local taxes was permitted under article VIII, section 1–e of the Texas Constitution:

> Our Constitution clearly recognizes the distinction between state and local taxes.... Tex. Const. art VII, § 1–e, prohibits the Legislature from merely recharacterizing a local property tax as a "state tax." .... These constitutional provisions mandate that local tax revenue is not subject to *state-wide recapture.*

*Id.* at 499 (emphasis added). The majority nonetheless offered a ringing endorsement of *local recapture* in the form of tax base consolidation:

> Focusing on the Legislature's power to create school districts and define their

taxing authority ... consistent with *Love* and contrary to the district court's suggestion, tax base consolidation could be achieved through the creation of new school districts.... *given the authority to generate local property tax revenue for all of the other school districts within their boundaries.*

*Id.* (emphasis added). It further dispensed the unsolicited advice that:

> [T]he Legislature ... may, so long as efficiency is maintained, authorize local school districts to supplement their educational resources if local property owners approve [17] an additional local property tax.

*Id.* at 500 (footnote added).

In short, the majority's message to the Legislature concerning constitutionally permissible action was:

1. You have independent power to define the taxing authority of school districts;

2. Statewide recapture of local taxes is prohibited;

3. Property tax revenue may, consistent with the constraints of the Texas Constitution, be recaptured locally—through redistribution among school districts—so long as this is confined within the boundaries of the new school districts that are superimposed upon existing districts;

4. Within reasonable limits, districts may supplement or enrich their educational resources with approval of additional taxes by local voters.

---

15. This opinion by five members of the court is referred to hereinafter as *Edgewood II–,* or Two Minus, since it represented the majority's effort to subtract from the holdings of *Edgewood I* and *II* while improperly detailing to the Legislature a preferred school funding solution.

16. A race is precisely what occurred as the inappropriate desire of the majority for maximum political influence was almost thwarted by a responsive legislative process with new leadership from both Governor Richards and Lieutenant Governor Bullock. The majority was fully aware that during the week preceding its opinion, Senate Bill 351 had been approved 20–7 by the Senate and a very similar version had

passed by a vote of 8–1 in the House Public Education Committee. Only by rushing its advisory comments after hours to the Clerk of the Supreme Court on the evening of February 25 was the majority able to interfere prior to the expected vote on the House floor on February 27. *See* Supplementary Response of Plaintiffs–Appellants to Motion for Rehearing and Amicus Curiae Briefs in *Edgewood II–* (Feb. 25, 1991) (informing court of status of pending litigation and urging noninterference in process).

17. *See infra* text discussing *Hill v. Stone,* 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975), this section.

As the majority envisioned, the Legislature attempted to draw the precise type of reorganization recommended. Nor is it surprising that, after diligent study of these prior writings, three Texas trial judges found the tax authorized by Senate Bill 351 constitutional, with Judge McCown concluding specifically that "the Supreme Court has already approved tax-base consolidation." [18] No one has been able to explain how the CEDs created by Senate Bill 351 differ in the slightest from the "new school districts ... given the authority to generate local property tax revenues for all other school districts within their boundaries," as specified in *Edgewood II*, 804 S.W.2d at 499. Virtually mirroring the majority's directions, Senate Bill 351 provides:

> Each county education district is an independent school district established by the consolidation of the local school districts in its boundaries for the limited purpose of exercising a portion of the taxing power previously authorized by the voters in those school districts and of distributing revenue of the county education district to those districts.

Tex.Educ.Code § 20.942. After following the majority's road map, the Legislature is now told it has come to a dead end.

The majority responds to this situation with contradiction and excuses. First, we are told that the decision reached today could not have been "foreshadowed" or suggested beforehand. Op. at 518. Indeed, the majority is correct in this particular, since today's decision adopts a view directly opposite of that announced previously. But then the majority claims that the vote requirement had been "obviously

contemplated" in its earlier writing. *Id.* at 520 & n. 37. Surely these two conflicting propositions cannot co-exist.

Let us examine how the majority made its prior declaration so "obvious" that it should have been understood immediately by any ordinary person. In short, it is claimed "obvious" for two reasons: (1) the content of the fourteenth footnote to *Edgewood II* and (2) certain language to which the court never referred in one of the many authorities it cited.

Assuming a magnifying glass was employed to study the fine print of the footnote, the reader would learn only that the "constitutional grant of powers does not specify the details of statutory implementation [and that accordingly] a number of alternatives are available to the Legislature." 804 S.W.2d at 497 n. 14. This language demonstrates an understanding that the Legislature enjoys a broad range of options. "One such method," mentioned by way of example, "allows voters to create an additional countywide school district." *Id.* This was certainly not the only constitutionally permissible course, nor does this example suggest that this or any other choice would *require* a voting prerequisite. Moreover, the text explicitly referred to Tex.Educ.Code § 16.001(d), a statute that contained no additional voting prerequisite to "redefining the tax base." If this court had desired an election precondition for all constitutionally allowable tax base consolidation, it could have said so clearly and unequivocally. Moreover, not even this single, indirect footnote reference to voting was employed by the majority in its *Edgewood II* opinion.

---

**18.** Transcript in the three consolidated appeals from the 250th District Court in Travis County, Texas—*Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, Cause No. D–1469; *Andrews Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, Cause No. D–1477; and *Highland Park Indep. Sch. Dist.*, Cause No. D–1560—at 724 (hereinafter Tr.). *See also* Gail F. Levine, *Meeting the Third Wave, Legislative Approaches to Recent Judicial School Finance Rulings,* 28 Harv.J. on Legis. 507, 512 (1991) ("The court so strongly emphasized [tax base] consolidation

that many lawmakers assumed it too was mandated."). Even the aggressive critique of the trial court's decision upon which the majority frequently relies notes "the apparent dictum of the Texas Supreme Court that tax base consolidation be effected." Billy D. Walker, *The District Court and Edgewood III: Promethean Interpretation or Procrustean Bed?* 27 (unpublished monograph attached as Appendix O to Consolidated Brief of Eliodoro Reyes) (hereinafter *The District Court and Edgewood III*).

The second excuse is even more peculiar. Previously uncited language is now relied upon from *Love v. City of Dallas*, 120 Tex. 351, 372, 40 S.W.2d 20, 29–30 (1931), suggesting a vote of the people of one district is necessary before using their "funds and properties for the education of scholastics from another district." This 1931 opinion was issued several decades before the people of Texas amended the Constitution by adding the current language of article VII, section 3–b in 1966, as discussed in section III, *infra*. Perhaps even more importantly, a significant objective of the court's writing about *Love* in *Edgewood II* was to correct the mistaken impression that it presented an obstacle to tax base consolidation. We held unanimously and unequivocally that it presented no such barrier. *Edgewood II*, 804 S.W.2d at 497–98.

Neither a magnifying glass nor a glass of another type—a crystal ball—would have revealed that the reference to *Love* in *Edgewood II*–, without discussion of any voting requirement, meant a vote was necessary. In *Edgewood II*–, the majority did find a way to make its views on voting known: it wrote what it wanted the reader to know. It did *not* mystically communicate that a vote was required through some obscure reference to an ambiguous footnote or to uncited language in an outdated opinion. There is but one mention of a voting requirement in *Edgewood II*–. Describing the circumstances under which further voter action would be mandated, it said plainly that the voters must be consulted *if a local district wished to supplement* its resources. Although indicating that the Legislature was constitutionally empowered to implement tax base consolidation, the majority did not indicate, in any way, an election precondition. Rather it directly resolved this matter in the negative.

Having charted the legislative course through the murky waters of Texas constitutional law, it is no minor matter that the majority now claims its map failed to detail the sharp rocks and swift current near the shore. The essence of the peculiar position now adopted is that by formerly providing guidelines for tax base consolidation without saying that a vote was unnecessary, the majority, upon further reflection, finds that it is necessary.

Disavowing paternity of the CED offspring of its prior writing, the majority tries vainly to shift the blame to the Legislature. In doing so, it exercises extreme caution in an attempt to protect itself on another front [19] by professing the "good faith" of the Legislature in enacting Senate Bill 351. Maj. Op. at 493. Once again contradicting itself, the majority then paints a picture of the conference committee chairman, as ringleader, urging the Legislature to confront the court by embarking on the audacious course of implementing tax base consolidation pursuant to this court's writings. *Id.* at 493. This attack on the Chairman, Senator Carl Parker, is both nasty and unfounded.[20] It also makes clear that despite lip service to the contrary, the majority truly feels that the Legislature acted in bad faith.

The Senator's comments are misconstrued to create the false impression that the Legislature purposefully disregarded a vote requirement for CEDs in Senate Bill 351 because of fear of voter disapproval. *Id.* at 493. In fact, his remarks concerned a different alternative—full consolidation of all functions of school districts, described in the transcript as "true consolidation"—that was rejected by the Legislature as unacceptable to the public.[21] In a further unfair attack, the majority quotes the chairman's comments on statewide recap-

---

**19.** *See infra* section V discussing prospectivity and the denial of a tax refund.

**20.** This ill-advised abuse follows the majority's previous rejection of Senator Parker's most appropriate plea that this court avoid unsolicited and disruptive judicial interference in the legis-

lative process. *See Edgewood II*–, 804 S.W.2d at 501 (Doggett, J., concurring).

**21.** *Hearings on Conference Committee on Senate Bill 351*, Tex.S.B. 351, 72nd Leg., R.S. (March 7, 1991) (Tr. 349).

ture, *id.* at 493 made prior to its pronouncements on this issue in *Edgewood II–*. After that advice was received, his views were changed, as evidenced by his assessment at the later conference committee hearings. Similarly, the chairman's *question* regarding any future state tax challenge has been wrongfully distorted by the majority into a statement. Upon receiving a response to this query from a witness who supported the legislation as constitutional, Senator Parker stated: "I tend to agree with you about that." [22]

Particularly revealing is the majority's excerpt from the conference committee testimony of an unnamed assistant attorney general that

22. *Id.* at 338 (exchange between Chairman Parker and Al Kauffman).

23. *See supra* notes 6 & 14 and accompanying text.

24. Mr. O'Hanlon testified that:

> The notion of tax base consolidation which is what we're talking about when we talk about recapture is, is pretty much a new critter in the State of Texas that arose uniquely out of the, the Supreme Court deliberations in the Edgewood opinion.... Edgewood two says specifically [that another way of achieving] efficiency is tax base consolidation.... and the court ... disagree[s] with the [trial] court's finding that tax base consolidation appeared to run [into] a problem with the constitution.... *That tax base consolidation can be done is, is clear as a matter of constitutional law* [from] Article 7, Section 3 B. It gives the legislature express authority to consolidate districts and to provide for the continuation of the taxing effort to those districts without a reauthorization.... [This is] [s]pecifically contemplate[d] and sets [sic] forth in Article 7, Section 3B. The question then becomes ... can you ... partially consolidate [district's] tax bases. *And we think that the Supreme Court clearly signals that, that the legislature has that authority.*
> ....
> The other question that comes with respect to recapture is not whether you can do it, but ... the collateral question of, of the necessity of the re-authorization election. Again Article 7, Section 3 B gives us some guidance here. Article 7, Section 3 B says that no re-authorization election is necessary in the event that you have consolidated districts and, there is a pre-existing [authorization] as there is in every school district.... So that again if you can, if you can flat consolidate school districts

you can steal the authorization [from existing school districts for CEDs] if you will under article VII, section 3–b, ... can we guarantee that this is gonna meet a constitutional challenge, the answer is, is no.

*Id.* at 513. This witness spoke neither anonymously nor briefly. He is none other than Kevin T. O'Hanlon, who, in argument to this court, had raised the very question of a vote as a prerequisite to tax base consolidation.[23] While any lawyer would be foolish to "guarantee" to a client anything about what this majority might do, Mr. O'Hanlon's testimony indicates that *Edgewood II–* provided him the answer to the argument that he had previously advanced to this court. Set forth below,[24] his

> ... you can do something less than consolidate, we can consolidate the tax base.... [W]hat you are doing in essence is splitting the original authorizations....
> ....
> ... The problem here is that *we appear to be in a situation ... of being led down the road by the Texas Supreme Court,* that which, that no one has yet fought. The notion of tax base consolidation is not something that you've done before, that's why we can't tell you, we cannot predict the outcome of the, a challenge to the mechanics of how we set, set about doing it. We have never done a limited purpose consolidation *which is what the Supreme Court has said over and over and over again is the way to fix the problem.* They're directing us into the, into an area where, where there are no answers. But they have, *on each occasion in which they have chosen to write on this, endorsed the concept of tax base consolidation,* they have .. called it ... base-tax sharing and *appear to be leading us down this road.* I will reiterate that every time they mention Love ... and they talk about it in terms of statewide recapture. Love prohibits statewide recapture of funds. And they go on to say in Edgewood [II-] that we can still do tax base consolidations through the creation [of] school districts. That's what we're doing. The question then becomes is, is this recaptured district ... some kind of sham because it's not a school district. I refer you to Chapter 18. Chapter 18 is not a school district as we know it either. Chapter 18 is an entity that exists solely for the purposes of collecting, levying taxes when they refer to that levy in that footnote 14.... They said it was one method that the legislature provided that it's constitutionally appropriate. They didn't say that was the exclusive method. And I take again that their choice of language in that regard to be significant. If they'd a said that

testimony provided the Legislature the advice of its lead counsel that Senate Bill 351 was both constitutional and directed by the majority's prior writing.

Why does the majority go to such lengths to strain and misconstrue the public record?[25] Because it is determined to shift responsibility for its own handiwork to anyone except itself. The majority cannot escape *Edgewood II* and *II* in which the *only* school financing alternative identified was consolidation—consolidation in whole or consolidation in part through tax base merger. Nor can its previous ruling be avoided by pointing to its disclaimer that only the Legislature could make the final choice of the type of consolidation to be adopted. Op. at 511. The people of Texas and their elected representatives had every reason to believe that the veto issue had been answered by the majority in *Edgewood II-*. The only change has been in the minds of the majority, as indicated by the doublespeak with which it unsuccessfully attempts to explain its own misdeed:

> We did not say that tax base consolidation *could not be* unconstitutional; all we said was that it *could be* constitutional.

*Id.* at 512. The majority entrapped the Legislature, and now it blames the victim. Unfortunately, the children of Texas are the ultimate victims of this entrapment.

For them, the majority offers little hope. Implementation of the majority's prior suggestion of tax base consolidation is made wholly dependent upon the benevolence of the advantaged to the disadvantaged. If happenstance has given two more populated districts within a county substantially more taxable property than their disadvan-

taged neighbor, the majority's consolidation plan will work if the wealthy will simply vote to share with the poor. Criticizing the 188 CEDs as "requiring the taxpayers in one school district ... to fund the schools in other districts over which they have no control," *id.* at 500, and "as forc[ing] taxpayers to pay for schools over which they have nothing to say," *id.* at 510, the majority makes no attempt to conceal its disdain for its previous panacea. Today's writing essentially implies that any citizen of a wealthy district would be almost foolish to vote to implement the preferred solution of the majority in *Edgewood II-*. As Judge McCown correctly concluded:

> A citizen in a rich district who votes against sharing can still draw on vast resources for his district's schools. Such a voter has no incentive to vote to share.... [T]he rich districts [have an] advantage in defeating any local vote to consolidate.... The state cannot structure its system so that this right can be defeated by local election, particularly if the election is stacked in favor of property-rich districts.

Tr. at 722–723. Tragically, it is just such a "stacked" election—a veto, not a vote—that the majority has demanded.

The majority has been ever mindful of its duty to protect the rights of the most privileged among us. In *Edgewood II-*, it was so carried away with this notion that it claimed the right to vote was limited to "local property owners." 804 S.W.2d at 500. While most reflective of the truly elitist attitude of the majority, this requirement of property ownership as a qualifica-

---

was the only method that you had to provide for only collection of taxes by the local levy of this now larger unit, they could have told us that and they chose not to. So in sum, this is a bit of a chancy prospect. There's no question about. Ah, but there is no guidance. *Hearings of Conference Committee on Senate Bill 351*, Tex.S.B. 351, 72nd Leg., R.S. (March 7, 1991) (Tr. 330–334) (emphasis added).

**25.** Further statements quoted are similarly skewed by their failure to identify the witness and to review the entire transcript. One of the quoted witnesses, Op. at 513–514, an Austin lawyer, also opined that "the Supreme Court

[doesn't] know all the ins and outs of school finance," Tr. at 349–50, that a lawsuit challenging the CEDs is "dead on arrival" at the Supreme Court "because the language, the clear language of *Edgewood [II-]*, it says tax base consolidation can be achieved through the creation of a new school district," *id.* at 346, and "I understand that [these alternatives] will work legally." *Id.* at 350. Other testimony, expressing unqualified opinions of constitutionality of the Legislature's course, is omitted. *See, e.g.,* Testimony of Al Kauffman, *id.* at 335 ("So I think *you have very clear authority to do it....* *[These] concepts are consistent with ... the general constitutional law.*") (emphasis added).

tion for voting long ago had been held an unconstitutional denial of equal protection. *Hill v. Stone*, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975). Now the virtue of the vote has been converted into a weapon to obstruct the very consolidation the majority previously recommended. Indeed, by rejecting tax base consolidation, the voters of even a single education district among the 188 CEDs can veto the state's attempt to guarantee the equality required by the mandate of *Edgewood I* and *Edgewood II*.

### III. Rewriting Article VII of the Texas Constitution

The Legislature may create, abolish or consolidate school districts without the consent of the trustees or the voters of the affected territory. *Lee v. Leonard Indep. Sch. Dist.*, 24 S.W.2d 449, 450 (Tex.Civ. App.—Texarkana 1930, writ ref'd); *see also Cowan v. Clay County Bd. of Educ.*, 41 S.W.2d 513, 516 (Tex.Civ.App.—Fort Worth 1931, writ ref'd). It has plenary power over school districts, which are "but subdivisions of the state government, organized for convenience in exercising the governmental function of establishing and maintaining public free schools for the benefit of the people." *Lee*, 24 S.W.2d at 450.

In organizing school districts, the Legislature is not limited to setting boundaries on their total authority; instead, it may fix boundaries on the exercise of particular powers. As we stated in *Edgewood II*, 804 S.W.2d at 497:

> Article VII of the Constitution accords the Legislature broad discretion to create school districts and define their taxing authority.

*See also Love v. City of Dallas*, 120 Tex. 351, 366, 40 S.W.2d 20, 26 (1931) (the Legislature may "increase or modify or abrogate" powers of school districts). Instead of imposing full consolidation of administrative and other functions, in Senate Bill 351 the Legislature chose the less intrusive approach of consolidating only a single taxing function, without disrupting the control over all other aspects of education exercised by local school boards. Those pow-

ers, including budgetary control, remained unaffected.

What is at issue is not the right of voters to approve school taxes, but rather how many times such approval must be obtained. Every penny of taxes the Legislature proposed to reallocate within the newly-created county education districts has been authorized by local voters. In reaching the result that another vote is required, the court ignores clear authority under the Constitution allowing the transfer of taxing authority from school districts to the CEDs without further voter approval. Indeed, in its desire to ensure a veto power for the privileged, the court ignores not just one, but two, previous tax approvals—the vote amending the Texas Constitution in 1966 and the vote setting the tax rate in individual districts.

Whether voters must approve taxes levied by the CEDs is a question answered by article VII, sections 3 and 3-b of the Texas Constitution. The majority's analysis of the former provision represents a significant departure from traditional methods of constitutional interpretation. This court has repeatedly and recently stated that in construing our Constitution, "we rely heavily on the literal text." *Edgewood I*, 777 S.W.2d at 394; *Damon v. Cornett*, 781 S.W.2d 597, 599 (Tex.1989). Article VII, section 3, a broad grant of power to create school districts, states that "the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts." As the majority concedes, this provision was enacted in 1909 as a separate sentence, unconditioned by any voting requirement: "The more plausible ... construction is that clause four [imposing the voting requirement] applied only to clause three [and not to the 1909 amendment]." Op. at 505 n. 18. To have its way, the majority does the implausible by reading out of the Texas Constitution words that permit the Legislature to do precisely what it did in Senate Bill 351. It rejects reliance on the literal text as the first rule of constitutional interpretation with the deceptive nonexplanation that it declines "to rest [its] construction of the provision on its grammar." *Id.*

A second cardinal rule of construction cast aside today is that absent a prohibition or limitation in the Texas Constitution, the Legislature is fully empowered to act. *Shepherd v. San Jacinto Junior College Dist.*, 363 S.W.2d 742, 743 (Tex.1962); *see also Mumme v. Marrs*, 120 Tex. 383, 391–92, 40 S.W.2d 31, 33–34 (1931). Finding no explicit limitation, grammatically or definitionally, the majority invents a new one, purportedly to give effect "to all [of the Constitution's] provisions if possible." Op. at 506. While the court's imposition of a voting requirement purportedly gives effect to part of section 3,[26] it renders superfluous the language of the 1909 amendment.

Previous noninvocation of this language by the Legislature is the next argument for which the majority grasps. *Walker v. Baker*, 145 Tex. 121, 196 S.W.2d 324 (1946), the single authority upon which the majority relies, presented a very different situation. There the Legislature sought to imply a power—the ability to call itself into session—which was not specifically authorized by the Constitution. In contrast, Senate Bill 351 represents legislative invocation of authority expressly granted by the Constitution—the levy of taxes—which the majority takes away by implying a limitation on its exercise. That the 1909 amendment may have grown dusty from nonuse should not vitiate its vitality, or cause it to crumble from age upon this court's touch. The makeshift reasoning employed today disserves the history of this court in analyzing the Texas Constitution with dignity and respect for its terms, and is insufficient to justify overriding the plain words of this fundamental governing document. Although not grounding this dissent on article VII, section 3, I find the reasoning of Judge McCown far more persuasive and constitutionally true than that proffered today. Tr. 726–38.

Even should article VII, section 3 require an authorization election, the majority recognizes that the "people may surrender their right to vote ... by amending that provision." Op. at 507. The people have done precisely that. In November 1966, the voters amended the Texas Constitution to "facilitate the process of [school district] consolidation by eliminating the costly elections," 2 George D. Braden et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 521 (1977) (hereinafter Braden), by providing that:

> No tax for the maintenance of public free schools voted in any independent school district ... shall be abrogated, cancelled or invalidated by any change of any kind in the boundaries thereof. After any change in boundaries, the governing body of such district, without the necessity of an additional election, shall have the power to assess, levy and collect ad valorem taxes on all taxable property within the boundaries of the district as changed ... in the amount, at the rate, or not to exceed the rate, and in the manner authorized in the district prior to the change.... In those instances where the boundaries of any such independent school district are changed by the annexation or consolidation with one or more school districts, the taxes to be levied for the purposes hereinabove authorized may be in the amount or not to exceed the rate theretofore voted in the district having at the time of such change the greatest scholastic population according to the latest scholastic census....

Tex. Const. art. VII, § 3–b.[27] The need for this amendment was manifest. In 1929 there were 7,840 school districts; in 1949,

---

**26.** The majority reasons that clause three, conditioning school taxes upon an election, is surplusage if districts can impose a tax under the 1909 amendment without a vote. It queries why a district would bother holding an authorization election if it need not. One apparent reason is that the 1909 amendment does not give this power directly to the districts but instead empowers the Legislature to authorize school districts to tax without a vote. Prior to Senate Bill 351, the Legislature had never given school districts this option.

**27.** Because section 3–b, as originally adopted in 1962, was limited to Dallas County school dis-

4,474; and in 1969, 1,244. 2 Braden at 521. These consolidations were largely designed to create school districts that were more fiscally and administratively efficient and to improve curricula. *Id.* (citing James Hankerson, *Special Governmental Districts*, 35 Tex.L.Rev. 1004 (1957)).[28] The difficulty presented was that, under *Crabb v. Celeste Independent School District*, 105 Tex. 194, 146 S.W. 528 (1912), no tax could be levied in altered districts without voter approval.

Section 3–b eliminated the requirement of subsequent elections, easing consolidation and other changes for school districts. *"Section 3–b is essentially an exception to the requirement in Section 3 that the voters of a school district approve any taxes levied by the district."* 2 Braden at 521–22 (emphasis added). The Legislature relied upon the voter's preauthorization of taxes set forth in article VII, section 3–b in creating CEDs empowered to levy taxes without requiring another vote.[29] Nonetheless, today's opinion abruptly dismisses the applicability of this critical constitutional provision, by finding that Senate Bill 351 neither changes the boundaries of any school district nor consolidates whole school districts. In reaching this result, the court begins by overlooking the statute that created each CED as a new "independent school district established by the *consolidation* of the local school districts in its *boundaries.*" Tex.Educ.Code § 20.942 (emphasis added). There is no question but that the geographical boundaries of the taxing powers of all existing school districts have been altered substantially. While recognizing that Senate Bill 351 works a boundary change, the majority labels the boundaries of the 188 CEDs as "imaginary," so it can ignore them. Op. at 508. These boundaries are *no more or less* real than those of any governmental unit, including the territorial limitations on school districts' governing power. Both

can be drawn on a map. Residents within these boundaries can be identified without difficulty. The CEDs are not the Legislature's imaginary friend; everyone can see them but a majority of this court.

Equally perplexing is the court's conclusion that Clinton Manges was right and this court was wrong when it decided *Freer Municipal Independent School District v. Manges*, 677 S.W.2d 488 (Tex.1984) (per curiam). There the court rejected an argument by Manges strikingly similar to the one it embraces today—that taxes could not be imposed by a newly-created school district without a vote. Manges owned property originally included in the Benavides Independent School District. The City of Freer, also part of the Benavides ISD, opted for disannexation and formed another district, wholly within the former. The Freer ISD then annexed additional territory, including the property owned by Manges. Having never voted to approve the creation of the Freer ISD, its expansion or its tax authorization, Manges refused to tender taxes to it.

This court upheld the levy and collection of the tax, stating that:

> Article VII, section 3–b authorizes independent school districts to tax for school purposes in those instances in which the school district was formed wholly by disannexation from an existing school district that possessed the power to tax.

*Id.* at 490. This language applies to districts formed by the disannexation of the power to tax from school districts and thus authorizes the CED taxes. Just as the newly-created Freer district derived its power from the previously authorized power of the Benavides district, so do CEDs derive their power from existing school districts.

---

tricts, amendment in 1966 was necessary to provide statewide applicability.

**28.** Urging that there remains "much to be done" in consolidating districts, Hankerson asserted that "a school district with insufficient scholastic population or financial resources cannot

give, at a cost that is reasonable, an education program that really meets modern needs." 35 Tex.L.Rev. at 1005.

**29.** *See* Testimony of Kevin O'Hanlon, *supra* note 24; *The District Court and Edgewood III, supra* note 18, at 9.

Consequently, we discover today that the writing in *Manges*, the only previous case to consider the question, is erroneous. It is wrong because "no part of that section addresses specifically the creation of new districts." Op. at 509. This statement is incorrect, because section 3–b clearly applies to districts—such as CEDs—newly created through the consolidation of whole districts.

The majority then distinguishes *Manges* because the Freer district was formed by a change in the boundaries of the old Benavides district. Yet the CEDs are similarly formed by a change in boundaries in existing districts. Since the majority views the CEDs' boundaries as "imaginary," it is not surprising that it refuses to apply the court's unequivocal decision in *Manges* to them.

Article VII, section 3–b also permits school districts formed by consolidation to tax without an authorization election. To skirt the consolidation issue, the majority must misrepresent the arguments of the parties. The conclusion that "Senate Bill 351, *as appellees admit*, does not consolidate whole school districts," Op. at 509 (emphasis altered), contradicts their brief which clearly states that:

Each of the C.E.D.'s described in S.B. 351 is a consolidation of whole school districts.

Brief of Appellees State Defendants at 41. Moreover, the court fails to observe that no CED is geographically configured to include part of a school district; each encompasses only *whole* districts.

While conceding the legislative power to establish CEDs as school districts, Op. at 504, the majority refuses to treat these same CEDs as school districts for the purposes of article VII, section 3–b. Emphasizing that CEDs "perform no educational duties. They employ no teachers, provide no classrooms, and educate no children . . . ," Op. at 498, the court finds Senate Bill 351 defective in failing to remove control over these functions from local school boards. The court thus rejects the less intrusive *consolidation* of Senate Bill 351 by requiring full consolidation under sec-

tion 3–b. Asserting that tax base consolidation is as intrusive as full consolidation because it requires taxpayers to "share the cost of schools" within the CEDs, Op. at 510, the majority then transmutes this debatable proposition into constitutional mandate. Contrary to the majority's reasoning, the Constitution does not distinguish between consolidations affecting all and those affecting only part of the prior district's functions. While the Legislature may undoubtedly dictate full consolidation without a local vote, under today's opinion it is precluded from choosing the less far-reaching alternative of tax base consolidation.

Applicable only to school districts, section 3–b is a unique, but quite narrow, exception to the requirement of voter approval. It ensures that the existing tax authorization cannot be enlarged by establishing a limit on the taxes imposed by the consolidated entities without a subsequent election. The newly-created CEDs, as consolidated entities, are constitutionally empowered to levy a tax not to exceed that already authorized by voters "in the district having at the time of such change the greatest scholastic population according to the latest scholastic census." Tex. Const. art. VII, section 3–b.

In 1991, all of Texas' school districts had voter authorization to levy a tax. *The District Court and Edgewood III, supra* note 18 at 33 n. 81. While it is argued that in some CEDs, the tax necessary to raise the local share may exceed this rate, either currently or at some unspecified future time as the required local share increases under Senate Bill 351, nothing in the record supports this conclusion. Judge McCown, in the suits pending before him, was petitioned to take judicial notice of the level of existing tax authorizations. Having concluded that the Legislature could, under article VII, section 3 of the Texas Constitution, empower the CEDs to tax, he determined it was unnecessary to consider this question, overruling the request to take judicial notice and deferring any factual

hearing or determination. Tr. 793–94.[30] Since the records in the consolidated cases are also inconclusive,[31] this court may not, in the absence of facts, presume an unconstitutional effect. *See Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 715 (Tex.1990, orig. proceeding) (determination of whether statute as applied violates Constitution "requires a fully-developed factual record").

Even were it shown to have a factual basis, this argument should not disrupt the application of Senate Bill 351. Instead, the tax rate used in those districts would be limited to that previously authorized by voters. A similar issue was presented in *Harris County Flood Control District v. Mihelich*, 525 S.W.2d 506 (Tex.1975), in which the district sought to void a judgment under the Texas Tort Claims Act, arguing that the Legislature was powerless to authorize a "tort claims tax" against it without approval of the voters. This court, in upholding the constitutionality of the enactment, concluded that:

> The District contends that the Tort Claims Act is void in its entirety as to this District, because it violates that part of … the Texas Constitution which prohibits the Legislature from providing for any indebtedness against a reclamation district unless such proposition shall first be submitted and adopted by the voters of the district. We think the Act can be reconciled with the Constitution.… Even if the collecting and taxing provisions are unconstitutional when applied to a conservation and reclamation district whose voters have not approved a maintenance and operations tax, it would not

affect the remainder of the Act or forego its application to those districts whose voters have approved a tax from which such judgments can be paid.

*Id.* at 509; *see also Brady,* 795 S.W.2d at 715 ("Statutes are given a construction consistent with constitutional requirements, when possible.…"). By limiting CED taxes to that previously authorized under article VII, section 3–b of the Texas Constitution, Senate Bill 351 can and should be upheld.

## IV. The "statewide property tax prohibition"

Another barrier to reform asserted by the majority is article VIII, section 1–e of the Texas Constitution, which provides:

> No state ad valorem taxes shall be levied upon any property within this State.

The court, parsing the words without reflecting on the circumstances in which they were adopted,[32] erroneously suggests that the State may not impose upon local districts the obligation to fund education through a property tax levy. The prohibition against state ad valorem taxes represented the culmination of 34 years of constitutional amendments. An examination of the history of school finance during that period reflects an intent that ad valorem tax revenues be used for education. Neither the Legislature nor the people of Texas contemplated that the proposal would require a complete redistribution of authority between state government and its subdivisions. Henceforth any legislation requiring any county, school district or other entity financially dependent on ad valorem

**30.** Judge McCown's order states that: "If the Texas Supreme Court is of the opinion that the previously-voted tax authority is crucial to the constitutionality of S.B. 351, then the court is prepared to hold a hearing on the question of previously-vote tax authority upon remand." Tr. 794.

**31.** In *Reyes v. Mitchell County Educ. Dist.*, No. D–1544, the plaintiffs presented the testimony of two witnesses, the tax collector and the superintendent of the Westbrook Independent School District. Neither testified that the taxes levied pursuant to Senate Bill 351 exceeded the authorized rate. The record in *McCarty v. County*

*Educ. Dist. No. 21,* No. D–1493, is similarly deficient.

**32.** The majority's willingness to sap the vitality from the relevant language is at odds with the view Justice Gonzalez recently expressed that "legal definitions frequently achieve their meaning from the context in which they are applied rather than from generic understanding. A term's applicable definition for a particular area of law should be shaped by constitutional and statutory policies that the state seeks to promote in that area." *Gifford–Hill & Co. v. Wise County Appraisal Dist.,* 827 S.W.2d 811, 820 (Tex.1991) (Gonzalez, J., dissenting).

taxes to take some action is subject to being invalidated as requiring a statewide property tax.

In determining that Senate Bill 351 imposes an impermissible state ad valorem tax, the majority fails to accord the required presumption of constitutionality that even today's opinion indicates is necessary. Op. at 503. *See Texas Public Bldg. Auth. v. Mattox*, 686 S.W.2d 924, 927 (Tex. 1985). That presumption is especially strong with respect to tax statutes, requiring a showing of a *clear* violation of a constitutional provision. *Vinson v. Burgess*, 773 S.W.2d 263, 266 (Tex.1989).

Judge McCown was one of three state district judges who properly accorded this presumption in determining that Senate Bill 351 does not impose an unconstitutional state ad valorem tax. His opinion set forth a thoughtfully developed test for distinguishing between a state tax and a local tax. The first element considers the manner in which the tax is collected and spent:

> A state ad valorem tax is a tax by the state assessed according to the value of property, which goes into the treasury of the state, and is withdrawn by an appropriation of the Legislature. A local ad valorem tax is a tax by a local unit of government assessed according to the value of property, which goes into the treasury of the local government, and is withdrawn by an appropriation of the local government.

Tr. 738–39. The second element focuses on the *nature* of the purpose for which the tax is collected and spent; when both state and local functions are served, the tax is not an unconstitutional state ad valorem tax. *Id.* at 741–48.

The tax authorized by Senate Bill 351 is not assessed by the state, nor is it placed into the state treasury or appropriated by the Legislature. The levy is made by the CEDs, goes into the treasuries of the CEDs and is used to finance schools within the CEDs.[33] The tax rate is not predetermined by Senate Bill 351. Op. at 498. As the court recognizes, Senate Bill 351 as originally introduced was amended so that the act no longer "prescrib[ed] the rate itself." Op. at 498 n. 10. The legislation does impose upon each CED the responsibility for raising a share of the cost of education in that district. That share is not a specified dollar amount, but rather is initially calculated as a percentage of its tax base equal to $0.72 per $100.00 of value, with adjustments in subsequent years. Tex. Educ.Code § 16.252. The tax rate is not $0.72. The amount of the levy will vary among CEDs depending upon collection rates and other factors unique to the district. Tr. 740.[34] The State thus does not impose the tax nor set the rate, but imposes a burden that can only be met by the local government's levy.

There is undoubtedly a superficial appeal to the argument that, by requiring school districts to levy a tax that the State cannot itself impose, the State has achieved indirectly what it cannot achieve directly. Whether Senate Bill 351 reflects the most prudent public policy alternative should not, however, be determinative of its constitutionality.

Absent from the majority's analysis is any consideration of whether the CEDs' levy serves a local purpose, a key factor in classifying the tax as state or local. Although claimed by some parties in this case to be purely a state function, education has undeniably significant local benefits and has traditionally been viewed as a joint responsibility shared by state and local

---

**33.** As the Mitchell County Education District persuasively states:

> The evidence showed that the taxes were local taxes only. They were assessed locally (only in Mitchell County), were to be collected locally, and were to be allocated only to the local Mitchell County school districts. Not one dime would ever leave Mitchell County. They were local taxes, not a state ad valorem tax. Mitchell County taxpayers will not write checks payable to the State of Texas. None of

their money will be sent to Austin; it will remain in Mitchell County.

Reply Brief of Appellees Mitchell County Education District at 8.

**34.** In concluding that this discretion to set the rate is of no consequence in classifying the tax as state or local, the majority relies solely upon extensive quotation from an "unpublished monograph."

governments. The Texas Constitution clearly permits the state to share the burden of financing education with localities and the power to determine most of the terms of that partnership.

Today's invalidation of Senate Bill 351 is accomplished in a way that both contradicts precedent concerning inter-governmental relations and places in doubt the validity of numerous enactments far beyond the arena of school finance where the state has imposed duties upon its various subdivisions. Texas courts have not been receptive to the notion that the state's imposition of a financial burden on local government unconstitutionally interferes with the power to tax. These challenges have been mounted under article VIII, section 9 of the Texas Constitution, granting to the counties the power to levy a tax, and setting the maximum chargeable rate. In *Pogue v. Duncan*, 770 S.W.2d 867, 869 (Tex.App.—Tyler 1989, writ denied), the court rejected the argument that a statute vesting district court judges with the authority to set compensation levels for county-paid court reporters constituted state impairment of the local government's taxing powers. *Accord Gill–Massar v. Dallas County*, 781 S.W.2d 612, 617 (Tex.App.—Dallas 1989, no writ). The counties were thus obligated to pay an expense of the state district court, without any right of approval or control. Similarly, in *Harris County v. Dowlearn*, 489 S.W.2d 140, 145 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.), the court rejected a challenge to the constitutionality of the Texas Tort Claims Act as requiring a tax beyond the lawful rate set for the county. *Cf. Vinson v. Burgess*, 773 S.W.2d at 267 (holding constitutional state statute authorizing rollback elections).

Interpreting the only other state constitutional provision in the country to bar the levy of state ad valorem taxes,[35] the State of Florida has had the opportunity to explore its limits. Three times that state's highest court has rejected reasoning similar to that adopted here by the majority. Not surprisingly, this extremely insightful experience of a sister state with a similar problem is relegated to a footnote in today's opinion.

In *Board of Public Instruction v. State Treasurer*, 231 So.2d 1 (Fla.1970) (per curiam), it was argued that legislation imposing upon local school districts the duty to render financial assistance to junior colleges not under the control of the local board violated the constitutional prohibition of a state property tax. Identifying the determinative question as whether the ad valorem tax receipts were used to further a local purpose, the court held:

> Plaintiff finally asserts that the whole legislative plan is to establish junior colleges as state institutions and to require their support by local ad valorem taxes thus circumventing the provision section 1 article VII which prohibits state ad valorem taxes. Junior colleges serve a state function. So do universities. So do the free public schools. Junior colleges also serve a distinctly local function.... Ad valorem taxes levied by school districts for support of such institutions are local taxes levied for local purposes.

> While the Legislature may not circumvent the prohibition of state ad valorem taxation by any scheme or device which requires local ad valorem taxes and then channels the proceeds into essentially state functions which are not also local functions, no such situation is here presented.

*Id.* at 4. In other words, the Florida Supreme Court, faced with a constitutional prohibition against statewide ad valorem taxes, upheld a state requirement that schools be funded by local property taxes.

Similarly, in *St. Johns River Water Management District v. Deseret Ranches of Florida, Inc.*, 421 So.2d 1067, 1070–71 (Fla.1982), the court held that taxes levied by a local water district to further the state's interest in water resource conservation did not constitute state ad valorem

---

**35.** Fla. Const. art. VII, § 1(a) ("No state ad valorem taxes shall be levied upon real estate or tangible personal property."). Although one commentator identifies two other states as barring a state property tax, neither is similar to Texas. *See* 2 Braden at 594.

taxes. This case is unjustifiably distinguished on the basis that the Florida Constitution authorizes the creation of water districts with the power to levy ad valorem taxes. The majority fails to recognize that article VII, section 3 of the Texas Constitution accomplishes a similar purpose by authorizing the creation of school districts, including CEDs, with the power to levy ad valorem taxes.

In *Sandegren v. State*, 397 So.2d 657 (Fla.1981), Sarasota County challenged a statute requiring local government to fund a share of the cost of mental health services. The Supreme Court, finding that these services benefitted the local community, compelled the county to make payments due to health care providers:

> Although local governing bodies are given the right to review, comment on, and approve plans drawn up by district mental health boards, this does not give them the right to refuse to fund mental health programs.... The judgment of a local governing body as to the necessity for such a program is not material when the legislature has declared those programs are necessary and that a share of the costs should be locally funded.... The funding of local programs, therefore, has been made a ministerial, rather than a discretionary, act and is enforceable through mandamus.

*Id.* at 659. Not only could it impose a financial burden without running afoul of the constitutional bar on state ad valorem taxes, but the state could also mandate payment, and remove the local government's discretion to participate.

Rejecting both the analysis of Judge McCown and guidance provided by precedent under the Texas and Florida Constitutions, the court adopts an unworkable and unpredictable test that imperils the delicate balance of rights and responsibilities between our state and local governments. By leaving unclear the exact wrong committed by Senate Bill 351 and the means to correct it, the majority invites a multitude of similar challenges to existing laws that impose any financial burden on a unit of local government that is funded by ad valorem tax revenues.

One example of what could be numerous statutes having substantial fiscal impact on local government is the 1985 Indigent Health Care and Treatment Act, Tex. Health & Safety Code §§ 61.001–.065. That Act imposes upon counties the obligation to fund up to $30,000 in health care expenses for each indigent resident. Only after expending 10% of revenues generated from taxes is the county entitled to state funding. The effect on local property taxes has been documented:

> *[O]ver two-thirds of Texas counties have raised their effective tax rates to meet the new obligations.* [In 1988], Cameron County spent $1.2 million on indigent health care and was reimbursed just under $500,000. The county has a $15 million general fund, and taxes had to be increased 13 percent to cover the program's cost. Hidalgo County officials—who met their ten percent statutory cap within the first six months of fiscal year 1987—estimate that they will be spending 15 percent of their total tax revenue on indigent care within two years.

R. Fritz, *Texas Local Government Finance, in* Select Committee on Tax Equity, *Rethinking Texas Taxes* 125 (1989) (emphasis added); *see also* Office of the State Auditor, *Report on the Indigent Health Care System* (1990).[36]

In attempting to distinguish the Indigent Health Care Act, the majority leaves the misimpression that all counties have multiple sources of revenue available to meet the substantial obligation to fund health care for indigents. These sources are identified as "sales and use taxes, ... property taxes, reducing expenses, or some combination of these," Op. at 502 n. 14, citing Tex.Health & Safety Code § 61.002(6),

---

**36.** Other state statutes carry similarly weighty burdens, ordinarily without any accompanying funding. *See, e.g.,* R. Fritz, *Texas Local Government Finance, supra,* at 122 (the cost of implementing Tex.Educ.Code § 16.054 establishing ratio of teachers to students and §§ 16.055–.057 setting teacher salaries exceeds $800 million); *see also e.g.,* Tex.Loc.Gov't Code § 84.002 (requiring county to pay salary of county auditor appointed by district judges).

which, in fact, defines "general revenue levy" to consist *solely* of the property tax and any sales and use tax revenue received. Basically the majority is implying that the availability to counties of revenues other than ad valorem taxes differentiates the burden imposed by the Indigent Health Care Act from that of Senate Bill 351.

This facile distinction exhibits the court's inability or unwillingness to understand the mechanics of local government finance. Although Texas now permits counties to impose sales and use taxes, that ability has significant limitations and, in certain instances, is barred completely. If any part of a county is located in a rapid transit authority or a regional transit authority, it may not adopt the tax. Tex.Tax Code § 323.101(b). Further, a county may not impose a tax if the combined rate of all sales and use taxes by other political subdivisions within the county exceeds two percent. *Id.* § 323.101(d). Thus, fewer than half of Texas counties have implemented these taxes. To name but a few, the counties of Bexar, Cameron, Collin, Dallas, Denton, Fort Bend, Galveston, Harris, Hidalgo, Montgomery, Nueces, Potter, Tarrant, Taylor, Travis, Wichita and Williamson collect no general sales and use taxes. Comptroller of Public Accounts, *Texas Sales and Use Tax Rates* (Jan. 1992).

Because counties do not receive as significant a contribution from state and federal sources, many are in fact *more* dependent on ad valorem taxes than school districts. *See* John Kennedy & Jeff Cole, *The Property Tax in Texas, in Rethinking Texas Taxes* at 321 (in 1986, "[c]ounties relied most heavily on property tax revenues....").[37] Additionally, most special districts in Texas, including junior college districts, fire prevention districts, water control districts and a host of others, have only the property tax available to fund their operations. *See generally* Tex.Prop. Code § 1.04(12). Under the test announced today, it is difficult to comprehend how any statutorily-mandated burden imposed on

these entities would not deprive them of "meaningful discretion." Op. at 502.

Regrettably there is little value in gaining a reasoned understanding of the majority's test for which taxes are state and which are local, because they admit it is not a very useful test. The majority accepts the unpredictability of the application of today's decision, stating that "[i]t is difficult, perhaps impossible, to define ... precisely where along this continuum such taxes become state taxes," Op. at 503. The Legislature is left to guess as to the manner of correcting its error:

> Therefore, if the Legislature, in an effort to remedy Senate Bill 351 with as few changes as possible, chose to inject some additional element of leeway in the assessment of the CED tax, it is impossible to say in advance whether that element would remove the tax from the prohibition of article VIII, section 1–e.

*Id.* Unless willing to submit to the vagaries of this court's decisionmaking process in *Edgewood IV, V* and so forth until it gets it "right," the Legislature is advised by the majority to junk tax base consolidation and try something else: "The Legislature can avoid these constitutional conundra by choosing another path altogether." *Id.* at 503.

In the majority's opinion, what should be deference to the Legislature degenerates into thinly-veiled contempt. Its colorful analogies charge the legislative branch with intentional obstruction of the school finance process. Describing the CEDs as "puppets," it accuses "the State [of] pulling all the strings." *Id.* at 501. We are also informed that the court's unhelpful test for distinguishing between state and local taxes produces a conundrum, but it is one the Legislature has created. *Id.* at 503. ("Although [the court's] parsing the differences may be likened to dancing on the head of the pin, it is the Legislature which has created the pin, summoned the dancers, and called the tune."). After now

---

37. In formulating the test for distinguishing between a state tax and a local one, the trial court was better informed than the majority as to the workings of intergovernmental relations: "[A] county raises revenue almost *exclusively* from the local ad valorem tax." Tr. 740 (emphasis added).

refusing to say what form of CED would pass constitutional muster, the majority blames the Legislature for daring to ask. This diatribe of disdain is designed to camouflage the majority's role as manipulator of the legislative process. *See supra* note 16 and accompanying text.

The uncertainty injected into the distribution of authority between state and local government by today's opinion is all the more objectionable in that it is based on a most incomplete analysis of our Constitution. In tracking constitutional developments beginning in 1948 and culminating in 1982 with abolition of state ad valorem taxes, the court fails to note that the shift away from a state property tax and the increased reliance on local taxes to finance public schools have not developed independently. As dependence on state property taxes declined over these 34 years, local funding of education increased proportionately. Even before voters had passed the first of several amendments commencing the slow death of the state property tax, the Gilmer–Aikin Education Committee had convened to evaluate public education. Confronting a crisis strikingly similar to the present, it realized the need for action to fulfill the Legislature's constitutional obligation to provide "an efficient system of public free schools." Gilmer–Aikin Commission, Finance Subcommittee, *Financing Public Education in Texas: A Proposed Plan* 2 (1948) (hereinafter *Financing Public Education*).

With the prohibition of the use of the statewide property tax for general revenue purposes, simultaneously, the committee envisioned that school funding would be achieved through the use of local property taxes. The Gilmer–Aikin Committee, *To Have What We Must* 15 (1948) ("Every local system in Texas *should be required* to raise some local funds for education. . . .") (emphasis added); *see also*

Rae Stills, *The Gilmer–Aikin Bills* 8 (1950) ("In order to obtain state aid, it is necessary for the district to levy a tax which will raise the funds assigned to it by the formula.") and 60–61 (legislation would require some districts to raise tax rates). Furthermore, school financing would be equalized by distributing the wealth, derived from local property taxes, throughout the county. James Taylor, *Texas Moves Forward in Education, in* Rae Stills, *The Gilmer–Aikin Bills* 167 (1950).

The committee's plan created a partnership between state and local governments.[38] The state would provide funds to all schools on a per capita basis and establish minimum standards of education. The local districts had imposed upon them the burden of raising their share of school funds through local property taxes and the responsibility of meeting the minimum standards set by the program because "it is important that local communities make a direct contribution to the cost of education." *Financing Public Education* at 10. In order to finance the Minimum Foundation Program, the committee relied upon local property taxes because the exercise of local initiative and local effort were viewed as essential in any finance plan. *See* James Taylor, *Texas Moves Forward in Education, supra,* at 167 (1950).

The constitutional amendments limiting the levy of a state ad valorem tax were adopted within this framework, to permit increased reliance on the local tax to fund education. See Texas Comm'n on State and Local Tax Policy, *The State Property Tax* 11 (Dec. 1962). Surely it was not the objective of the voters of Texas and the Legislature to render unconstitutional school funding laws enacted contemporaneously with the first step toward eliminating

---

**38.** On January 25, 1949, the committee concluded its work and released *The Final Report of Gilmer–Aikin Committee,* 51st Leg., R.S. (separate pamphlet) (1949), which contained recommendations to reform the condition and financing of the Texas education system. In 1949, the Legislature adopted almost every proposal verbatim when it enacted the Gilmer–Aikin Bill,

S.B. 116. Act of June 1, 1949, 51st Leg., R.S., ch. 334, 1949 Tex.Gen.Laws 626. This landmark legislation established minimum standards for education and a financing plan intended to equalize school funding by redistributing local property tax money from wealthier school districts to poorer ones.

the state ad valorem tax.[39] In construing the language of the Texas Constitution, we must look to "the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished." *Edgewood I*, 777 S.W.2d at 394 (quoting *Markowsky v. Newman*, 134 Tex. 440, 136 S.W.2d 808, 813 (1940)). The meaning of the literal text is derived with the "understanding that the Constitution was ratified to function as an organic document to govern society and institutions as they evolve through time." *Edgewood I*, 777 S.W.2d at 394. The historical context of article VIII, section 1-e, highlighting the interplay between school funding and state taxes, supports the conclusion reached by the three trial courts below—that Senate Bill 351 does not impose an unconstitutional tax.

## V. Taxpayer, Pay Thy Unconstitutional Taxes

Unwilling to live with the legal consequences of its own improper action, the majority weaves a more tangled web by adopting a new rule: convenience dictates that taxpayers *must* pay the tax which this court just declared unconstitutional. The majority attempts to justify its refusal to enforce the law by invoking "equity." This incantation is of little consolation to Texas taxpayers who bear the inequity of being forced to pay an illegal tax, a burden even the majority describes as "very onerous, indeed." Op. at 521. Those taxpayers of Mitchell and Glen Rose Counties that brought this suit are now rewarded for their efforts and expense with the pronouncement that they win, that from the outset they have been absolutely correct, that the tax complained of violates the fundamental charter of this state, but, nevertheless, "keep paying." [40] How "disingenuous" of the majority to suggest that it is this dissent which lacks "sympathy for taxpayers." Op. at 521 n. 38. The majority's assurance that they "do not leave the parties before us unaffected" but rather "only limit [their] relief," Op. at 521, represents an incredible understatement. The prevailing taxpayers have been denied any relief for a two year period.[41] The majority is more than willing to inflict this wholesale injury [42] in order to avoid the unhappy results of their maneuvering. Despite blusterings to the contrary, today's rejection of a refund for taxpayers is not so much to avoid chaos in school financing as to distract attention from the broken promise of *Edgewood II–*. By declaring the law they recommended unconstitutional yet refusing to enforce that declaration, the majority denies responsibility and diffuses resentment for having created the crisis in the first place.

In the name of avoiding its self-inflicted chaos, the majority has in fact only prolonged and intensified it. Inviting collateral attacks in federal court, the majority may offer only a brief respite before the state sinks into the quagmire of federal law.

One of the stranger responses of the majority is the accusation that this dissent

---

39. In considering whether use of local taxes to fund junior colleges was an impermissible state ad valorem tax, the Florida Supreme Court reviewed the history of the funding of such colleges. Finding no constitutional bar, the court observed: "This is particularly true when as a matter of contemporary history we know that the junior colleges were being supported in part by local funds when the constitution was adopted." *Board of Public Instruction v. State Treasurer*, 231 So.2d at 3.

40. This result discourages suits by those with valid claims, since such parties cannot know that they will reap the benefits of their victory. *See* Note, *Limitation of Judicial Decisions to Prospective Operation*, 46 Iowa L.Rev. 600, 614 (1961) (hereinafter *Limitation of Judicial Decisions*).

41. This result conflicts with prior rulings by this court which have regularly allowed the parties to the suit to enjoy the fruits of their victory. *See, e.g., Whittlesey v. Miller*, 572 S.W.2d 665, 669 (Tex.1978).

42. The choices of remedy are not, as the majority presumes, limited to complete, immediate refund or denial. Making the taxpayers whole can take a variety of forms, including tax credits and refunds in installments. It is thus the majority, and not the dissent, who fail to consider middle grounds between "two extreme positions." *See* Op. at 520 n. 37.

is involved in mere "word tricks." Op. at 507. In fact, a very genuine "word trick" lies at the heart of the majority's mishandling of this appeal. All of our prior rulings [43] have considered challenges to the constitutionality of the school finance *system;* today's ruling for the first time considers the constitutionality of a school finance *tax.* Proclaiming to be "constrained by the arguments raised by the parties to address only issues of school finance," *id.* at 524, the majority carefully disregards the fact that the parties have only objected to a school finance *tax.* The constitutionality of the school finance *system* is still pending before Judge McCown.

That today's judgment is instead directed to the *system* and not to the *tax* is no mere drafting error. Rather it is indispensable to the illusion created by the majority that its opinion amounts to more than a simple declaration that the victorious taxpayers must continue to pay a tax which has been held unconstitutional. This calculated jumble of terms is designed to justify the majority's incredible decision to declare the petitioning taxpayers as winners but deny them their winnings.

Misconstruing this *tax* appeal as a *system* appeal conveniently allows today's opinion to:

> conclude, as we have in both those prior school funding decisions, that the constitutional defects we have found pertain not to individual statutory provisions but to the scheme as a whole. It is the system that is invalid, and not merely a few of its components.

Op. at 515. At the same time this appeal is treated precisely like *Edgewood I* and *II,* which concerned the entire "scheme as a whole" for financing schools in Texas, *id.,* the court recognizes the differing nature of this appeal, which concerns "a few of [the] components" of the system, specifically the CED tax. *Id.* at 515. Brushing the latter realization aside, the majority insists that not giving retroactive effect to the present *tax* ruling is consistent with action taken on the *system* invalidations in *Edgewood I, II* and *II–,* which "could not be given retro-

active effect because the past could not be corrected." *Id.* at 515. Today's wholly unwarranted delay then incomprehensibly becomes a mere parallel of the delays in *Edgewood I* and *II* and in opinions of "[o]ther courts which have required revisions in their state's school finance laws." Op. at 522. Revision in the system is not mandated today, except for a change in one tax. The reason for this confusion is simple: if the court's remedy were limited to the requested relief—to enjoining an unconstitutional *tax*—there would be no excuse for denying a tax refund.

"[D]efer[ing] the effect of [its] ruling," Op. at 522, the majority compels taxpayers to continue paying an illegal tax even in 1992. Given the holding that the state may collect "1991 and 1992 CED taxes" under Senate Bill 351, no Texas property owner who paid the unconstitutional levy for tax year 1991, even under protest, before January 31, 1992, when 1991 taxes are due, will ever be entitled to a refund. Only in 1993 will today's dormant opinion spring to life, making the illegal tax at last officially uncollectible and unenforceable. This prospective application of the court's ruling is contrary to the very basis of the doctrine of prospectivity, which requires that a rule begins to apply *as of the time of decision.* As the United States Supreme Court recently explained: "It is, of course, a fundamental tenet of our retroactivity doctrine that the prospective application of a new principle of law begins on the date of the decision announcing the principle." *American Trucking Ass'ns v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 2335, 110 L.Ed.2d 148 (1990) (plurality opinion). Since today's opinion declares that the rule shall apply only at some future date, it is questionable whether the doctrines of retroactivity and prospectivity on which the majority dwells are controlling. Today's amazing ruling is not prospective, it is unprecedented "prospective-plus."

The decision to apply a rule to the litigants before the court beginning at least a year in the future renders today's ruling an

---

**43.** *See infra* at Section II.

advisory opinion. Invalidating an enactment in *Wessely Energy Corp. v. Jennings*, 736 S.W.2d 624 (Tex.1987), we noted that to declare that statute unconstitutional "and then not apply the holding here would transform our pronouncement into mere advice." *Id.* at 628. Although not previously slowed in its writing on school finance by this prohibition against advisory opinions, *see Edgewood II–*, 804 S.W.2d at 503–05 (Doggett, J., concurring), the majority should not again compound its error. The majority contends only that "[i]n some respects ... every prospective decision is advisory," and that this court and "every other jurisdiction" apply some decisions prospectively. Op. at 521. These generalities utterly beg the question. That prospectivity may be appropriate in some circumstances certainly does not explain its unprecedented use in the unique context of tax law. Nor does it indicate that this opinion is not only prospective, but prospective as of two years in the future. Neither this nor other jurisdictions typically apply such prospectivity-plus.[44]

While inviting chaos, the majority has also ensured inequity, not only for the school children of Texas, but also for the taxpayers. It is well-established that when a tax statute is ruled unconstitutional, relief applies retroactively. In this unique context, retroactivity allows taxpayers to seek a refund of their illegally collected taxes. This court has never allowed an unconstitutional tax to be collected without permitting the taxpayers to seek a retroactive refund.

When declaring a state franchise tax unconstitutional, this court required a complete refund to all corporate taxpayers, despite the potentially extensive reimbursements required for every affected party during a ten-year period. *National Biscuit Co. v. State*, 134 Tex. 293, 135 S.W.2d 687, 695 (1940). In considering the effect of a previously invalidated state statute taxing citrus fruit packed or processed prior to sale, we mandated the refund of all the unconstitutional taxes paid, despite the possibility that some of what had been collected had already been expended. *State v. Akin Prods. Co.*, 155 Tex. 348, 286 S.W.2d 110, 112 (1956); *see also Harris County Water Control & Improvement Dist. v. Hornberger*, 601 S.W.2d 66, 68 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) (requiring a full refund of an unconstitutionally collected tax). Until now, it has always been the law in Texas that when the tax collecting entity "received from the [taxpayers] money to which it now appears it was not entitled ... it would not be just for the [entity] to continue to retain the money." *Crow v. City of Corpus Christi*, 209 S.W.2d 922, 925 (Tex.1948). Any other result condoning the state's refusal to pay back money it collected illegally simply "would be against good conscience." *Id.*[45]

Only when an illegal tax has been paid voluntarily may there be no claim for repayment. *National Biscuit Co.*, 135 S.W.2d at 692. This "voluntary payment rule" will not, however, bar an action for recoupment where there has been "express or implied duress" motivating payment of the tax. *Id.; Texas Nat'l Bank v. Harris County*, 765 S.W.2d 823, 824–25 (Tex.Civ. App.—Houston [14th Dist.] 1988, writ denied).[46] When there has been such duress,

---

**44.** *See infra* note 55.

**45.** In correctly determining that the unconstitutional tax should not be endured for the 1992 tax year, Justice Cornyn announces that:

We either have a constitution which is the fundamental law of our state or we do not. Out of due regard for the rule of law the constitution must be enforced or it must be amended—the law simply cannot be ignored or its enforcement delayed for reasons of expediency.

Op. at 525. Inexplicably, however, he concludes that there is no reason not to allow collection and non-refund of those same unconstitutional taxes in 1991, precisely because any other approach would be inexpedient. For some unknown reason, the very same conduct that is *wrongfully inexpedient* in 1992 is deemed by Justice Cornyn as *rightfully expedient* in 1991. This is an irreconcilable contradiction.

**46.** To avoid application of this rule and forfeiture of their taxes, thousands of taxpayers have filed suit to establish payment under duress. *See supra* note 1. Little could they expect the court to both hold the tax unconstitutional and deny them a refund of their involuntary tender of taxes.

the taxpayer can later seek a refund even if the tax was not explicitly paid "under protest." *Crow*, 209 S.W.2d at 924.

Having announced to the taxpayers of Texas that this tax is illegal but must be paid to avoid statutory penalties, this court creates a situation in which everyone is paying under implied duress, yet no one gets a refund. The majority announces that for taxpayers who, awaiting this court's tardy opinion still have not paid, its "ruling is not to be used as a defense to the payment of any such taxes," Op. at 522, meaning that the state is not precluded from pursuing delinquent tax suits. The penalties for non-payment of these taxes range from monetary fines to seizure and sale of property.[47] In other words, "either pay this illegal tax or pay even more in fines and have your property seized." In *Akin Prods. Co.*, 286 S.W.2d at 111, this court found that duress may be shown when payment is made to avoid accrual of penalties and interest on unpaid taxes. Again in *Highland Church of Christ v. Powell*, 640 S.W.2d 235 (Tex.1982), this court found that tax payments to avoid penalties and interest were made under duress. *Id.* at 237. *Accord Fort Bend Indep. Sch. Dist. v. Weiss*, 570 S.W.2d 241 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ) (taxpayer is entitled to an injunction against illegal collection of taxes if liable in penalties and interest for non-payment); *City of San Antonio v. Grayburg Oil Co.*, 259 S.W. 985 (Tex.Civ.App.—San Antonio 1924, no writ). "Texas Courts [have consistently held] that where a legislative act by its terms provides for penalty and interest on taxes (as is the case *for ad valorem taxes*), the taxpayer may pay the taxes and recover them back if the tax is illegal...."

*City of Houston v. Standard–Triumph Motor Co.*, 347 F.2d 194, 199 (5th Cir.), *cert. denied*, 382 U.S. 974, 86 S.Ct. 539, 15 L.Ed.2d 466 (1965) (emphasis added).[48]

This line of Texas tax cases is wholly ignored by the majority in favor of a number of non-tax opinions. Even then, the majority must concede that "[g]enerally, judicial decisions apply retroactively." Op. at 515. *See Burns v. Thomas*, 786 S.W.2d 266, 267 n. 1 (Tex.1990) ("[T]he general rule is that a decision of this court is retrospective in operation.").

Who knows what law the majority is applying to reach its predetermined result of abandoning the well established Texas rule.[49] Surely its claim that this court has never "clearly articulated the factors which bear upon [prospectivity] decisions," *id.* at 518, conflicts rather dramatically with our recent announcement of just such factors in *Wessely Energy Corp. v. Jennings*, 736 S.W.2d 624 (Tex.1987):

> To determine whether, and to what extent, a judicially modified rule will apply retroactively, a court should determine (1) whether the holding decided an issue of first impression not clearly foreshadowed by prior decisions; (2) whether retroactive operation will further or retard the holding in question; and (3) whether a retroactive application could produce substantial inequitable results.

*Id.* at 628. While that case did cite *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), it clearly set forth a Texas interpretation of the factors that a Texas court should consider when determining retroactivity questions. *See also Segrest v. Segrest*, 649 S.W.2d 610,

---

**47.** *See* Tex.Tax Code § 32.01 (tax lien attaches to property to secure payment); § 33.01(a) (penalty imposed on delinquent taxes); § 33.21(a) (property subject to seizure for delinquent taxes); and § 33.48 (recovery by taxing unit of costs and expenses of bringing suit to collect delinquent taxes).

**48.** The view that payment to avoid penalties may constitute payment made under duress has received support in *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 110 S.Ct. 2238, 2258, 110 L.Ed.2d 17 (1990). *See* James M. Ervin, Jr., and Katherine E. Giddings,

*Supreme Court Distinguishes Remedy and Retroactivity Issues Affecting State*, 73 J.Tax'n 296, 302 (Nov.1990) (hereinafter *Retroactivity*).

**49.** The cost of ignoring precedent is a high one. Justice Blackmun recently emphasized that when the courts fail to demonstrate respect for precedent, the bar and the public lose trust in the judiciary. *James B. Beam Distilling Co. v. Georgia*, —— U.S. ——, 111 S.Ct. 2439, 2450, 115 L.Ed.2d 481 (1991) (plurality opinion) (Blackmun, J., concurring).

612 (Tex.), *cert. denied,* 464 U.S. 894, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983). Among the significant differences in this prior writing from the version of the three-part *Chevron Oil* test set out by the majority at Op. at 520–521, are: addition of the requirement that a holding must not have been clearly foreshadowed *"by prior opinions;"* a requirement that the retroactive application not retard "the *holding"* in question rather than the underlying "rule"; and the qualification that any inequitable result be truly *"substantial."* Compare *Chevron Oil,* 404 U.S. at 106–07, 92 S.Ct. at 355–56, *with Wessely,* 736 S.W.2d at 628.[50] The obvious reason for rejecting this court's own interpretation of *Chevron Oil* is that the majority cannot meet that standard, and therefore must today weaken it. Instead of acknowledging the Texas standard, the majority searches through the unique interpretations of *Chevron Oil* in dozens of sister states. Op. at 519 n. 35.

Apparently not satisfied with the law of other states, the majority selectively turns to a number of lower federal courts which have to varying degrees focused on the first and third factors of the three-part test. Op. at 519.[51] It actually should be irrelevant how, for instance, a federal district court in Washington, D.C. chooses among the three requirements of *Chevron Oil,* Op. at n. 36 (citing *Silverman v. Barry,* 845 F.2d 1072 (D.C.Cir.1988)), when Texas has consistently required that all three be met. *Wessely,* 736 S.W.2d at 628–29; *Segrest,* 649 S.W.2d at 612–13; *First*

*Bank v. Deer Park Indep. Sch. Dist.,* 770 S.W.2d 849, 851 (Tex.App.—Texarkana 1989, writ denied).[52] Indeed, the signatory of today's opinion, Justice Gonzalez, recently emphasized the indispensable nature of the first part of the Texas test in *Reagan v. Vaughn,* 804 S.W.2d 463 (Tex.1990): prospective application is appropriate only when "the court's decision establishes a new principle of law that either overrules clear past precedent on which litigants may have relied or decides an issue of first impression whose resolution was not clearly foreshadowed." *Id.* at 467–68.[53] Nevertheless, the majority explains at length that the three factors set out in *Chevron Oil* should be balanced. Op. at n. 36. It is difficult to escape the conclusion that the majority is simply making law up as it goes, here and there grabbing an odd mix of federal law and precedent from other states. This dissent chooses instead to rely on established and relevant Texas caselaw.[54]

But even if other jurisdictions are considered, the general rule throughout this country is similar to that of Texas—an "unconstitutional act is not a law; it confers no rights; it imposes no duties ...; it is, in legal contemplation, as inoperative as though it had never passed." *Norton v. Shelby County,* 118 U.S. 425, 442, 6 S.Ct. 1121, 1125, 30 L.Ed. 178 (1886); *see* Clifford L. Pannam, *The Recovery of Unconstitutional Taxes in Australia and the United States,* 42 Tex.L.Rev. 777, 795 n. 74

---

**50.** *Wessely* thus did not simply interpret *Chevron Oil* because federal constitutional questions were raised, as the majority remarkably suggests. Op. at 521. If this court in *Wessely* were simply parroting the federal law, we would not have rephrased and reshaped each part of *Chevron Oil's* three elements.

**51.** The choice to ignore relevant Texas law in favor of federal law of questionable relevance is consistent with the court's increased propensity to act as a mere drone, blindly following federal courts. *See Caller–Times Publishing Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 595–596 (Tex.1991) (Doggett, J., dissenting) ("Disregarding our State's unique statute, the court looks to federal precedent...."); *Bexar County Sheriff's Civil Serv. Comm'n v. Davis,* 802 S.W.2d 659, 666–69 (Tex.1990) (Doggett, J., dissenting).

**52.** Even if one is to look at how federal courts have recently utilized the *Chevron Oil* test, it is best to look to the source of that rule, the U.S. Supreme Court, which recently applied equally all three parts. *See American Trucking,* 110 S.Ct. at 2331–33.

**53.** The majority curiously cites *Reagan v. Vaughn* in a footnote, Op. at 515 n. 29, yet ignores the rule of that case.

**54.** It is untrue that this dissent "would afford no relief at all, prospective or otherwise." Op. at 521 n. 38. No relief is required from an act of the Legislature not in conflict with the Constitution. *If* this statute were unconstitutional, I would enforce Texas law.

(1964) ("Judges in the United States have vied with one another in describing the utterness of the nullity that they believe an unconstitutional statute to be."); Note, *Limitation of Judicial Decisions to Prospective Operation*, 46 Iowa L.Rev. 600, 617 (1961) ("As a general rule judicial decisions operate retroactively as well as prospectively.").

Nor with rare exception have the courts of other states applied a prospective ruling of an illegal tax in the manner of the majority. Normally when other states utilize prospectivity in a tax context, the ruling applies immediately rather than at some future date.[55] Taxes not yet collected need not be paid;[56] the ruling is applied at least to the litigants before the court to allow complete relief from an illegal tax;[57] a refund is permissible for anyone who had already brought a suit or paid under protest;[58] and a refund is refused only when parties fail to act timely,[59] the tax had been collected for many years,[60] or the tax is not capable of being neatly and accurately refunded.[61] These distinguishing factors demonstrate the absence of support for applying today's decision to deny a refund even to the successful litigants in this suit.

Eagerly seeking refuge in federal law, the majority mistakenly assumes that there has been no recent evolution of that law, and neglects to consider precedents which appear to disfavor or even doom this approach. In fact, federal law offers more unrest than refuge, as evidenced by the majority's reliance on a source appropriately entitled *"Confusion in Federal Courts."* Op. at 519 n. 36.

A review of *Chevron Oil* shows that the majority has failed to satisfy the critical first prerequisite expressed in the federal test:

> First the decision to be applied nonretroactively *must* establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ..., or by deciding an issue of first impression whose resolution was not clearly foreshadowed....

*Chevron Oil*, 404 U.S. at 106, 92 S.Ct. at 355 (citations omitted) (emphasis added). The major thrust of this first requirement is that the change in law cannot have been foreshadowed. Put another way, a rule of law will not be applied prospectively when it is "predictable" that the rule would be

---

55. *Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, 806 P.2d 598 (Okla.), *cert. granted and judgment vacated,* —— U.S. ——, 111 S.Ct. 2882, 115 L.Ed.2d 1048 (1991) (remanding the case on other grounds in light of a new Supreme Court decision but not addressing the prospectivity issue); *Strickland v. Newton County*, 244 Ga. 54, 258 S.E.2d 132, 133 (1979) (prospective application from the date of the trial court judgment); *Kansas City Millwright Co. v. Kalb*, 221 Kan. 658, 562 P.2d 65 (1977); *Gottlieb v. City of Milwaukee*, 33 Wis.2d 408, 147 N.W.2d 633, 646 (1967).

56. *Kansas City Millwright*, 562 P.2d at 74 (ordering refund of all taxes received after date of decision).

57. *Rio Algom Corp. v. San Juan County*, 681 P.2d 184, 196 (Utah 1984) (requiring a refund to six plaintiff taxpayers to avoid issuing an advisory opinion and to give the plaintiffs "the fruits of their victory."); *Strickland*, 258 S.E.2d at 134; *Kansas City Millwright*, 562 P.2d at 74.

58. *Forward v. Webster Cent. Sch. Dist.*, 133 Misc.2d 480, 506 N.Y.S.2d 528, 532 (1986) (noting that other plaintiffs would be allowed recovery because they commenced their action prior to the tax levy and preserved their right to a

refund); *Osterndorf v. Turner*, 426 So.2d 539, 545 (Fla.1982) (retroactive application "for those taxpayers who have timely judicially challenged" the tax); *Kansas City Millwright*, 562 P.2d at 74 (allowing relief to anyone who paid under protest and with an action pending). *See also Hurd v. City of Buffalo*, 41 A.D.2d 402, 343 N.Y.S.2d 950, 954 (1973) (leaving open the possibility of recovery of taxes paid under protest); *Perkins v. County of Albemarle*, 214 Va. 416, 200 S.E.2d 566, 569 (1973) (explicitly leaving open the ability of any taxpayer to seek a refund).

59. *Forward*, 506 N.Y.S.2d at 532 (a refund is allowed where the action is brought prior to the tax levy); *Salorio v. Glaser*, 93 N.J. 447, 461 A.2d 1100, 1110, *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983) (no one challenged the tax until fifteen years after its inception).

60. *Salorio*, 461 A.2d at 1110 (tax had been collected for twenty years); *Soo Line R.R. Co. v. State*, 286 N.W.2d 459, 465 (N.D.1979) (tax had been collected from 1974–76).

61. *Bond v. Burrows*, 103 Wash.2d 153, 690 P.2d 1168, 1174 (1984); *Strickland*, 258 S.E.2d 132, 134 (both sales tax cases).

announced. Richard H. Fallon, Jr. & Daniel J. Meltzer, *New Law, Non–Retroactivity, and Constitutional Remedies*, 104 Harv.L.Rev. 1733, 1794 (1991) (hereinafter Fallon & Meltzer).

When the Legislature follows established precedent which is later overruled, the first part of the *Chevron Oil* test is met. *American Trucking*, 110 S.Ct. at 2326, 2334. The logic behind this rule is again a respect for *stare decisis:* announcements of law should be adhered to except where that law is so new and unpredictable that its application would be unjust. To warrant prospectivity, a new rule of law must be downright "revolutionary." *Ashland Oil, Inc. v. Caryl,* 497 U.S. 916, 110 S.Ct. 3202, 3205, 111 L.Ed.2d 734 (1990) (per curiam). *See also* Fallon & Meltzer at 1755 (concluding that under *American Trucking,* "a rule of law [is] sufficiently new to trigger nonretroactivity analysis only when it marks a 'clear break' with settled authority."). The rulings of the United States Supreme Court indicate that this is particularly true in the tax context. *See id.* at 1831.

But today's opinion claims that the law is and always has been that a tax of the sort imposed by Senate Bill 351 is unconstitutional, and denies any contrary holding in *Edgewood II–.* This assertion is completely inconsistent with meeting the *Chevron Oil* test. Under its own theory, the court neither overturns any precedent nor establishes any remotely new rule of law. The majority is thus trapped in an internal inconsistency. Their concession that the Legislature acted "in good faith," Op. at 493, assumes a legislative belief in the constitutionality of Senate Bill 351. Yet the majority also argues that Senate Bill 351 is unquestionably unconstitutional, and goes to great pains to note that the Legislature was aware of the problems with tax base consolidation before it enacted Senate Bill 351, as evidenced in the comments of the chairman of the conference committee. *Id.* at 513. While claiming that "today's opinion involves issues of first impression," *id.* at 520, the majority unhesitatingly concludes that the type of tax enacted in Senate Bill 351 is undoubtedly illegal, in part because enacted without the voter approval "obviously contemplated" by the writing in *Edgewood II–. Id.* at 512 & 520 n. 37. How could the Legislature have acted in good faith in adopting a law which is so obviously illegal?[62] Certainly, under the majority's own theory, it should have been clearly foreshadowed that Senate Bill 351 was unconstitutional. When there has been no truly new declaration of law and a holding is predictable, neither the first prong of the *Chevron Oil* test nor the standards established by this court in *Wessely* and *Reagan* can be met.[63] To deny the taxpayer's claims, today's decision would have to be not only a case of first impression, but also one whose result was not even remotely foreseeable. *See Ashland Oil,* 110 S.Ct. at 3205. Only by contradicting itself can the majority attempt to justify the unjustifiable refusal of relief to the taxpayers in this case.[64]

**62.** If, in the alternative, the question of the constitutionality of Senate Bill 351 is an extremely close one, the majority has failed to presume the constitutionality of a statute and to rely on an available interpretation that upholds that constitutionality. *See supra* Section IV.

**63.** The majority does not deign to respond to the dissent on this critical point. Instead, they accuse the dissent of being "logically inconsistent" for arguing that the majority misled the Legislature and yet *Chevron Oil's* first requirement is not met. Op. at 520 n. 37. It is my position that the majority entrapped the Legislature, and that the majority has no valid basis for declaring Senate Bill 351 unconstitutional. Once they improperly do so, however, they are bound by Texas law to apply their rule retroactively under

their own theory of this case. Shifting the onus of inconsistency will not let the majority escape their own. The majority's contorted explanation of the dissent's flawed "fallacy of the excluded middle," *id.,* is simply another attempt to shift the issues away from the tax in question today. It is ironic that the majority shows this sudden professed concern for a "middle" position between extremes when they rush today past any point of moderation to reach the conclusion that Senate Bill 351 is unquestionably unconstitutional.

**64.** Compare today's opinion, which denies that *Edgewood II–* may have misled the Legislature, with Justice Mauzy's opinion in *Huston v. FDIC,* 800 S.W.2d 845, 849 (Tex.1990) (holding that a rule would apply prospectively "because liti-

It is impossible to square today's approach with that undertaken by this court only weeks ago in *Caller–Times Publishing Co. v. Triad Communications, Inc.*, 35 Tex.Sup.Ct.J. 114 (Tex. Nov. 13, 1991).* That case represented this court's first interpretation of the Texas Free Enterprise and Antitrust Act of 1983. Tex.Bus. & Com.Code §§ 15.01–15.51. Despite acknowledging that "this [was] a case of "first impression" in Texas," the majority applied its new rule of law purely retroactively, even denying a remand to retry the case under a newly announced standard, because its decision allegedly did "not reflect an unpredictable change in the law." This was so even though the exact form and even much of the content of the new standard had never been applied before by any state or federal court. *See id.* at 601 (Doggett, J., dissenting).[65] If the unlikely outcome of that case of first impression could be predictable, certainly today's decision, which is purported to be an obvious application of the State Constitution, is also predictable. The only way to rectify these two cases is in their identical result: relief was denied in both cases to the parties seeking relief.

Now the majority tells us that despite our crystal clear writing in *Edgewood II–*, and the supposedly well-established law of *Love v. City of Dallas*, the rule was a little unsettled—that despite the alleged determination of the Legislature to flout this court, these misguided officials must have been acting in "good faith." The majority

is willing to use any magic words to create the impression that it need not now apply a decision that is solely the product of its own misdeed. Because today's opinion insists that the Legislature should have known that Senate Bill 351 would be unconstitutional, the holding should, under Texas law, be applied retroactively.

In addition to these "first prong" problems, there is a deficiency regarding the second requirement of *Chevron Oil*, that the purpose of the constitutional provision involved be retarded by retroactivity. *Chevron Oil*, 404 U.S. at 106–07, 92 S.Ct. at 355–56. The majority first attempts to escape this part of the test by citing non-Texas cases which have put more stress on the first and third prerequisites. Op. at 519 n. 36. But this second prerequisite cannot so easily be wished away, as seemingly conceded by the majority's hurried attempt to show its satisfaction:

> There is no need to attempt a detailed analysis of all the purposes served by the constitutional provisions at issue here.... Suffice it to say that the effect of a retroactive application of our decision ... could not further any purpose of the Constitution.

*Id.* at 520–521. Because, as the court emphasizes, the Constitution facially prohibits the type of statute embodied by Senate Bill 351, the purpose of the relevant constitutional provisions is arguably absolute: such a tax, collected through CEDs and without a vote, is always void. This unequivocal constitutional prohibition is retarded by not

---

gants and trial courts have understandably misconstrued the somewhat cryptic holdings of the cases relied upon herein."). *See also Jacobs v. Lexington–Fayette Urban City Govt.*, 560 S.W.2d 10, 14 (Ky.1978).

\* Editor's Note—The court's original opinion, filed November 13, 1991 was ordered withdrawn on motion for rehearing February 26, 1992; see 826 S.W.2d 576. Justice Doggett did not withdraw his November 13, 1991 dissenting opinion; it is published preceding his dissent on motion for rehearing at 603.

**65.** The majority contends that "[a]lthough this issue [in *Caller–Times*] was one of first impression for us," it was not necessary to remand the case because they "were not writing on a clean state," the issue had been "addressed by dozens of courts and commentators," and the state antitrust statute allows harmonization with federal

law. Op. at 520 n. 37. Aside from the fact that no federal court had ever adopted the test this court threw together, surely the majority does not contend that the presence of commentary both for and against a position is enough to signal the adoption of that position. Even if that were true, today's ruling would apply retroactively because, as the sources cited both by the majority and the dissent indicate, the questions raised today have been previously discussed. Furthermore, it is necessary once again to correct the majority's misreading of the state antitrust law. While harmonization with federal law is permissible, it is precluded when that federal law is contrary to the purpose of the Texas legislation. *See Caller–Times*, 826 S.W.2d at 595 (Doggett, J., dissenting). The majority has not indicated a true distinction, rather it has demonstrated its error in each of these cases.

applying it to all cases at all times—there is no "King's X" from the command of the constitution.[66] Since the thrust of the majority's holding is that the tax is unconstitutional, *that* holding is clearly retarded by not allowing a tax refund. *See Wessely*, 736 S.W.2d at 628 (the second question is "whether retroactive application will ... retard the *holding in question*.") (emphasis added).

The court is willing to brush aside the law so that it may play with the more malleable concept of equity. It must alter state law because today's action is unprecedented. Likewise, it must qualify and in part ignore the *Chevron Oil* test because the facts before it cannot be shaped to meet that test. Instead, it shapes the test to fit the facts by rushing past the first two prongs in order to reach the third, which allows consideration of equity. *Chevron Oil*, 404 U.S. at 107, 92 S.Ct. at 355–56.

In balancing equities, however, the court examines only half of the equation when the payment of taxes is the issue. While a refund of already collected taxes may be harsh, the competing inequity is compelling taxpayers to pay an unlawful tax. It is difficult to see inequity in "ordering that the State not pick a taxpayer's pocket" or in requiring the State to "return the money when it is caught doing so." *Swanson v. State*, 329 N.C. 576, 407 S.E.2d 791, 797 (Mitchell, J., dissenting). Indeed, one state court recently ruled that "[i]f inequitable results occur whether retroactivity is applied or not, we must make the ruling retroactive," and on that basis mandated a tax refund. *Pledger v. Bosnick*, 306 Ark. 45, 811 S.W.2d 286, 293 (1991), *petition for certiorari filed*, 60 U.S.L.W. 3173 (U.S. Sept. 3, 1991) (No. 91–375). The true na-

ture of prospective rulings in the tax context is perhaps accidentally described with some accuracy by the majority itself:

> By applying our decision prospectively, we allow the collection of a tax without voter approval, in derogation of this constitutional provision [article VII, section 3]. We also allow a levy of a state ad valorem tax in violation of article VIII, section 1–e.

Op. at 520.

In an attempt to justify the lack of remedy under today's decision, the majority engages in a hasty analysis of the doctrine of non-retroactivity that combines omission with mischaracterization of the great debate currently raging on this subject in the United States Supreme Court.[67] In embracing *Great Northern Ry. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932), while disregarding or dismissing more recent federal caselaw, the court has again demonstrated that it prefers law of the Great Depression era which has been substantially refined, modified or even rejected, over current caselaw when that ancient precedent is useful to its preconceived ends. *See Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1, 12–13 (Tex.1991) (Doggett, J., dissenting) (discussing the court's reviving a precedent from 1935 that had been overturned by a 1984 decision).

While providing limited approval for prospectivity[68] as determined by the states, *see Chevron Oil*, 404 U.S. at 364, 92 S.Ct. at 484, *Sunburst* is hardly the stopping point for analysis of this issue. *Chevron Oil* established a restrictive test for nonretroactivity which provided the basis for this court's prior consideration of the three prerequisites for prospectivity. *See Wessely*, 736 S.W.2d at 628–29; *Seg-*

---

**66.** "[T]he constitution is the constitution all the time and should be enforced all the time and we shouldn't say King's X because it is inconvenient." Transcription of Oral Argument (Nov. 19, 1991) (Response by R. James George to question from Justice Gonzalez).

**67.** This debate has in fact gone on for decades. *See* Francis X. Beytagh, *Ten Years of Non-Re-*

*troactivity: A Critique and a Proposal*, 61 Va. L.Rev. 1557, 1570–96 (1975).

**68.** Full *Sunburst* nonretroactivity is not automatically applied in all cases. *See generally* Walter V. Schaefer, *The Control of "Sunbursts": Techniques of Prospective Overruling*, 42 N.Y.U.L.Rev. 631 (1967) (discussing variations in application of *Sunburst* prospectivity); *Limitation of Judicial Decisions* at 613.

*rest,* 649 S.W.2d at 612. Moreover, *Sunburst*'s allowance of prospectivity provides only an *exception* to the general rule of retroactivity. The presumption remains that an unconstitutional statute may not be enforced at any time. *See James B. Beam Distilling Co. v. Georgia,* — U.S. —, 111 S.Ct. 2439, 2442–43, 115 L.Ed.2d 481 (1991) (Souter, J., plurality opinion); *id.* 111 S.Ct. at 2448 (White, J., concurring); *id.* 111 S.Ct. at 2449–50 (Blackmun, J., concurring).

Since the limitation of *Sunburst* in *Chevron Oil,* the United States Supreme Court has more recently readdressed the issue of prospective application of laws. A number of Justices on the high court appear to have returned to the concept that unconstitutional laws are void, prohibiting the prospective application of a holding of unconstitutionality. *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco,* 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), involved review of the Florida Supreme Court's holding unconstitutional a state tax giving preference to in-state manufacturers using local produce, while denying the taxpayers any postpayment remedy. Rejecting the same argument urged today, that requiring the state to remedy the collection of unconstitutional taxes "would plainly cause serious economic and administrative dislocation for the State," the United States Supreme Court reversed and remanded on due process grounds because *"the State's interest in financial stability does not justify a refusal to provide relief."* *Id.* 110 S.Ct. at 2257 (emphasis added). While allowing consideration of the Legislature's good faith in enacting a tax, the court rejected the Florida Supreme Court's reliance on "equitable considerations" as overriding constitutional rights. *Id.* at 2251.[69] After *McKesson,* "equitable considerations are of limited significance once a constitutional violation is found." *American Trucking,* 110 S.Ct. at 2334.[70]

Most recently, in 1991 several members of the Supreme Court continued their attack on the prospective application of law in *James B. Beam Distilling Co. v. Georgia,* 111 S.Ct. 2439, and may have further limited the deference to equity acknowledged in *Chevron Oil.*[71] The possible shift

---

**69.** The entirety of the majority's response to the grave concerns raised by *McKesson* is that the issue in that case "was not retroactivity but the failure of Florida to follow [U.S. Supreme] Court precedent in fashioning its tax laws." Op. at n. 33. The only support cited for this conclusion is the plurality opinion in *American Trucking* that *McKesson* did not "consider the equities of *retroactive* application of a new law." *Id.* As usual, the majority stops reading a page too soon. In the same paragraph, continued on the next page, the plurality clarifies what it is that they are concerned with: *"At this initial stage,* the question is not whether equitable considerations outweigh the obligation to provide relief for a constitutional violation," but whether such a violation exists. *American Trucking,* 110 S.Ct. at 2333 (emphasis added). To the extent that these four members of the Court may have been attempting to distinguish remedy from retroactivity, it may be enough to note, as has one commentator, that "[i]n reality ... although these retroactive and remedy determinations well may be distinct, their close interrelationship is obvious in each case." *Retroactivity* at 297. In the end, it matters little whether *McKesson* is classified as about prospectivity, remedies, or due process—its mandate cannot be ignored.

**70.** In *American Trucking,* a plurality opinion decided the same day as *McKesson,* four Justices straightforwardly applied the *Chevron Oil* test.

*See* 110 S.Ct. at 2325. The dissent, however, written by Justice Stevens and joined by Justices Brennan, Marshall and Blackmun, took the position that: "Petitioners are entitled to an adjudication of the constitutionality of the [state tax statute] under our best *current* understanding of federal law regardless of the good faith of the [state] legislators." *Id.* at 2346. Most significantly, Justice Scalia, the swing vote, although concurring with the result of the plurality, agreed with the dissent's rejection of prospectivity. He announced that "prospective decision-making" is *always* impermissible. *Id.* at 2343. This opinion thus seems to reflect five votes for the position that a declaration of unconstitutionality should always be applied retroactively. *See Retroactivity* at 298. Indeed, in *Ashland Oil, Inc. v. Caryl,* — U.S. —, 110 S.Ct. 3202, 111 L.Ed.2d 734 (1990) (per curiam), the Court concluded that a state supreme court decision which prospectively held a tax statute unconstitutional necessarily had to be reversed under *either* the dissent or the plurality in *American Trucking. Id.* 110 S.Ct. at 3204.

**71.** The court denies that *James B. Beam* has any real impact because of its limited holding. It is actually impossible to conclude exactly what *James B. Beam* did to *Chevron Oil* other than to note the continuing chaos in this area of U.S. Supreme Court jurisdiction. In this plurality opinion, Justice Souter was joined by Justice

on that Court towards a rejection of prospectivity,[72] and its recent interest in this issue increases the possibility of federal examination of today's decision. In the end, it is "difficult to predict" how the United States Supreme Court's recent writings on the subject will be interpreted and applied "given the many options [it has] provided...." James M. Ervin & Katherine E. Giddings, *The Supreme Court Distinguishes Remedy and Retroactivity Issues Affecting State Taxes*, 73 J. Tax'n 296, 297 (Nov.1990) (hereinafter *Retroactivity*). I offer no "prognosis," Op. at 518 n. 33, because no certain outcome exists. While I agree that the federal courts have been unpredictable in this area that is no excuse for the majority's willingness to throw us carelessly into the great unknown.

Curiously, after focusing solely on selective federal law, the majority concludes that a federal court will not review a decision reached on state grounds. This position is startling, considering that the signatory of today's opinion, Justice Gonzalez, only a few weeks ago described the federal judiciary as "a 1000–pound gorilla" which "need[s] no excuse [for] what it may do in the future." *Terrazas v. Ramirez*, 829

S.W.2d at 712, 756 (Tex.1992) (Gonzalez, J., concurring on motion for leave to file motion for rehearing). What is certain is that by disregarding the recent pronouncement of *McKesson* that a state's view of equity cannot overcome a taxpayer's due process rights, today's writing presents a serious federal due process problem. As expressed by the nation's high court:

> Our precedents establish that if a State penalizes taxpayers for failure to remit their taxes in a timely fashion, thus requiring them to pay first and obtain review of the tax's validity later in a refund action, the Due Process Clause *requires* the State to afford taxpayers a *meaningful opportunity* to secure postpayment relief for taxes already paid pursuant to a tax scheme ultimately found unconstitutional.

*McKesson*, 110 S.Ct. at 2242 (emphasis added). Due process is implicated because "exaction of a tax constitutes deprivation of property." *Id.* at 2250. *See also American Trucking*, 110 S.Ct. at 2339. Not surprisingly, many state courts which have considered the issue of retroactivity after *McKesson* have required retroactivity with a tax refund.[73]

Stevens; Justice White concurred in the judgment; Justice Blackmun wrote a concurrence which Justices Marshall and Scalia joined expressing a view in favor of retroactivity in all cases; Justice Scalia, joined by Justices Marshall and Blackmun, concurred; and Justice O'Connor, joined by Justices Rehnquist and Kennedy, dissented. The six Justices not dissenting agreed only on a retroactive application in that case. One observer has gone as far as saying that *James B. Beam* may actually have abandoned the *Chevron Oil* test altogether. *Swanson v. North Carolina*, 329 N.C. 576, 407 S.E.2d 791, 797 (1991) (Mitchell, J., dissenting). Justice Souter criticized the cases on which the court today relies, including *Chevron Oil* and *Lemon v. Kurtzman*, 411 U.S. 192, 198, 93 S.Ct. 1463, 1468, 36 L.Ed.2d 151 (1973), for applying rulings prospectively in light of equitable considerations. *James Beam*, 111 S.Ct. at 2444. He wrote that "this equitable method has its own drawback: it tends to relax the force of precedent, by minimizing the costs of overruling, and thereby allows the courts to act with a freedom comparable to that of the legislatures." *Id.*

**72.** *See also Ashland Oil*, 110 S.Ct. at 3205 (reversing a state court decision which allowed

prospective application of a tax ruling); *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 817, 109 S.Ct. 1500, 1508–1509, 103 L.Ed.2d 891 (1989) (noting the appropriateness of retroactivity to the extent of allowing a tax refund under the circumstances of that case).

**73.** *E.g., Automobile Trade Ass'n v. City of Philadelphia*, 528 Pa. 233, 596 A.2d 794 (1991) (remanding case to appellate court because of failure to consider and meet due process concerns of *McKesson*); *Pledger v. Bosnick*, 306 Ark. 45, 811 S.W.2d 286, 293 (1991), *petition for certiorari filed*, 60 U.S.L.W. 3173 (U.S. Sept. 3, 1991) (No. 91–375) (requiring a tax refund because inequity of denying the refund overrides third prong of *Chevron*); *Bohn v. Waddell*, 167 Ariz. 344, 348, 807 P.2d 1, 5 (1991) (allowing partial refund); *Private Truck Council*, 806 P.2d 598 (allowing refund retroactively to date of U.S. Supreme Court opinion on which unconstitutionality of tax statute is based). Citing two cases which did allow a purely prospective decision to stand, the majority makes the erroneous claim that these alone are "the most recent" precedent. Op. at 519. *Swanson v. State*, 329 N.C. 576, 407 S.E.2d 791 (1991), *on rehearing*, 330 N.C. 390, 410 S.E.2d 490 (1991), was written

Under today's opinion, there can be no meaningful opportunity to contest the state's collection of illegal taxes and its failure to refund those taxes. In Texas, the necessary remedy simply doesn't exist: section 31.11 of the Tax Code allows a refund to be sought only when payment is made by mistake, such as an erroneous calculation by the taxpayer. *See First Bank v. Deer Park Indep. Sch. Dist.*, 770 S.W.2d 849, 853 (Tex.App.—Texarkana 1989, writ denied). Because no genuine relief is available, the court's result appears to violate the Fifth Amendment mandate that there be some "clear and certain remedy" to cure the unlawful tax collection. *See McKesson*, 110 S.Ct. at 2251. Under both federal and state law, the ability to obtain some real remedy is necessary to meet due process concerns. *See Shaw v. Phillips Crane & Rigging, Inc.*, 636 S.W.2d 186, 188 (Tex.1982) (noting the constitutional protection of a taxpayer's ability to enjoin collection of an unlawful or erroneous tax). *McKesson* indicates that foreclosing the possibility of a refund for unlawfully collected taxes presents a very real due process problem. *See* Case Comment, *Unconstitutional State Taxes—Federal Standards for Remedies in State Courts*, 104 Harv.L.Rev. 188, 190 (1990) (hereinafter *Unconstitutional State Taxes*); *Retroactivity* at 298. The good faith of our Legislature and the "serious economic and administrative dislocation for the State" simply cannot outweigh constitutional due process rights. *McKesson*, 110 S.Ct. at 2257; *see Unconstitutional State Taxes* at 195–96.

The majority, ignoring these due process considerations, suggest only that because of language in *Sunburst*, there is no federal constitutional question raised. Op. at 516–517. While that 1932 case does not indicate that states have the final authority to determine prospectivity, the states are not free to apply their decisions so as to deprive citizens of their federal rights. State action, even in areas preserved for state concern, is still subject to constitutional limitations. Perhaps the most notable example is *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), which stated that "education is perhaps the most important function of state and local governments," *id.* at 493, 74 S.Ct. at 691, and then nonetheless concluded that discriminatory state educational policies had violated the equal protection clause of the Fourteenth Amendment. *Id.* at 495, 74 S.Ct. at 692.

Similarly, the Supreme Court, although noting the constitutional delegation of authority to the states in controlling the election process for state office, held that "this authority does not extinguish the State's responsibility to observe the limits" set forth in the Constitution. *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986) (considering the First Amendment). And in Texas, of course, with the generous assistance of a majority of this court, the federal courts recently reaffirmed control over state elections in overturning a legislatively approved redistricting plan. *Terrazas v. Slagle*, 789 F.Supp. 828 (W.D.Tex. 1991), *application for stay denied*, *Richards v. Terrazas*, —— U.S. ——, 112 S.Ct. 924, 116 L.Ed.2d 924 (1992).

*Sunburst* indicates only that a state may make the initial decision of how to apply its laws. *See* 287 U.S. at 364, 53 S.Ct. at 148. That case was decided before the modern process of incorporating through the Fourteenth Amendment the liberty guarantees contained in the Bill of Rights to action taken by the states. *See* Beytagh at 1611. *Sunburst* was also decided well before the U.S. Supreme Court spelled out the requirements of pre- and post-deprivation procedural due process in such landmark cases as *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84

with a strident three-judge dissent, and gave *McKesson* even less consideration than does the majority today. Likewise, *Stroh Brewery Co. v. Department of Alcoholic Beverages Control*, 112 N.M. 468, 816 P.2d 1090 (1991), *petition for certiorari filed*, —— U.S.L.W. —— (Dec. 12,

1991), with its own lengthy two-judge dissent, failed to even mention *McKesson*. The Supreme Court will soon have an opportunity to address the approaches taken by these courts in light of the petitions for certiorari which have been filed.

L.Ed.2d 494 (1985), and *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).[74] *Sunburst* simply did not involve consideration of when a state's decision could violate federal due process rights. Forced to choose between law from 1932 and that which has evolved over the past several decades, the United States Supreme Court, unlike this one, may well choose the more recent precedent.[75] The majority simply fails to consider realistically the ramifications of its prospective ruling.

Under the majority's antiquated reading of federal law, due process protection never becomes an issue when a state court applies its own law. In essence, the majority is arguing that the Due Process Clause of the United States Constitution does not and cannot apply to the states when the underlying issue is one of state or local concern. Quite aside from its regressive posture, this position conflicts with *McKesson*'s unequivocal mandate of a "clear and certain remedy" when a state tax is collected illegally. *See Retroactivity* at 302.

The majority invites federal intrusion. It is clear that "[t]here will be ... inevitable appeals resulting ultimately in further guidance from the Supreme Court" in this area of the law. *Retroactivity* at 302. Unfortunately, the majority has created the possibility that those appeals will come from Texas. The same due process problems exist, of course, under our State Constitution. *See* Tex. Const. art. 1, § 19.

As a result of this court's lack of concern for real due process protection, an aggrieved taxpayer can turn to a federal judge to seek an injunction against the eventual application of this court's ruling. While eager to borrow federal law on prospectivity facilitating its erroneous conclusion, the court rejects federal due process principles that interfere with that conclusion. The result of this selective acceptance and rejection of federal law may doom this state to further complicated and prolonged litigation in federal court and the possibility of reversal by the U.S. Supreme Court. That Court can certainly review our opinion where deprivation of a federal right is involved. *See McKesson*, 110 S.Ct. at 2245 n. 9; *see also Unconstitutional State Taxes* at 188, 190. Our reliance on the Texas Constitution will not preclude such review. *See Retroactivity* at 298. The simple fact is that *McKesson*'s language clearly indicates an intent to prohibit all unconstitutional deprivations resulting from imposition of an illegal tax without remedy.

While the court implies that its only desire is to avoid chaos, one can only imagine the chaos resulting if *Edgewood III* were remanded by the U.S. Supreme Court in the same year that the inevitable *Edgewood IV* makes its way through our state courts.

## VI. Response to Justice Cornyn's Opinion

In a most misleading concurring and dissenting opinion, Justice Cornyn rejects the commitment to equal educational opportunity to which this court unanimously subscribed in *Edgewood I.* This is the same principle to which even the opponents of school finance reform have acceded. It is the same principle for which today's majority continues to demonstrate at least a tepid

---

**74.** The position that federal courts may review state courts for due process violations is not, however, entirely new. Indeed, writing over half a century ago, one scholar explained that:

The federal courts may ... enjoin the collection of state taxes.... [i]f no refund law is applicable, and even if one is applicable, it must be adequate.... States wishing to avoid the interference of federal injunction in the state tax field must, therefore, provide a really adequate system of tax refunds or recovery. Oliver P. Field, *The Effect of an Unconstitutional Statute* 243 (1935, reprinted in 1971) (citations omitted). In fact, the federal courts have required a remedy in tax cases above and beyond

that required in other constitutional litigation. Fallon & Meltzer at 1826.

**75.** The majority misses the point in concluding that "forc[ing] taxpayers to pay an illegal tax" is not a "violation of their due process rights under the federal constitution" because its decision "is prospective only." Op. at 521 n. 38. Certainly *Sunburst* sixty years ago left the initial consideration of whether to apply law prospectively to the states. Whether it may do so without allowing the taxpayers to seek a refund is a separate and distinct due process question affected by the Supreme Court's writing of two years ago in *McKesson.*

commitment. In contrast with its sharp response to my dissent, the majority offers only deafening silence to Justice Cornyn's bold adventure in revisionism of this court's unanimous writing in *Edgewood I.* Accordingly, it is vital to provide a comprehensive analysis of this writing.

Justice Cornyn's search "to discern how 'equality of funding' took center stage in this drama," Op. at 528, leads him down a trail of criticism of Judges Harley Clark and Scott McCown, the district judges in the *Edgewood* cases. That criticism is more appropriately leveled at the other eight members of the Texas Supreme Court. Judge McCown is condemned for daring to suggest that Texas children have a constitutional right to "a substantially equal opportunity to have access to educational funds." *Id.* at 497 (quoting McCown Slip. Op. at 8–9). These are not words Judge McCown originated. He may quote, but we wrote. Justice Cornyn is only citing the precise words of this court's holding in *Edgewood I:*

Children who live in poor districts and children who live in rich districts must be afforded a substantially equal opportunity to have access to educational funds.

777 S.W.2d at 397. Indeed, this precise language is quoted from *Edgewood I* by the majority today "to reaffirm our earlier holdings." Op. at 497, 493.

There is absolutely nothing "unfortunate" concerning this court's "word choice" in *Edgewood I,* nor was "occasion[al] use of equal rights terminology" a mere accident in that opinion. Op. at 529. The concept of equality permeates the entire opinion; we "recognized the implicit link that the Texas Constitution establishes between efficiency and equality." *Edgewood I,* 777

S.W.2d at 397.[76] True, we used the term "substantially" to modify equal opportunity in recognition that opportunity could never be absolutely or precisely equal. Indeed, some of those challenging the existing system acknowledged this rather obvious fact during oral argument in *Edgewood I.*[77] Likewise we recognized in 1989 "the reality" of differing costs among diverse districts that Justice Cornyn has discovered today:

This does not mean that the state may not recognize differences in area costs or in costs associated with providing an *equalized educational opportunity* to atypical students or disadvantaged students.

*Edgewood I,* 777 S.W.2d at 398 (emphasis added).

While resolution of that case under the " 'efficiency' provision [made unnecessary our] consider[ation of] petitioners' other constitutional arguments," 777 S.W.2d at 398, the seemingly narrowed basis for the *Edgewood I* opinion was of far less significance than suggested by Justice Cornyn. This is because the court "recognized the implicit link that the Texas Constitution establishes between efficiency and equality." *Id.* at 397. In no way did a majority of this court then or since then either approve or disapprove Judge Harley Clark's conclusions of law concerning equal protection and equal rights deprivation. Nor is that question presented in the instant appeal. Justice Cornyn's odd footnote, Op. at 529 n. 8, indicating that that the trial court's adherence to this court's decision in *Edgewood I* decides the equal protection challenge to every funding issue from education to abortion only provides an indication of his own prejudgment of those mat-

---

**76.** *See Edgewood I,* 777 S.W.2d at 397 ("[D]istricts must have substantially equal access to similar revenues per pupil at similar levels of tax effort.... Children who live in poor districts and children who live in rich districts must be afforded a substantially equal opportunity to have access to educational funds."); *id.* at 397–98 ("[E]qualizing educational opportunity cannot be relegated to an 'if funds are left over' basis."); *id.* at 398 ("An efficient system ... requires only that the funds available for education be distributed equitably and evenly.").

*See also Edgewood II,* 804 S.W.2d at 496 ("Even if the approach of Senate Bill 1 produces a more equitable utilization of state educational dollars, it does not remedy the major causes of the wide opportunity gaps between rich and poor districts."); *id.* (criticizing Senate Bill 1 for "mak[ing] no attempt to equalize access to funds among all districts.").

**77.** *See* Transcription of Oral Argument in *Edgewood I* (July 5, 1989) (Responses of Richard E. Gray to questions from Justice Spears).

ters. The only "fundamental right" central to today's debate is his fundamental right to ignore our unanimous writing on equal educational opportunity. He has fundamentally exercised this right with enthusiasm.

"It's money that matters in the USA"— so the popular verse goes.[78] But Justice Cornyn says not to worry so much about money in education, because some educational experts have concluded that it does not have a substantial impact. Justice Cornyn makes highly selective use of the comment from *Abbott v. Burke,* 119 N.J. 287, 575 A.2d 359, 404 (1990), that "beyond doubt ... money alone has not worked." Op. at 527. Nonetheless, that court ordered new legislation "to assure that poorer urban districts' educational funding is substantially equal to that of property-rich districts." 575 A.2d at 408. Despite development of an extensive record debating whether money constituted a critical factor in the quality of education, the New Jersey Supreme Court concluded:

> Money can make a difference if effectively used, it can provide the students with an equal educational opportunity, a chance to succeed. They are entitled to that chance, constitutionally entitled. They have the right to the same educational opportunity that money buys for others.

> \* \* \* \* \* \*

> These children are ... entitled to a fair chance in the form of a greater equality of funding. They have already waited too long for a remedy, one that will give them the same level of opportunity, the same chance, as their colleagues who are lucky enough to be born in a rich suburban district.

> \* \* \* \* \* \*

We ... adhere to the conventional wisdom that money is one of the many factors that counts.

*Id.* at 363, 405–06.

Justice Cornyn's true message to the poor districts is capsulized in a portion of the title of an article upon which he relies: "Don't Worry, Be Happy." [79] He attacks as a "major, unwarranted leap of faith" with "no citation of authority," Op. at 529–530, this court's unanimous determination that

> The amount of money spent on a student's education has a real and meaningful impact on the educational opportunity offered that student.

*Edgewood I,* 777 S.W.2d at 393. Unfortunately, he omits the all too real experience of thousands of students to which this court referred in support of its well-justified conclusion that:

> High-wealth districts are able to provide for their students broader educational experiences including more extensive curricula, more up-to-date technological equipment, better libraries and library personnel, teacher aides, counseling services, lower student-teacher ratios, better facilities, parental involvement programs, and dropout prevention programs. They are also better able to attract and retain experienced teachers and administrators.

> The differences in the quality of educational programs offered are dramatic. For example, San Elizario I.S.D. offers no foreign language, no pre-kindergarten program, no chemistry, no physics, no calculus, and no college preparatory or honors program.

*Id.*[80] Even school district experience cited by the majority in support of its position[81] is at variance with the view of Justice Cornyn.

**78.** Randy Newman, *It's Money That Matters, on* Land of Dreams (Reprise Records 1988).

**79.** Mark G. Yudof, *School Finance Reform: Don't Worry, Be Happy,* 10 Rev.Litig. 585 (1991). Interestingly, a thorough review of this article reveals the author does not share this elitist view but rather believes that Senate Bill 351 represents a realistic solution to school finance inequities.

**80.** *Accord Abbott v. Burke,* 575 A.2d at 395–97 (discussing disparities between rich and poor districts in the availability of equipment, such as computers and science laboratories, as well as differences in the extent of curricula offerings).

**81.** *See* Op. at 507 n. 24 (testimony correlating increase in tax base with educational results).

Although accompanied by an intimidating but misleading chart correlating spending on education with SAT scores, Op. at 533–535, the opinion engages in no analysis of its underlying data. Justice Cornyn ignores reservations of even its source that "[t]here are reasons ... for quibbling about these specific statistics for both achievement and spending," in no small part because of the debatable merit of measuring performance with SAT scores. Eric A. Hanushek, *When School Finance "Reform" May Not Be Good Policy*, 28 Harv.J. on Legis. 423, 428 (1991). Even Hanushek recognizes that when properly used, money can affect performance. *See id.* at 425, 442. Overlooked by Justice Cornyn, moreover, is the opening statement of the next article in the same publication that "it is simply indefensible to use the results of quantitative studies of the relationship between school resources and student achievement as a basis for concluding that additional funds cannot help public school districts," Richard J. Murnane, *Interpreting the Evidence on "Does Money Matter?"*, 28 Harv.J. on Legis. 457, 457 (1991), and its conclusion that "increased funding can improve the quality of public education." *Id.* at 488.

Considering this same argument "concerning the effect of spending variations on educational achievement," Justice Thurgood Marshall two decades ago provided the best answer:

> We sit ... not to resolve disputes over educational theory but to enforce our Constitution. It is an inescapable fact that if one district has more funds available per pupil than another district, the former will have greater choice in educational planning than will the latter.... [We must look] to what the State provides its children, not to what the children are able to do with what they receive. That a child forced to attend an underfunded school with poorer physical facilities, less experienced teachers, larger classes, and a narrower range of courses than a school with substantially more funds—and thus with greater choice in educational planning—may nevertheless excel is to the credit of the child, not the State. Indeed, who can ever measure for such a child the opportunities lost and the talents wasted for want of a broader, more enriched education?

\* \* \* \* \* \*

> Likewise, it is difficult to believe that if the children of Texas had a free choice, they would choose to be educated in districts with fewer resources, and hence with more antiquated plants, less experienced teachers and a less diversified curriculum. In fact, if financing variations are so insignificant to educational quality, it is difficult to understand why a number of our country's wealthiest school districts, which have no legal obligation to argue in support of the constitutionality of the Texas legislation, have nevertheless zealously pursued its cause before this Court.

*Rodriguez*, 411 U.S. at 83–85, 93 S.Ct. at 1322–23 (Marshall, J., dissenting) (citation and footnote omitted).[82]

Money is not the be all and end all in education.[83] But without equal access to funds, as mandated in *Edgewood I* and unanimously reaffirmed in *Edgewood II*, equal educational opportunity will never be achieved.

Next Justice Cornyn asserts more candidly the concern additionally underlying so much of the majority's writing—the bogeyman of "local control." We rejected that same claim in *Edgewood I*:

> Some have argued that reform in school finance will eliminate local control,

---

**82.** Justice Marshall went on to say that in light of the existing disparities proven by Demetrio Rodriquez and others, "the burden of proving that these disparities do not in fact affect the quality of children's education must fall upon [the wealthier school districts who oppose correcting the disparities]." *Id.* at 86, 93 S.Ct. at 1324.

**83.** We recognized this truism in *Edgewood II:*

> Nor do we suggest that an efficient funding system will, by itself, solve all of the many challenges facing public education in Texas today.

804 S.W.2d at 498.

but this argument has no merit. An efficient system does not preclude the ability of communities to exercise local control over the education of their children. It requires only that the funds available for education be distributed equitably and evenly. An efficient system will actually allow for more local control, not less. It will provide property-poor districts with economic alternatives that are not now available to them. Only if alternatives are indeed available can a community exercise the control of making choices.

777 S.W.2d at 398. Repackaging the same worn argument[84] has not improved its validity. Inequities in the current school finance system continue to deny too many school districts an opportunity to exercise meaningful local control. As one commentator has astutely noted:

If [a local school board] has very little money, it has almost no control; or rather it has only negative control. Its freedom is to choose which of the children's needs should be denied.

Jonathan Kozol, *Savage Inequalities* at 213. Rather than deny local authority, the effect of *Edgewood I* is for "each district to have the same flexibility, the same local control."[85]

Though money allegedly does not matter so much, Justice Cornyn's principle objective is to ensure the right of wealthy school districts to unlimited spending in the form of "local enrichment." Again *Edgewood I* recognized that a commitment to equal educational opportunity does not

mean that local communities would be precluded from supplementing an efficient system established by the legislature; however any local enrichment must derive *solely from local tax effort.*

777 S.W.2d at 398 (emphasis added).

While the majority tried desperately to weaken this commitment in *Edgewood II-*, even an attorney representing many of the districts challenging Senate Bill 351 conceded that unlimited local enrichment would produce the same type of disparities among districts that were rejected in *Edgewood I.*[86] Districts with ample wealth and unlimited enrichment capability have no incentive to encourage the State to fully fund a realistically adequate level of educational services.[87] That is why we insisted that enrichment "derive solely from local tax effort," *Edgewood I,* 777 S.W.2d at 398, not from the happenstance of a superior tax base.

Finally, Justice Cornyn tells us that the poor district plaintiffs in this case brought the wrong lawsuit. They should have com-

---

**84.** Indeed, this argument was long ago rejected as "a myth for many of the local school districts in Texas." *Rodriguez,* 411 U.S. at 129, 93 S.Ct. at 1346 (Marshall, J., dissenting). Justice Marshall recognized that "striking down interdistrict disparities in taxable local wealth, ... is most likely to make true local control over educational decisionmaking a reality for *all* Texas school districts." *Id.* at 130, 93 S.Ct. at 1346 (emphasis in original). He observed that unconstitutional inequities could be eliminated while "leav[ing] in local hands the entire gamut of local educational policymaking—teachers, curriculum, school sites, the whole process of allocating resources among alternative educational objectives." *Id.* at 131 n. 98, 93 S.Ct. at 1347 n. 98.

**85.** *See* Transcript of Oral Argument in *Edgewood I* (July 5, 1989) (Responses of Al Kaufman).

**86.** *See* Transcription of Oral Argument (Nov. 19, 1991) (Responses by R. James George to questions from Justice Gonzalez):

There is a constitutional prohibition against uncontrolled local supplementation.... [L]ocal supplement [cannot be allowed] to distort the equity that this court required in *Edgewood.* It cannot provide a system that allows this voluntary supplement to distort the equity that was the fundamental problem addressed in *Edgewood I.*

**87.** "To a real degree, what is considered 'adequate' or 'necessary' or 'sufficient' for the poor in Texas is determined by the rich or relatively rich; it is decided in accord with their opinion of what children of the poor are fitted to become, and what their social role should be. This role has always been equated with their usefulness to us; and this consideration seems to be at stake in almost all reflections on the matter of the 'minimal' foundation offered to schoolchildren, which, in a sense, is only a metaphor for 'minimal' existence." *Savage Inequalities* at 216 (quoting Professor O.Z. White of Trinity University).

plained about "outputs" not "inputs." Since he is not satisfied with the litigation presented for decision today, Justice Cornyn in an amazing display of judicial activism decides the case he thinks should have been presented. This is the natural progression of writing the type of improper advisory opinion upon which Justice Cornyn and his majority colleagues insisted in *Edgewood II-. See* 804 S.W.2d at 503 (Doggett, J. concurring) (regarding the danger of this court deciding a case without a pending appeal "solely on its own initiative").

It may eventually be necessary to consider "outputs" in evaluating the "efficiency" of the school finance system, but let us at least wait until the issue has been presented to a trial court. To preclude Justice Cornyn's writing from unduly prejudicing the public debate on the matter, I must note my personal concern that judicial involvement in measuring the "outputs" of the educational system is even more likely to produce prolonged judicial intrusion than the task on which we have already embarked. How strange that we should broaden the scope of this action beyond that asserted by the parties before we get resolved properly the issues they have raised.

If the true objective is to avoid "having yet another generation of school children [being] denied the benefits of their constitutional rights," Op. at 534, the solution will be found in less judicial doubletalk and more consistent application of the Constitution. While proclaiming concern for education with pleasant platitudes, this concurrence only serves as an obstacle to reform.

## VII. Any Glimmer of Hope?

Those on this court who have regularly supported altering the public's right to vote in the selection of judges have now rediscovered the sacred right of elections and proclaim, as if anyone argued otherwise, the axiom "that the votes cast by all persons, regardless of their circumstances,

count equally." Op. at 507. But all of this discussion, it turns out, is only a diversion.

The voters, of course, have already had an opportunity to vote once on section 3–b of article VII, and again regarding the tax authorization for their individual districts, but if an additional third vote would make the CEDs constitutional, the Legislature could promptly call for 188 local elections. Yes, this would require a special session and the waste of millions of tax dollars, but would even that step remove the majority's latest roadblock to reform? Apparently not; apparently the majority's new found interest in participatory democracy is an excuse, not a reason.

If the lack of a vote were the only obstacle, the election procedure could be structured to avoid the veto by the privileged of which the majority is so desirous.[88] Since the Legislature has the unquestioned authority to require complete consolidation of school districts, there is no reason that it could not provide for contingent consolidation. Theoretically, to accomplish complete control over the expenditure of locally-generated tax dollars, citizens in some areas might prefer complete consolidation. The Legislature could accord a choice: for any of the 188 CEDs whose voters have not approved tax base consolidation by a given date, complete consolidation of all school districts within the CED would be automatically accomplished. Such contingency legislation would differ little from previous enactments that were contingent upon the outcome of a vote on a constitutional amendment. *See, e.g.,* Tex.Rev.Civ.Stat. Ann. art. 6252–9d.1 (Vernon 1992) (concerning Texas Ethics Commission). This would assure that by the next academic year the school districts in every CED in the State would be merged either in whole or in part for tax base purposes.

The majority rejects this approach because it presents voters with only two choices—complete and partial consolidation. If these two choices sound familiar, they are: they represent the only choices

---

**88.** Certainly it is within the proper purview of a dissent to define the scope of a majority opinion, as I do here. Rather than attempting to

explain the contradiction central to its faulty analysis, the majority prefers to discount this discussion as "speculation." Op. at 524 n. 43.

approved by the majority in *Edgewood II-*.[89] Most revealing is the majority's conclusion that "voter approval alone would not avoid the obstacle presented by [the statewide property tax bar of] article VIII, section 1–e." Op. at 524 n. 43. Even if local CED elections were conducted, the statewide property tax prohibition would still preclude utilization of CEDs. Similarly, this constitutional bar would even prevent use of tax base consolidation under former Chapter 18 of the Education Code, referenced in the newly significant footnote 14 of *Edgewood II* to which the majority now so proudly points. The majority's writing is indicative of a Houdini-like attempt to escape the confines of its improper writing in *Edgewood II-*:

> Tax base consolidation and its possible problems were discussed simply as one alternative the Legislature might consider. We said only that it is possible to consolidate school district tax bases without violating the Constitution. In that very limited context, *we obviously contemplated tax authorization elections and said so. But we were not asked by any party to decide, and we did not hold that voter approval either would or would not be required....*

Op. at 520 n. 37 (emphasis added).[90] In truth the majority has no interest in more elections; it has lost its once zealous interest in tax base consolidation; it now prefers "choosing another path altogether." *Id.* at 503.

### VIII. Conclusion

Today's opinion concedes that Senate Bill 351 represents progress in securing a school finance system that would assure Texas students equal educational opportunity. This legislation works to diminish inequities, the majority must admit; it has "reduced the geographical disparities in the availability of revenue for education." Op. at 500.

Nevertheless, Senate Bill 351 is condemned for utilizing the very method of taxation which the majority contemplated in *Edgewood II-*. With this alternative eliminated, counsel for the Appellant school districts have recognized that the only broad-based revenue source remaining under the present Constitution is an income tax.[91] A further indication of the majority's determination to nudge the Legislature toward an income tax is the rather clear indication that any attempt to revise property tax financing must be charted through a judicial minefield, with no map provided.[92] Fully aware that its action today leaves only the option of an income tax as a major funding source, the majority then washes its hands of any personal responsibility for this result, effectively telling the Legislature: choose any method you desire excepting that which we last urged upon you. The majority is absolutely correct that "an income tax is not the only remedy," Op. at 524; rather it is the only remedy the majority has left available to the Legislature.

Finally the majority seeks one more bit of protective covering—it discovers "eliminating gross wastes in the bureaucratic administration of the [educational] system" as an alternative source of revenues for achieving efficiency. *Id.* at 524. Throughout *Edgewood I, Edgewood II,* and *Edgewood II-*, no record has been made in support of this claim. But that does not constrain the majority. It is good camouflage and bad law, as is the balance of the majority's writing.

What will happen after today is a prolonged battle timed to coincide with an election year. Moreover, as I concluded in *Edgewood II-*, "today's opinion ensures that this litigation which [seemed to] be finally nearing an end will go on indefinitely" because no one "can act with any assurance concerning what this court will do in the future." 804 S.W.2d at 506 (Doggett, J., concurring). Having entrapped the Leg-

---

**89.** *See supra* text following note 16.

**90.** Additionally, this convoluted statement is an admission that this court's opinion in *Edgewood II-* was advisory, since the majority "obviously contemplated" an issue which they were "not asked by any party to decide." Op. at 503.

**91.** *See* Transcript of Oral Argument (November 19, 1991) (Response by R. James George to questions from Justices Doggett and Mauzy and Response of Earl Luna to questions from Justice Gammage).

**92.** *See supra* text following note 37.

islature, they further invite Texas to be ensnared by the federal judiciary.[93]

The majority's remarkable willingness to abandon precedent so recently announced demonstrates not only disregard for the law and indifference to the taxpayer, but also abandonment of the children of this state. Our school children have long suffered from the failure of the school finance system. Today they suffer anew from the failure of the justice system to deliver on the promise of the Texas Constitution. The majority offers our children only delay, and they have already had plenty of that. A child who began the first grade when this cause was originally filed in state court is already in high school and will probably have graduated before any new finance plan becomes effective.

Frankly it takes the greatest audacity to cite delays in *Edgewood I* in 1989—delays which represented part of the price paid for unanimity at this court—as an excuse for having still more delay in 1992 in *Edgewood III.* In 1989, implementation of this court's ruling required cooperation from Governor William Clements. He had repeatedly voiced a dual response to the *Edgewood* litigation: castigate the messenger—any judge involved—and change the Constitution to lower the standard for the school system. Like other torchbearers of inequality, he urged a simple solution—what Texas needs is not greater equality of educational opportunity, but a weaker Constitution. To cope with this ardent opponent of reform, the court extended the period for a solution.

With more enlightened leadership thankfully in place at the time of *Edgewood II* and with a determination to avoid another disrupted school year, we limited the time for action to about two months. Moreover, we criticized the delay that the trial court had already permitted and declared that it had "clearly abused its discretion in refusing to enforce the mandate of this Court issued in *Edgewood I.*" *Edgewood II,* 804 S.W.2d at 498.

Today the majority offers more unjustified delay as an alternative to a solution.

After purposefully delaying release of this very opinion, the majority's suggestion that the Legislature move forward "without unnecessary delay," Op. at 524, rings hollow. The majority's vague pronouncements sound more like the Oracle at Delphi than a provider of justice. Its attempt to shift responsibility to the Governor to act more promptly is nothing but a diversion. The delay that will now ensue is attributable not only to the lengthy time frame provided for a legislative response, but in the unresolvable ambiguities created by today's opinion. If there was ever a case to prove the old maxim "justice delayed is justice denied," this is it.

It was for the benefit of our children that the Constitution commanded that education be efficient. It was for their benefit that Demetrio Rodriguez sought relief. It was for their benefit that we decided *Edgewood I* and *II.* But now, for the benefit of the privileged, the court turns a deaf ear both to the commanding voice of the law and to the whispered pleas of the children.

MAUZY, J., joins in this dissent.

---

**93.** This encouragement of intrusion by the federal judiciary echoes that most recently worked in *Terrazas v. Ramirez,* 829 S.W.2d 712 (Tex. 1991, orig. proceeding). *See supra* note 2.